UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-CV-22866-MORENO/HUNT

XTEC, Incorporated, a Florida corporation,

Plaintiff,

v.

CARDSMART TECHNOLOGIES, Incorporated, a New Jersey Corporation and DAVID FISHER, an Individual,

Defendants.
________________________________________/

**DEFENDANTS' MOTION *IN LIMINE* TO STRIKE THE EXPERT REPORT OF KEVIN KENNEDY ASSOCIATES AND TO BAR PLAINTIFF'S EXPERT TESTIMONY AT TRIAL AND SECURING ON THE RELIEF, WITH INCORPORATED MEMORANDUM OF LAW**

Defendants CARDSMART TECHNOLOGIES, INC. and DAVID FISHER (collectively, the "Defendants"), by and through their undersigned counsel, hereby submit this motion *in limine* to: (A) strike the expert report of Kevin Kennedy Associates (Jan P. Eiras -- author); (B) bar Plaintiff's expert from offering testimony at trial regarding misappropriation and other issues; and (C) grant Defendants such other relief as the Court may deem equitable and just.

***I. Scope of the motion***

In support of its causes of action against Defendants at trial, Plaintiff requires the opinion testimony of an expert witness. Plaintiff's causes of action against Defendants under Florida's Uniform Trade Secret At ("FUTSA")(Fla. Stat. 688.002) and Florida's Deception and Unfair Trade Practices At ("FDUTPA")(Fla. Sta. 501), Counts I and II of its complaint, rely heavily on expert testimony regarding the presence of, access to, use of and the alleged misappropriation of the alleged trade secrets. The trade secrets at issue, broadly relate to the source code of AuthentX, Enabler 1.0 and Enabler 3.0. More specifically, Plaintiff has the burden to demonstrate that the source code for

AuthentX was on the Pensacola Server in 2009-2010 when CardSmart allegedly had access, that Enabler 1.0 source code (which is owned by the United States Navy) was on the Pensacola Server in 2009-2010, and that CardSmart used portions of the source code of AuthentX or Enabler 1.0 when it developed Enabler 3.0 in 2009-2010.

Plaintiff also has the obligation to establish that the code in question is proprietary to, original to, developed independently by its employees. This is highly critical in this case, given the extensive public available, open source code Plaintiff apparently used. Therefore, an important issue is the dividing line between what is opens source code and what could be failrly considered to be AuthentX or Enabler 1.0 source code. Plaintiff's counsel retained as an expert Kevin Kennedy Associates, which assigned this matter to Jan P. Eiras ("Eiras") to prepare a report. Eiras issued a report dated April 30, 2013 (the "Report"). Exhibit 24. Eiras was deposed on October 17, 2013. Exhibit 42.

To prove its misappropriation of trade secrets allegations at trial, Plaintiff is required to offer expert opinion testimony. Indeed, the subject matter of whether or not trade secrets, in the form of source code, was misappropriated is clearly beyond the ordinary ken of lay jurors and requires expert opinion testimony. *See* Fed. R. Ev. 702; *see also Trident Products and Services, LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F.Supp.2d 771, 778 (E.D. Va. 2012)(holding that allegations of trade secret misappropriation under Virginia's version of the Uniform Trade Secrets Act, requires expert testimony).

The expert disclosure requirement under Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure "is intended to provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *OFSFitel, LLC v. Epstein, Becker & Green, P. C.*, 549 F.3d 1344, 1361–62 (11th Cir. 2008). "Rule 26(a)(2) provides that disclosure of the identity of an expert witness and the expert's written report 'shall be made at the times and in the sequence directed by the court.'" *Poole v. Gee*, No. 07-CV-912-EAJ, 2008 WL

2397603, at *1 (M.D. Fla. June 10, 2008) (citing Fed. R. Civ. P. 26(a)(2)).

Rule 37 provides for sanctions against the party that fails to make necessary disclosures pursuant to Rule 26, including: (1) an adverse inference; (2) prohibiting a party from introducing evidence; (3) striking a party's pleadings; (4) staying the proceedings; (5) dismissing the action; or (6) rendering a default judgment against the non-producing party. Fed. R. Civ. P. 37(b). Where a party fails to provide information as required by Rule 26(a), "the party is not allowed to use that information or witness to supply evidence . . . unless the failure was *substantially justified* or *harmless*." Fed. R. Civ. P. 37(c)(1). "Substantial justification means 'justification to a degree that could easily satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request.'" *Poole*, 2008 WL 2397603, at *2 (*citing Chapple v. Alabama*, 174 F.R.D. 689, 701 (M.D. Ala. 1997)). Likewise, "[f]ailure to disclose is 'harmless' where there is no substantial prejudice to the party entitled to receive the disclosure." Id. "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the non-disclosing party." *Mitchell v. Ford Motor Co.*, 318 F. App'x. 821, 824 (11th Cir. 2009) (citation omitted); *Prieto v. Malgor*, 361 F.3d 1313, 1318 (11th Cir. 2004); *Vilsant v. Saxon Mortg. Svcs., Inc.*, No. 08-61148-CIV, 2009 WL 413724, at *3 (S.D. Fla. Feb. 18, 2009).

Here, there is no dispute that Plaintiff was required to serve its expert reports that it expected to rely upon at trial by February 28, 2013. Nonetheless, Plaintiff belatedly served its expert report, namely the report of Jan Eiras of Kevin Kennedy and Associates on April 30, 2013. The subject matter of that Report was limited to a review of the portions of the Enabler 1.0 or AuthentX source code that Plaintiff told Eiras to look at, and then a comparison of those limited portions with the CardSmart developed source code, known as Enabler 3.0. Based on that review, Plaintiff's expert has offered his opinion that there are four areas of similarity between the source code Plaintiff produced to him and the one CardSmart developed for Enabler 3.0. Those similarities consist of the OID, the getnumber script, the cURLS web service, and the RBS. That is the sum and substance of

the expert opinion testimony offered by Plaintiff's expert and serves as one basis of this motion *in limine*.

Plaintiff wishes to offer Eiras as an expert in the computer industry. Exhibit 24. Plaintiff seeks to offer Eiras' opinion on the legal question of whether Defendants' misappropriated the software/source code produced by Plaintiff known as Enabler 1.0 and whether software designed as AuthentX was used (in whole or in part) in the development of Enabler 3.0. Exhibit 24, at p. 4. Eiras' Report and testimony should be excluded because it fails to satisfy the requirement of Fed.R.Evid. 702 that expert testimony to "assist the trier of fact to understand the evidence or to determine a fact in issue". Eiras has general experience in the computer field (such as programing, construction analysis, failure analysis, and writing source code), but has no expertise in conducting a forensic study to validate or authenticate source code, which is a critical component to his proposed testimony. Thus, Eiras does not have the qualifications that are required to offer opinion testimony that will be helpful to the trier of fact.

As detailed below, in addition to his lack of qualifications, Eiras' Report is improper because he did not have a reliable methodology to support his opinions, he relied on the analysis of Plaintiff who told him what to look at, he did not attempt to verify any of Plaintiff's oral representations, offered an opinion regarding various authors' "intent" in writing emails, and he conducted no true analysis to support his testimony.

## ***II. Plaintiff's expert testimony should be limited to the four areas noted***

Critically, based on the subject matter of Plaintiff's expert report, it is clear that this Court should also limit the testimony of Plaintiff's expert to the four areas that are noted in the report that identify the alleged similar source code. Exhibit 24. Here is why:

It appears based on Plaintiff's opposition to CardSmart's motion for summary judgment that Plaintiff may still want to argue to the trier of fact that CardSmart misappropriated the architecture and functionality that are associated with AuthentX or Enabler 1.0. Putting aside for the moment

that Plaintiff has not produced any development discovery to establish with certainty what the "architecture" is which is at issue and whether such architecture was, in fact, ever incorporated into Enabler 1.0, there is no expert opinion testimony by Eiras to support that theory. Specifically, on pages 5 to 6 of his report, Plaintiff's expert discusses generally the "AuthentX Core" and is illustrated by bar charts (one circular and one rectangular) that are on page 6. Other than those illustrations, Plaintiff's expert has not offered any further details regarding the alleged architecture or an explanation of what is the AuthentX Core. That is significant.

As the party who bears the burden of proof, Plaintiff should have at least produced some source code lines, engineering documentation, written descriptions, designs, and other writings that set forth in detail the specific lines of code, the functions being performed by those lines of code, and how the lines of code interact with one another to define the AuthentX Core, as well as the AuthentX architecture. As noted by Defendants' expert report, no details were ever produced by Plaintiff regarding the AuthentX core and whether or not that the AuthentX core was ever used as part of the Enabler 1.0 source code. Exhibit 25, at pages 8, 10, 29, and 49-52. Instead, Plaintiff, through the oral testimony of its President (Albert Fernandez) and of its expert, speaks generally about what is the AuthentX core without offering any details of the true architecture. Because of the absence of any details or the source code that constitutes the "core" being provided, there is no proof of what is the "AuthentX core" other than the two rudimentary graphic illustrations. Exhibit 25, at pages 49-52.

It would be gravely misleading to the trier of fact to allow Plaintiff or its expert to offer any testimony regarding the "AuthentX Core" or its architecture, when there has been no competent evidence that any such thing even exists, much less whether it is even proprietary to Plaintiff.

Thus, Plaintiff's expert witness should be barred from offering any testimony that CardSmart had access to or misappropriated the AuthentX Core.

### *III. Eiras' Lack of a Forensic Examination and Lack of an Acceptable Methodology*

### *A. No Forensic examination was performed.*

Eiras did not conduct any forensic analysis as part of his tasked work for Plaintiff. Eiras testified he was "retained to examine source code and provide an opinion as to whether the two sets of source code were related, whether one had been derived from the other." T66-4 to 16. He admitted that he did not determine whether Plaintiff or some other entity developed AuthentX, he merely accepted the oral representations of Plaintiff. Likewise he accepted at face value Plaintiff's oral representatiuons that the AuthentX core that was given to him was from the year 2009. And he did not ask to see the version of AuthentX from 2004 or 2005. T77-7 to 13, 80-22 to 81-9, T85-17 to 23. Critically, Eiras admitted he did not conduct any type of forensic examination of any of the servers that are relevant to the case. T98-7 to 19. Therefore, he was unable to verify the version of the Enabler 1.0 code Plaintiff gave him:

> Q. So you had Enabler 1 code as it existed in September 2009?
>
> A. I can't verify that beyond the representation of Mr. Bimston when he gave me the disk, that that was source code I was looking at as my baseline.
>
> Q. You can't verify the Enabler 1 code as it existed at any point in 2009 supposedly on that server, right?
>
> A. I cannot verify that on my own observation, no.

*See* Exhibit 42, T111-10 to 20; T117-3 to 118- 18.

In particular, during his deposition, Eiras admitted that he was retained to "examine source code and provide an opinion as to whether the two versions of source code were related, and whether one had been derived for the other." Exhibit 34, T66-4 to 9. However, he admitted that:

- He did not determine whether or not Plaintiff developed the AuthentX core because "that wasn't part of my purview, so I know it because they told me." His sole testimony was based on what orally Plaintiff told him about the AuthetnX core. *Id.*, T77-7 to 25.

- He never asked Plaintiff to identify the version of AuthentX that existed in 2004 or 2005, which was supposedly used by Plaintiff to create the initial beginnings of Enabler 1.0 in 2004-2006. *Id*, T85-17 to 23.

- Plaintiff never made a representation to Eiras that the source code that existed in 2009 was, in fact, on a CD of source code that Plaintiff's counsel provided to him for purposes of preparing his expert report. *Id.* ,T86-3 to 22. Plaintiff represented that AuthentX was on the CD, but not specifically the code that existed in 2009; it was his assumption of what he had, but he did not conduct any investigation to confirm the verbal representation *Id.* T86-23 to 87-20.

- He did not conduct any type of forensic examination of any appliance or server in this action. *Id.*, T98-11 to 99-1.

- He did not verify that the AuthentX that was given to him was, in fact, the AuthentX that existed in 2009. *Id.*, T99-2 to 15.

- The only documents that he reviewed regarding AuthentX was a Power Point presentation and a spread sheet; he did not review any documents issued by the Navy. *Id*, T 107-11 to 24.

- He was not given a certified version of CardSmart's development code from the Pensacola Server in 2009 and he could not verify the Enabler 1.0 code that supposedly existed in 2009. *Id.*, T110-16 to 111-20.

- He only had pieces of AuthentX, not the entire code set, and some other representations of AuthentX from 2012. *Id*, T114- 9 to 115-22.

- There are significant differences between the Enabler 3.0 code and the Enabler 1.0 code. *Id*, T127-3 to 128-23.

- The similarities are limited to the OID, the getnumber, the cURLS and the RBS. *Id.*, 131-18 to 22; T208-7 to 24.

Accordingly, Plaintiff's expert should not be permitted to offer any testimony that he conducted any forensic analysis to verify the source code that was provided to him was, in fact, from the Pensacola Server or that it existed in 2009. Plaintiff should be prevented from seeking to qualify Eiras as conducting any forensic examination of the Pensacola Server, from offering any testimony that the source code was, in fact, from the Pensacola Server and that the source code from CardSmart was, in fact, as it existed in 2009.

Eiras also conducted no forensic analysis of the Pensacola Server to determine if the Enabler

3.0 code that was presented to him was, in fact, code from that particular server. T89-20 to 90-25. He did not attempt to verify the accuracy of the statements regarding the Enabler 3.0 code that was presented to him. Therefore, he admittedly made no attempt to forensically verify the authenticity of the AuthentX/Enabler 1.0 or the Enabler 3.0 source code Plaintiff presented to him as running on the Pensacola Server in 2009. T99-2 to 21. In his words, "I did not have -- I have not been given a certified version of CardSmart's code from 2009". T110-25 to 111-4.

Accordingly, Eiras did not have a verified version of the AuthentX source code that existed in 2009 to support his opinions and did not have a verified version of the Enabler 1.0 which allegedly was on the Pensacola Server. What Plaintiff did present to him was a CD containing a collection of certain incomplete versions of AuthentX (T183-7 to 15), including from 2012 (T183-25 to 184-25), which it orally represented to him was the AuthentX that supposedly existed in 2009, as well as some Enabler 1.0 code from presumably 2009.

***B. Lack of a Reliable Methodology***

The purported "methodology" used by Eiras was to take the AuthentX/Enabler 1.0 code that Plaintiff gave him and compare that to the Enabler 3.0 code that Plaintiff represented to him was Enabler 3.0 CardSmart developed code. T98-20 to 99-1. Eiras, in conducting his analysis, did not take into account any of the thousands of pages of Government Furnished Information ("GFI") that is relevant to this action and did not consider any of the relevant contracting documents such as the 2004 SPAWAR contract that was issued to Plaintiff to develop Enabler 1.0 for the United States Navy (the "Navy"). T107-11 to 108-3, T132-6 to 133-1. Review of these relevant documents, in Eiras' view, was "outside the scope of what [he] . . . was looking for." T107-25 to 108-3; *See* Exhibit 42, T148-1 to 19. Instead, his purported methodology was to do a side-by-side comparison of the source code he was presented with and then conclude, based on any similarities, that a misappropriation had occurred. T125-25 to 9. Worst yet, Eiras admitted that the alleged similarities that he set forth in his report, were based on the areas that Plaintiff specifically directed him to look

at for comparison purposes. T131-12 to 22.

Therefore, the only supposed "methodology" Eiras used was to accept as true the oral representations made by Plaintiff and then do a side-by-side comparison of the portions of the Enabler 3.0 code that Plaintiff, not Eiras, considered to be similar. This is confirmed by Eiras' testimony:

> Q. By the way, was Suzette that person at Xtec who would point you to look at certain code? Was she the person?
>
> A. I had conversations with both Suzette and Albert Fernandez about which sections of the code were most likely to be of value.
>
> Q. Then code that's of value --
>
> A. To my investigation.
>
> * * * *
>
> Q. Did Suzette help you determine where to look at the CardSmart code the following day on the 28th?
>
> A. No. She helped me to determine where to look in the XTec code for a few specific items.
>
> Q. That was for a basis so that you could compare the CardSmart code, right.
>
> A. Yes.

T238-1 to 8. Exhibit 42, T228-4 to 11. Eiras testified that he used Suzette as a resource in identifying the areas of the code at which to look for purposes of the preparation of his report. Exhibit 42, T 235-1 to 237-24. This is confirmed by the notes he prepared that described what he and Suzette discussed, which set forth the specific areas of code to look for in the CardSmart code, obviously based on her own analysis of the CardSmart Code. Exhibit 43. This is further evidenced by his statement dated February 27, 2012 titled "suzette notes.text: curl connection is funky -- look

for 1) what do they call the certificates" . . . and also:

> do they have entities, tokens, credentials.
> Print out one of their ldap searches.
> Find the ldap host treetop : dc=cardsmart.
> Xt: config-app.php
>
> Look at the schema and evaluate what they're using for userid

Exhibit 43. Eiras explained, somewhat, that these were his notes after speaking with Plaintiff during his February 27-28, 2013 examination of the CardSmart code which was produced at its local counsel's office in Florida. Exhibit 42, T233-2 to 238-12.

***C. Opinions Regarding the Emails Should Be Excluded***

In Section 3.1.1 of his report, Eiras also offers "opinions" regarding a variety of emails. Starting on page 3 of his report, Eiras offers his opinions regarding why an email was written, what the author of the email supposedly knew, and the reasons why an email was written. In essence, Eiras is offering a personal opinion regarding his own subjective interpretation of emails (or more accurately that of Plaintiff's attorneys), masquerading as expert opinion testimony. Eiras cannot possibly offer an expert opinion regarding the substance of the emails, as his expertise is in the computer industry. He is not an expert in the field of interpreting the meaning of emails or, worse, in determining an author's intent in writing an email. Eiras did not speak with either CardSmart, Fisher, Larry Hembree, or any of the authors of the subject emails to determine the who, what, where and why a particular email was sent, let alone the contexts in which they were created and sent. Exhibit 42, T210-10 to 20, T213-3 to 12. Thus, Eiras' opinions regarding the meaning of the emails are wholly irrelevant and not the proper subject of expert testimony. Therefore, pages 13 to 16 of his report should, respectfully, be stricken and Eiras should be barred from offering any testimony regarding the meaning, intent or purpose of any emails.

### *IV. Eiras' Report and Testimony Should Be Stricken*

Based on the text of Report and the testimony of Eiras, Defendants submit that his report should be stricken and he should be barred from testifying at trial.

Fed.R.Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified by knowledge, skill, experience, training or education, may testify in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"The function of an expert witness is not simply to draw conclusions, but rather to help the trier of fact understand the evidence and to determine issues of fact by imparting to the trier of fact the benefit of the expert's specialized knowledge." *Goldman v. Bracewell & Patterson, L.L.P.*, 2005 WL 5740234, at *2 (M.D.Fla. Sept. 13, 2005). Expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. *Eberli v. Cirrus Design Corp.*, 615 F.Supp.2d 1357, 1363 (S.D.Fla. 2009). Such testimony is, therefore, properly excluded "when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *Id.* "When the trier of fact is entirely capable of determining issues in the case without any technical assistance from experts, expert testimony is unhelpful and must be excluded from evidence. Otherwise, there is a risk that the trier of fact will give the expert testimony undue weight on account of its special status." *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 579 (N.D.Fla. 2009).

As the Supreme Court held in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), courts may consider several factors when determining whether to admit an expert opinion, such as whether a method consists of a testable hypothesis; the existence and maintenance of standards controlling the techniques operation, and the relationship between the techniques to methods which have been established to be reliable. Under Eleventh

Circuit law, expert opinion evidence is admissible if:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1338 (11th Cir. 2003). The trial court's general "gatekeeping" obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co, Ltd et al. v. Carmichael, et al.*, 526 U.S. 137, 141 (1999). The objective of that obligation "is to ensure the reliability and relevancy of expert testimony; it is to make certain than an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152; *see also Paoli*, 35 F.3d at 747 (noting that a "district judge must make a factual finding as to what data experts find reliable.").

Even if proposed expert testimony is admissible under Rule 702, that evidence may be excluded if it is irrelevant or if "its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, [or] misleading the jury." Fed.R.Evid. 403; *see* Fed.R.Evid. 401, 402; *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1309–10 (11th Cir. 1999). Since "expert testimony may be assigned talismanic significance in the eyes of lay jurors," a district court "must take care to weigh the value of such evidence against its potential to mislead or confuse." *United States v. Frazier*, 387 F.3d 1244, 1260-1263 (11th Cir.2004).

Here, Eiras' Report and testimony should be stricken for several reasons. First, he is not qualified to perform a forensic analysis *and* more importantly did not perform any forensic analysis of the source code that was provided by Plaintiff. This is an extremely critical flaw in Eiras' Report. Eiras admitted that he took, at face value, the oral representations Plaintiff and its attorneys provided

to him regarding the AuthentX, Enabler 1.0 and Enabler 3.0 source code that was delivered. He made no attempt to secure, let alone forensically obtain and authenticate, that the source code of AuthentX or Enabler 1.0 Plaintiff provided him was, in fact, from the Pensacola Server. Indeed, if the Pensacola Server is the "source" or ground zero for the alleged misappropriation, then it is critical that the trier of fact have before it expert testimony that authenticated that the code set that was used as a baseline was the actual code from the server. Although Eiras has expertise in the computer field, his forensic analysis generally is limited to the analysis of software, as opposed to verifying that the source code under examination was actually running on these server. Accordingly, Eiras is not qualified to provide any testimony regarding a forensic examination or validation of the source code that Plaintiff presented, including, but not limited to, that the source code is in fact taken from the Pensacola Server and is as it existed in 2009.

Second, Eiras does not know any more than the trier of fact will as to whether or not the source code relied upon by Plaintiff is, in fact, the source code on the Pensacola Server. Indeed, the notes that Eiras took during his examination, as well as the screen shots of the files that were given to him, confirm Plaintiff has been accessing, using, modifying and/or resaving the very source code that allegedly lies at the heart of this matter: that is, the baseline AuthentX and Enabler 1.0 that were allegedly on the Pensacola Server as well as the CardSmart code from the server. Documentation obtained by CardSmart's expert, the Sylint Group, confirms modifications to the source code under evaluation from 2009 to 2012, a period of time in which such code was in Plaintiff's sole possession and care. Exhibits 31 to 36. Those modifications render the source code completely unreliable and inadmissible under Fed.R.Evid. 901. It would be highly prejudicial to Defendants if it is relied upon by Plaintiff.

Third, in terms of "analysis", all Eiras did was to look at the codes sets that were provided to him and then perform a haphazard side-by-side comparison. There was no methodology he used to reach his so-called conclusions. Indeed, Eiras' notes around the time of his examination (Exhibit 43

and 44) confirm there was significant collaboration with Plaintiff in terms of identifying the areas of the CardSmart development source code to search to find some similarities. Where are the reasons for his conclusion of focusing on the exemplars (i.e., the OID, the getnumber, the cURLS and the RBS)? Why did Plaintiff exclude from the scope of his analysis any consideration of the extensive GFI in this case, the Enabler Design documents that Plaintiff delivered under contract to the Navy, or even the Contract that Plaintiff operated under to deliver Enabler 1.0 in the first place? What are the reasons for the approach that he took to perform the examination? Plaintiff, it appears, kept Eiras completely in the dark and spoon fed him limited information in order to support their legal arguments in Court.

Critically, under the net opinion rule, "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) (Posner, C.J.) An expert must articulate "a reasonably accurate conclusion" and cannot base his opinion on "speculation, possibilities or contingencies." *Curtis*, 2008 WL 1732956, at *6. He must be "in possession of the necessary facts which would allow the expert to form an accurate conclusion." *Id.* Furthermore, an expert witness cannot merely tell the jury what result to reach or testify as to the legal implications of conduct. *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990); *see also Nicholson v. McCabe*, 2003 WL 25676474, at *1 (N.D. Ala. 2003) (excluding expert testimony on whether defendant violated regulations). "[T]he court must be the jury's only source of law." *Id.* "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing argument." *Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1111 (11th Cir. 2005).

Given the heavy handed guidance at play from Plaintiff in steering the direction of this supposed expert analysis, Eiras' testimony should be excluded. If it is not barred, CardSmart will be subject to extreme prejudice if, during Plaintiff's case in chief, Eiras is allowed to testify that he in fact reviewed the source code from the Pensacola Server and the CardSmart code which was

allegedly on that server. All that Eiras did was look at sections of the CardSmart source code where Plaintiff told him he would find similar lines of code. He conducted no analysis as to what CardSmart did to develop the code, did not try to understand and confirm that Plaintiff in fact owns and wrote the source code at issue, and did not perform any analysis of the extensive documentary evidence in this matter regarding the development of the Enabler 1.0 and 3.0 codes for the Navy or any of the specifications required by the Navy.

As a final matter, Eiras admitted he did not even examine the entire source code sets that were provided to him and that, even based on his limited review, he noted there are architectural differences between Enabler 1.0 and 3.0. The substance of his report is looking at lines of code that are similar and then drawing the huge, speculative conclusion that misappropriation in fact occurred. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. . . . a court may conclude that there is simply too great an analytical gap between the data and the opinion offered." *Owaki v. City of Miami*, 491 F.Supp.2d 1140, 1160-61 (S.D.Fla. 2007) (quoting *General Electric v. Joiner*, 522 U.S. 136, 146 (1997). In this matter, simply because Eiras found several lines of code that are similar, does not mean that a misappropriation occurred. He was required to conduct more than a drive-by analysis and had an obligation to determine the development of the code by CardSmart, the development of the Code by Plaintiff, and determine why any similarities exist, and which of the similarities are significant or not, and therefore, are *de minimus*. An expert on the topic of misappropriation is required to perform an in depth objective and methodical analysis, not just simply look at the end result and then conclude that misappropriation occurred. For example, at the preliminary injunction hearing Eiras concluded that CardSmart misappropriated the source code, after making a comparison of the getnumber script. However, what Eiras was comparing was CardSmart code to CardSmart code, which magnifies the lack of a reliable method/process for the code comparison. That is precisely why Eiras' report and proposed trial testimony should be

excluded. At the very least, the portion of the report that is based on the "get number" script because that conclusion was in error, as Eiras and Plaintiff has admitted.

## *V. Conclusion*

For these reasons, Defendants submit that the Court should enter an order striking Plaintiff's expert report and excluding Plaintiff's expert for offering opinion testimony in this action.

Respectfully submitted,

By: s/G. Glennon Troublefield

G. GLENNON TROUBLEFIELD
Admitted *Pro Hac Vice*
gtroublefield@carellabyrne.com
CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Tel. No. (973) 994-1700
Fax No. (973) 994-1744

-- and --

DAVID M. DEMAIO
Florida Bar No. 886513
david.demaio@ogletreedeakins.com
GREGORY R. HAWRAN
Florida Bar No. 55989
gregory.hawran@ogletreedeakins.com
PAUL J. DE BOE
Florida Bar No. 52051
paul.deboe@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.
701 Brickell Avenue
Suite 1600
Miami, Florida 33131
(305) 374-0506
(305) 374-0456 (Fax)

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 7th day of November, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.
*Attorneys for Defendants*
701 Brickell Avenue
Suite 1600
Miami, Florida 33131
(305) 374-0506
(305) 374-0456 (Fax)

By: s/Paul J. De Boe
PAUL J. DE BOE

**SERVICE LIST**

*XTEC, INC. V. CARDSMART TECHNOLOGIES, INC. AND DAVID FISHER*
*United States District Court, Southern District of Florida*
*CASE NO. 11-CV-22866-MORENO/HUNT*

Eduardo I. Rasco, Esq.
eir@rrrklaw.com
Steve M. Bimston, Esq.
smb@rrrklaw.com
ROSENTHAL ROSENTHAL RASCO KAPLAN, LLC
One Aventura, Suite 600
20900 Northeast 30th Avenue
Aventura, Florida 33180

**Method of Service:** *CM/ECF*

Oliver A. Ruiz, Esq.
oruiz@malloylaw.com
MALLOY & MALLOY, P.L.
2800 S.W. 3rd Avenue
Miami, Florida 33129

**Method of Service:** *CM/ECF*

*Attorneys for Plaintiff*

G. Glennon Troublefield, Esq.
gtroublefield@carellabyrne.com
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068

David M. DeMaio
david.demaio@ogletreedeakins.com
Gregory R. Hawran
gregory.hawran@ogletreedeakins.com
Paul J. De Boe
paul.deboe@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART P.C.
701 Brickell Avenue, Suite 1600
Miami, Florida 33131

*Attorneys for Defendants*