# Jorgensen Tr. 12/15/2014

```
                                                Page 1

 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2           CASE NO.: 11-22866-CIV-MORENO/HUNT
 3     - - - - - - - - - - - - - - -X
       XTEC, INCORPORATED, a Florida         :
 4     corporation,
                                             :
 5                       Plaintiff,          :
       vs.                                   :
 6                                           :
       CARDSMART TECHNOLOGIES, INCORPORATED, :
 7     a New Jersey corporation, and         :
       DAVID FISHER, an individual,          :
 8                                           :
                         Defendants.         :
 9     - - - - - - - - - - - - - - -X
10        VIDEOTAPED
          DEPOSITION OF:      JOHN JORGENSEN
11
12        DATE:               December 15, 2014
13
          TIME:               12:15 p.m. to 7:45 p.m.
14
15        PLACE:              240 North Washington Boulevard
                              6th Floor
16                            Sarasota, Florida
17
          PURSUANT TO:        Notice by counsel for
18                            Defendants for purposes of
                              discovery, use at trial or
19                            such other purposes
                              as are permitted under the
20                            Federal Rules of Civil
                              Procedure
21
22        BEFORE:             HILLARY S. SQUIRE, RPR, CRR
                              Notary Public, State of
23                            Florida at Large
24
25                            Pages 1 - 186
```

Page 2

```
 1   APPEARANCES:
 2        EDUARDO I. RASCO, ESQUIRE
          Rosenthal, Rosenthal, Rasco, Kaplan, LLC
 3        20900 NE 30th Avenue
          Suite 600
 4        Aventura, Florida  33180
          (305) 937-0300
 5             Attorney for Plaintiff
 6
          G. GLENNON TROUBLEFIELD, ESQUIRE
 7        Carella, Byrne, Cecchi, Olstein, Brody & Agnello
          5 Becker Farm Road
 8        Roseland, New Jersey  07068-1739
          (973) 994-1700
 9             Attorney for Defendants
10
11   ALSO PRESENT:
12        MICHAEL McCLAIN
          DON WALDHALM
13        PATRICIA DUFOR
          ANTONIO ARNER (via telephone)
14        ALBERT FERNANDEZ (via telephone)
          LaJUANA PRUITT, Videographer
15
16                         INDEX
17                                             PAGE
18   DIRECT EXAMINATION BY MR. TROUBLEFIELD       8
19   CROSS-EXAMINATION BY MR. RASCO              99
20   CERTIFICATE OF OATH                        185
21   REPORTER'S CERTIFICATE                     186
22
23
24
25
```

1                    EXHIBITS REFERENCED

                 (Retained by counsel)

2

3                                                    PAGE

4    D-900 – Curriculum vitas                        36

5   D-900A – Qualification sheet                     46

6    (NO NUMBER PROVIDED) – Mr. Eiras's report       52

7    D-899 – Preliminary report by Sylint            53

8    D-930 – Supplemental report by Sylint           53

9    D-929 – Forensic Investigation Process          59

10   D-666 – Screen shots                            66

11   D-806 – Directory listings                      70

12   D-924 – Enabler Design Document                 72

13   D-927 – ADR Software Development Guide          73

14   D-926 – AuthentX 2008                           73

15   D-920 – CNIC Enabler 3                          74

16

17

18

19

20

21

22

23

24

25

Page 4

1        MR. TROUBLEFIELD:  We're going to go on the

2     record.

3        I spoke with counsel for plaintiff, Ed Rasco,

4     regarding the subject matter of this deposition;

5     and Mr. Rasco believes that the purpose of this

6     deposition is only to cover the Daubert portion of

7     Mr. Jorgensen's testimony.

8        He checked with his associate, Steve Bimston.

9     I called and spoke to my local counsel, Paul

10    Deboe.  Mr. Deboe stated to me that this deposition

11    should cover both the Daubert and its

12    anticipated -- that is, Mr. Jorgensen's anticipated

13    testimony at trial.

14       In order to work out a resolution, I advised

15    Mr. Rasco that Mr. Jorgensen -- with the trial

16    starting on the 29th and probably defendants' case

17    starting on January 5th that Mr. Jorgensen will

18    be -- likely to be physically present at trial, to

19    be healthy enough to attend the trial; and that

20    we'll cover the Daubert today and some of his

21    opinion testimony.  And plaintiff's counsel's

22    reserving all his rights regarding the, I guess,

23    cross-examination on the opinion testimony and that

24    I fully expect Mr. Jorgensen to be there physically

25    so that he'll testify live.

Page 5

1          MR. RASCO:  He'll be there at the trial?

2          MR. TROUBLEFIELD:  At the trial, right.

3          MR. RASCO:  So I will not be required to put

4     on my cross-examination of his opinion testimony

5     today; is that our agreement?

6          MR. TROUBLEFIELD:  I think you should get into

7     it a little bit because --

8          MR. RASCO:  Okay.

9          MR. TROUBLEFIELD:  But reserving your rights,

10    understanding that we have a -- there's a --

11         MR. RASCO:  For the record, it's my -- it's my

12    understanding that this was a Daubert hearing.

13    Mr. Jorgensen was unable to appear at the Daubert

14    hearing because of his health.  It was postponed.

15    Judge Moreno said do the Daubert hearing by

16    deposition.

17         This case was not noticed as a trial

18    deposition.  Based upon my understanding of the

19    judge's statements at the hearing, I understood

20    this to be only a Daubert deposition and,

21    therefore, I do not have my expert with me who

22    would otherwise assist me in formulating

23    cross-examination responses.  I do not have that

24    available, and I've explained that to

25    Mr. Troublefield.

Page 6

 1           And, frankly, we're both a little unsure; but

 2      I think Mr. Bimston, who's my co-counsel, has the

 3      same understanding.  I did speak to him.  And so I

 4      reserve the right to -- and we've resolved the

 5      issue by your statement that you've advised that he

 6      is going to be at trial, and so I will be able to

 7      have the opportunity to cross-examine him.

 8           MR. TROUBLEFIELD:  Right.

 9           MR. RASCO:  And if he's at trial, you will do

10      his direct at the hearing.

11           MR. TROUBLEFIELD:  I will do his direct

12      examination at trial --

13           MR. RASCO:  Okay.

14           MR. TROUBLEFIELD:  -- so that he --

15           MR. RASCO:  With that understanding, we're

16      going to move forward.

17           MR. TROUBLEFIELD:  Right.  But I may get into

18      some of his opinions, but understanding I just have

19      to do that because Judge Moreno has a thought

20      that -- that he wanted to see more.

21           MR. RASCO:  If you have to do that, but you

22      would always have a choice of bringing him down --

23           MR. TROUBLEFIELD:  Right.

24           MR. RASCO:  -- so, therefore --

25           MR. TROUBLEFIELD:  I'm going to bring him

Page 7

1    down.

2         MR. RASCO:  Okay.

3         MR. TROUBLEFIELD:  I'm just telling you, for

4    today I am going to go through some of his opinions

5    just to cover myself so Judge Moreno doesn't

6    prejudice me by my not doing that.

7         MR. RASCO:  For the record, I vehemently

8    object.

9         MR. TROUBLEFIELD:  Okay.

10             (A brief recess was taken.)

11        THE VIDEOGRAPHER:  Please note that the

12   microphones are sensitive and may pick up

13   whispering and private conversations.

14        Please turn off all your cell phones or place

15   them away from the microphones as they can

16   interfere with the deposition audio.

17        Recording will continue until all parties

18   agree to go off the record.

19        My name is LaJuana Pruitt.  I'm your

20   videographer representing Veritext New Jersey.

21        The date today is December the 15th, the year

22   2014.  The time's approximately 12:29 p.m.

23        This deposition is being held at 240 North

24   Washington Boulevard in Sarasota, Florida, and is

25   being taken by counsel for the defendant.

Page 8

1          The caption of this case is XTec,

2     Incorporated, a Florida corporation vs. CardSmart

3     Technologies, et al., to be heard before the U.S.

4     District Court, Southern District of Florida, Case

5     No. 11-22866-CIV-MORENO/HUNT.

6          The name of our witness is John Jorgensen.

7          At this time, will counsel present please

8     identify yourselves and the party they represent.

9          MR. RASCO:  Eduardo I. Rasco; Rosenthal,

10    Rosenthal, Rasco, Kaplan on behalf of the

11    plaintiff, XTec, Incorporated.

12         MR. TROUBLEFIELD:  G. Glennon Troublefield of

13    Carella Byrne on behalf of the defendants,

14    CardSmart Technologies and David Fisher.

15         THE VIDEOGRAPHER:  And will our court

16    reporter, Hillary Squire, please swear in our

17    witness.

18                    JOHN JORGENSEN,

19    the witness herein, being first duly sworn on oath, was

20    examined and deposed as follows:

21         THE WITNESS:  I do.

22                   DIRECT EXAMINATION

23    BY MR. TROUBLEFIELD:

24    Q    Mr. Jorgensen, good afternoon.

25    A    Good afternoon.

Page 9

1      Q     State your name -- full name for the record.

2      A     John, J-o-h-n, Eliot, E-l-i-o-t, Jorgensen,

3  J-o-r-g-e-n-s-e-n.

4      Q     How old are you today, Mr. Jorgensen?

5      A     68.

6      Q     What is your present place of employment?

7      A     The Sylint Group, S-y-l-i-n-t.

8      Q     What is the address of the Sylint Group?

9      A     240 North Washington Boulevard, Suite 600,

10  Sarasota, Florida 34232.

11     Q     Are you presently employed by the

12  Sylint Group?

13     A     Yes, I am.

14     Q     What is your title?

15     A     I'm president and CEO, and also I am a senior

16  forensics engineer.

17     Q     How long have you been president and CEO of

18  the Sylint Group?

19     A     Since approximately '96.

20     Q     Has it been continuous from 1996 to the

21  present?

22     A     Yes.

23     Q     Can you describe for me the services that are

24  offered by the Sylint Group today.

25     A     The Sylint Group is a digital data forensics

1    firm that provides expert testimony in forensics cases;

2    intellectual property, theft, criminal cases; some

3    divorce cases and other litigation.  We also provide

4    what can be called electronic stored information,

5    eDiscovery services.  We also provide cyber security

6    services.  We provide cyber security services to large

7    corporations such as Nissan, Cord Blood, Nucor Steel

8    International, Pandora, various other companies.

9         MR. RASCO:  I'm going to object to the extent

10        that it's not his qualifications but that of the

11        corporation as to what he's testifying to.

12        MR. TROUBLEFIELD:  Well, we'll get to that.

13        THE WITNESS:  We also provide source code or

14        code review services for various clients, various

15        legal -- law firms that we have ongoing

16        relationships with.

17   BY MR. TROUBLEFIELD:

18        Q    Now, as president -- or in your capacity as

19   president from 1996 to the present, are you personally

20   familiar with the services offered by the Sylint Group?

21        A    I do forensic analysis for the cyber group --

22   for the Sylint Group, and I provide expert testimony for

23   those forensic services and provide other services as

24   required, but mostly my area of concern is computer --

25   digital data forensics and electronic discovery and

Page 11

1   electronic discovery for electronically stored
2   information.
3        Q    Are those -- what you described, is that what
4   you personally perform or do for the Sylint Group?
5        A    That is what I personally do.
6        Q    Now, how long has the Sylint Group offered
7   it's services in the computer science field?
8        A    Since '96, '98 time frame.
9        Q    And based upon what you described before, does
10  the Sylint Group offer professional services in the area
11  of digital forensic analysis?
12       A    That's correct.
13       Q    Do you personally perform services for the
14  Sylint Group in the area of digital forensic analysis?
15            MR. RASCO:  Objection.  Form.
16            THE WITNESS:  Yes, I do.
17  BY MR. TROUBLEFIELD:
18       Q    Now, what is digital forensic analysis, or
19  what's your understanding of that term?
20       A    Data on -- in today's day and age, much of
21  that data that a company uses to operate its normal
22  course of business is kept in the form of electronically
23  stored information.
24            That electronically stored information is
25  actually digital information on computer systems and on

Page 12

1  storage devices and transmitted through communication

2  systems, and we perform analysis of that data to extract

3  information that is used in litigation processes.

4      Q    And I might not have heard you.  What is your

5  specialty working for the Sylint Group?

6      A    It is reviewing, analyzing, and reporting on

7  the digital data that I recover using various software

8  routines and various methods and providing information

9  that's used in litigation as a result of performing

10  analysis on the data that I've recovered.

11      Q    Is there a name that describes the services

12  that you personally perform for the Sylint Group?

13      A    I would say it's digital data forensics

14  analysis.

15      Q    How long have you personally performed digital

16  data forensic analysis for the Sylint Group?

17      A    Since 1996, but I've done that before that

18  time also.

19      Q    So in the -- putting together the work for the

20  Sylint Group and prior to, what is the length of time

21  that you have personally performed services in the area

22  of digital forensic analysis?

23      A    Since 1970.

24      Q    Has it been continuous from 1970 to the

25  present?

Page 13

1      A     Yes.

2      Q     What is the percentage of your work at the

3    Sylint Group in the area of digital data forensics?

4      A     It's probably 70 percent.

5      Q     What is the other 30 percent?

6      A     I do some work in cyber security, and I also

7    work in conjunction with my son and our CEO in managing

8    the company.  I'd say approximately 10, 15 percent of my

9    work is in the area of cyber security as well.  Cyber

10   security also includes digital data forensics, but it is

11   focused on cyber security issues.

12     Q     How did you develop your understanding of the

13   field of digital data and forensic analysis?

14     A     Back in 1970, I joined the military.  I joined

15   the Army Security Agency.  And when I joined the Army

16   Security Agency, which was a four-year tour, I went to

17   various schools for two years dealing with digital data,

18   digital data recovery, and digital data analysis.

19           I subsequently had active assignments, in

20   particular with special activities detachments and

21   special operations.  And essentially the Army Security

22   Agency is a military arm of the National Security

23   Agency.  And I received an MOS as a -- what's called a

24   internals analyst/externals analyst and performed

25   functions of recovering digital data, analyzing digital

1   data, and producing reports as a result of that digital

2   data.

3       Q    Is the area of digital data and forensic

4   analysis a specialty within the computer science field?

5       A    It can be considered a specialty within the

6   computer science field; however, I would say that it's

7   very divergent from what is normally considered computer

8   science.  And it's divergent in the sense that you learn

9   certain techniques, methods, and processes and use

10  certain software to ensure that the data which you are

11  collecting, processing, and analyzing will meet certain

12  criteria for validity as well as you do not do anything

13  or the methods that you use will not corrupt that data

14  and change the meaning of that data in any way.  So we

15  have found -- or I have found in my experience that

16  people who are involved in computer science really don't

17  understand the forensic side of digital data collection.

18          Also in computer science, you typically are

19  not involved in reverse engineering data and reverse

20  engineering digital information in order to determine

21  its meaning, and you're not involved in analyzing that

22  data to determine the value of the information that

23  you're collecting.

24      Q    Do you consider yourself to be among experts

25  in the field of digital data and forensic analysis?

Page 15

1          MR. RASCO:  Objection.  Form.

2          THE WITNESS:  I'm told by various law firms

3      that we work with that I'm considered to be one of

4      the top five --

5          MR. RASCO:  Objection.  Move to strike.

6          THE WITNESS:  -- forensics analysts.

7   BY MR. TROUBLEFIELD:

8      Q    Now, are you involved, during your work with

9   the Sylint Group, with the development of any software?

10     A    Yes, I am.  The Sylint Group develops various

11  suites of software that were used in the eDiscovery

12  process, electronic discovery process.  One of those is

13  DRIL, D-R-I-L, and DRIL is used to provide our clients

14  with an easy means to review data that we've collected

15  and processed and analyzed, and allows them to review

16  the metadata associated with it.  It allows them to

17  review other information associated with that data.

18          And there are a number of law firms that -- at

19  least a dozen and probably closer to 20 law firms across

20  the United States that use DRIL.  And I'm responsible

21  for overseeing that development effort of DRIL and

22  ensuring that we maintain proper development logging,

23  proper development -- software development methodology.

24  Most importantly because we're patenting DRIL and going

25  to sell it as a product, so there's a number of

Page 16

1     different aspects of the development that need to be

2     monitored closely.

3               Also, I provide input to the software

4     developers to ensure that they're incorporating various

5     capabilities within DRIL to make that software package

6     easier for the various law firms to use.

7               Shumaker Loop, as an example, is using DRIL

8     almost --

9               MR. RASCO:  Objection.

10              THE WITNESS:  -- almost extensively in some

11         800 cases that they are processing through us.

12              Another suite of software that I am overseeing

13         the development of is something called Stalker.

14         Stalker is in the cyber security arena, and it's a

15         suite of software that collects information and

16         monitors various aspects of information flow within

17         a company to detect the presence of an intrusion

18         into the -- into the company network and then

19         notifies the appropriate monitors of a cyber

20         security intrusion.

21              And the third piece of software that I'm

22         involved with is monitoring and the development of

23         a piece of software called Synergy.  And Synergy is

24         essentially a console that allows senior-level

25         security monitors to keep track of the state of

Page 17

```
 1          various security programs and various security

 2          systems on a large network.

 3               All of those software suites are currently

 4          being used by our clients, and all of those

 5          software suites are going through the patent

 6          process if they haven't already proceeded through

 7          that process.

 8               MR. RASCO:  Could you repeat the name Shumaker

 9          or spell that.  You said Shumaker.

10               THE WITNESS:  Shumaker Loop.

11               MR. RASCO:  Could you spell that, please?

12               THE WITNESS:  S-h-u-m-a-k-e-r, L-o-o-p.

13     BY MR. TROUBLEFIELD:

14          Q    Can you just summarize out of the three

15     softwares that you just described what is your personal

16     involvement in each of those softwares or the

17     development of it?

18          A    Overseeing the development, ensuring that the

19     proper technical capabilities are being incorporated

20     into it, ensuring that we're using the right databases,

21     discussing data flow, modularity of the software systems

22     to ensure that the software systems can be built on,

23     what software languages are being used, and discussing

24     the outputs and the formats of the outputs for the

25     various -- various clients' use so that they have
```

1    outputs that can be readily used and integrated into

2    other systems.

3        Q    Now, do you hold any -- any other

4    specializations in the digital forensic area besides

5    what you just described?

6        A    Only the ones that are listed in my CV, and

7    those are various schools that I went through at NSA.

8        Q    Okay.  We'll go through those.

9             Do you hold any security clearances?

10       A    Currently not.  I used to hold a top-secret --

11            MR. RASCO:  Objection.

12            THE WITNESS:  -- sensitive information

13       clearance.

14   BY MR. TROUBLEFIELD:

15       Q    During what years?

16       A    I believe through '93/'94 time frame.

17       Q    That was -- you're referring to your national

18   security clearance?

19       A    Yes.

20       Q    And that was between 1993 and 1994?

21       A    Right.  And that was a TSSI clearance.

22       Q    What is a TSSI?

23       A    Top Secret Sensitive Intelligence.

24       Q    What entity oversees the approval of an

25   individual to have a TSSI clearance?

1      A      In this particular case --

2             MR. RASCO:  Objection.  Form.

3             THE WITNESS:  -- it was NSA, National Security

4      Agency.

5   BY MR. TROUBLEFIELD:

6      Q      Did having a TSSI have any bearing to the

7   digital forensic -- or digital data and forensic

8   analysis work that you're performing for the

9   Sylint Group?

10            MR. RASCO:  Objection.

11            THE WITNESS:  Yes, it does directly.

12  BY MR. TROUBLEFIELD:

13     Q      How so?

14     A      When I was working for NSA, we were attacking

15  communications and computer systems that were highly

16  classified and that were adversarial in nature;

17  therefore, we had to -- or I had to -- that was my

18  particular job.  I had to collect that information,

19  process that information, and analyze that information.

20            And during the course of that work, I also

21  developed a collection of processing and analysis

22  systems for NSA; and those systems were typically four

23  racks to 15 racks in size, each rack valued at about a

24  million dollars, and was a systems that I had designed

25  using receivers, using computers, using processing

Page 20

1   equipment, using storage equipment that would perform

2   realtime analysis and processing of highly complex

3   digital systems, some of which I coined terms from that

4   are currently being used such as "cascaded systems" and

5   "complex modulation systems."

6          And in designing those systems, I had to

7   incorporate capabilities utilizing computers to do the

8   actual collection and then to do the analysis and

9   processing, buffering of the data, and to output various

10  reports and information off of those systems.  For that

11  work, I was personally awarded the defense meritorious

12  service metal by the director of NSA.

13     Q    Well, let's -- I want to turn to your

14  educational training.  Did you receive any formal

15  education?

16     A    The formal education was -- I went to

17  Northeastern University for a year in electrical

18  engineering and left Northeastern University and joined

19  the military.

20     Q    What years did you attend Northeastern

21  University?

22     A    That was a '68 time frame; '68, '69 time

23  frame.

24     Q    What was your major course of study?

25     A    Chemical engineering.

1      Q      Did you take any courses in the computer

2    field --

3      A      No.

4      Q      -- while matriculating as a chemical engineer?

5      A      Yes.

6      Q      What were the courses?

7      A      A course in BASIC and FORTRAN and COBOL.

8      Q      What types of languages -- FORTRAN, BASIC, and

9    COBOL, what type of languages were they?

10     A      They were machine languages used at the time

11   that had basic capability in performing scientific

12   calculations.  They were not very complex at the time,

13   and I -- these were basic courses that were being taken,

14   so you learned how to program in those languages.

15     Q      Did you have any other educational training

16   outside of Northeastern University?

17     A      I did have educational training by the

18   National Security Agency, and that was on a classified

19   project where I learned how to -- I was taught how to

20   and learned how to program in assembly language.  And

21   the purpose of that was to program satellite vehicles

22   for NSA.

23     Q      Did you serve in the military?

24     A      I served in the military for 12 years, and my

25   grade at the end of those 12 years was a sergeant first

Page 22

1    class E7.  And I was asked to convert over to civilian

2    status for NSA at that time.

3         Q    And while enlisted in the military, did you

4    take any courses?

5         A    I took NSA courses essentially, not

6    only military -- they were military courses, but there

7    were also -- most of them were NSA courses.

8         Q    And when you say "NSA courses," explain a

9    little bit what you're talking about.

10        A    These are classified courses taught by NSA in

11   digital data techniques and -- specifically to assist in

12   your technical ability to address some very complex

13   and -- signal types and some very complex digital data

14   types that we were collecting.

15        Q    Have you ever heard the term "ASA"?

16        A    I'm -- yes.  ASA stands for Army Security

17   Agency.

18        Q    Did you ever spend time working with the ASA?

19        A    I enlisted in the Army Security Agency.

20        Q    And what years, approximately?

21        A    And that was '69.

22        Q    While enlisted with the ASA, did you take any

23   courses in the computer field?

24        A    Yes.

25        Q    Can you describe those courses to me, please.

Page 23

1      A     Those courses were based around the

2   collection, the processing, and analysis of digital data

3   and computer data.

4      Q     Have you heard the term "tri-service"?

5      A     Yes.

6      Q     What is that?

7      A     The Fort Devens facility where I went to

8   school is a tri-service school.  That means that the

9   Army, Air Force, and Navy all are part of that school

10  system.

11         After my initial assignment, after the two

12  years of schooling, I went to Shemya, Alaska, where I

13  was a senior analyst.  And when I came back from Shemya,

14  Alaska, as a senior analyst, I was an instructor at the

15  tri-service school in internals analysis.

16     Q     Can you describe the nature of your classroom

17  studies at the tri-service school versus when you were

18  an instructor.

19     A     The --

20         MR. RASCO:  Objection to form.

21         THE WITNESS:  The classes at the tri-service

22     school are at various levels.  And depending upon

23     how well you do at each one of the levels, you will

24     proceed to the next level.

25         So you can go from a class that is teaching

Page 24

1          you how to collect the signals and how to process

2          the signals to a class that teaches you how to

3          analyze the signals, and that would be externals

4          analysis class.

5     BY MR. TROUBLEFIELD:

6          Q     Were these courses you were personally taking?

7          A     Yes, these are courses that I personally took.

8                And then the next class would be internals

9     analysis, so I also took -- I was allowed to take an

10    internals analysis class.  I completed the internals

11    analysis class.  And from the internals analysis class,

12    I was assigned to a special activities detachment.

13               And later from the special activities

14    detachment and special projects, I went to Shemya,

15    Alaska, as a senior analyst and operated in Shemya as a

16    senior analyst with a group of people who I was

17    responsible for for collection analysis and processing

18    of digital signals.

19               And when I completed my assignment in Shemya,

20    Alaska, I actually broke a signal that had not been

21    broken before and -- digital signal, communications

22    signal; and I received the Army commendation medal for

23    that, and they sent me back to Fort Devens to teach

24    internals analysis.  And specifically because of the

25    fact that I had broken a signal in Shemya, they were

Page 25

1    interested in my ability to extend that information on

2    to others who were -- who had graduated to the internals

3    analysis level.

4         Q    So you were teaching courses at that point?

5         A    Yes.

6              MR. RASCO:  Objection.

7              THE WITNESS:  I was teaching courses at that

8         point.

9    BY MR. TROUBLEFIELD:

10        Q    And how would you describe the nature of the

11   computer courses that you were teaching in terms of the

12   computer language or what subject matters being covered?

13        A    You had to understand how computer data was

14   formulated, how it was transmitted, how it was encoded,

15   and how that data could carry other data within it.  And

16   you had to be able to understand the data that was

17   associated with that data in order to associate it with

18   certain events, certain happenings, certain information

19   that may be of interest.

20             So you had to be able to essentially filter

21   out that information that is easily known and not of

22   interest to that information that may not be easily

23   known and was of interest to include encryption

24   technique, certain coding techniques.  And many of the

25   coding techniques were coding techniques that were used

Page 26

1    within computer systems at the time.  And you also --

2    you also wanted to be able to identify potentially what

3    computer systems were being utilized to structure the

4    data and to handle the data.

5            So the analysis work that was associated with

6    this type of information gathering was fairly complex,

7    and you had to be able to logically think through a

8    problem and understand the problem.  And then you had to

9    do extensive research to discover any relative data that

10   may be associated with what you were doing.  And,

11   frequently, you had to reconstruct data and

12   understand -- and understand what the data may represent

13   as far as functions are concerned, as far as

14   communication signals are concerned; and then test those

15   results to determine whether or not your conclusions

16   were correct.

17       Q    How many years did you serve as an instructor?

18       A    I was there for a little over a year.  At that

19   point, I was provided with two assignments.  One was to

20   go to the University of Pennsylvania and be an

21   instructor at the University of Pennsylvania, and the

22   other was to go to a NSA location in Europe and to

23   provide internals analysis at that location in Europe.

24       Q    Describe for me the nature of what you did at

25   the University of Pennsylvania.

Page 27

1      A     I didn't go -- I didn't select that --

2      Q     You did not.  Okay?

3      A     -- opportunity.  I went to Europe instead.

4      Q     Okay.  Did any of your training at ASA or the

5  NSA have any bearing on the subject matter of the

6  CardSmart action?

7      A     Well, it all does because you have to

8  understand -- first of all, I believe, to be a good

9  analyst, you have to understand the importance of all of

10  the data that you're looking at and that you don't

11  ignore any data because it tends to chain link into an

12  overall picture of the information about the data

13  itself.

14          So I think the most important aspect was not

15  only understanding digital data and how digital data can

16  represent data but also how to go about analysis of

17  digital data in order to get its full meaning and a full

18  understanding of how that data can resolve questions

19  that you might have, and also there are very strict

20  methodologies about validating not only your data but

21  your results of your analysis.  And you find that one of

22  the most important things that you need to do when you

23  collect data is to validate it and to ensure that it

24  is -- it is as it is being presented to you or as you

25  think it is and -- to reduce any chance of drawing an

Page 28

```
 1    erroneous conclusion without understanding completely

 2    the data set that you're looking at.

 3            And I think that -- and I think that one of

 4    the successes of Sylint has been -- and the reasons why

 5    our customer set is large law firms as well as large

 6    companies has been because we have been very successful

 7    internally here in teaching that methodology and

 8    teaching those techniques, and we have a high success

 9    rate in court as a result of that.

10            MR. RASCO:  Objection.

11    BY MR. TROUBLEFIELD:

12       Q    You mentioned the word --

13            MR. RASCO:  Move to strike.

14    BY MR. TROUBLEFIELD:

15       Q    -- before, "metadata."  Tell us what's your

16    understanding of what metadata is.

17       A    Metadata over the last five years has taken on

18    a developed meaning.  Originally people would say that

19    metadata is data about data.  However, metadata is the

20    information that, say, surrounds your primary

21    information of concern or your primary evidence or

22    whatever you want to call it.  And it's sort of like --

23    one way to explain it is, it's sort of like DNA at a

24    murder scene or it's a forensic analysis of a bullet and

25    the scoring on the bullet as it leaves the barrel at a
```

1    murder scene.  It may not be the body, and it may not be

2    the perpetrator, but it's information about what

3    happened, and it's a confirming information about the

4    data that you're looking at to make your decision about

5    a particular -- in that case, a particular crime.

6           So metadata is not only data about data --

7    which may be as simple as last access times, modify

8    times, and creation times for a particular file -- but

9    it may also include information that is contained on the

10   operating system about what was happening to that file

11   and what applications were operating on that file at

12   that time, or it may include information about what

13   storage devices were connected to the system at that

14   moment when that file was being affected and what may be

15   on those storage systems.

16          So metadata actually extends beyond -- and

17   this is -- this is the current thinking, and it's being

18   driven in part by us.  Metadata is -- should not only

19   include the data about the data, but it should include

20   other information that's available that will tell you

21   what has happened to that data and what is acted upon

22   that data that you're most interested in looking at.

23          In a particular case, it might be a file.  And

24   it gives you more information about the validity of that

25   file, gives you more information about the age, the --

1    the manipulations that may have occurred to that file,

2    the subsequent activity that may have occurred to that

3    file which could cause you to take and expand your

4    investigation to discover more about what actually

5    occurred to a particular file.

6            So metadata's grown in its size, and these --

7    and these are lectures that I give in front of the

8    American Bar Association, and in particular the EDDE

9    committee, and these are also lectures that I give at

10   the RSA conference.

11       Q    What's RSA?

12       A    RSA is a security conference that's held in

13   three different locations in the world.  It's held in

14   Asia, it's held in the United States, and it's held in

15   Europe.  RSA is probably the largest security conference

16   that is conducted in the world.  There are -- this RSA

17   conference coming up in April -- last year's had 22,000

18   attendants.  This year will probably reach closer to

19   30,000 attendants.

20            I am a speaker at the RSA conference on the

21   legal track, and I am also a judge at the RSA

22   conference.  I have been asked to be a judge for the

23   last two years and determine what subjects are taught --

24   what subjects are given at the RSA conference.

25            The RSA conference legal track is very

Page 31

1    interesting because these talks about metadata, these

2    talks about -- it's very complicated but also talks

3    about ethics in court and representing evidence in

4    court, misrepresenting evidence in court, experiences

5    with those problems.

6            There is a -- there are a number of federal

7    judges and local judges that follow these RSA

8    conferences.  The most notable of these is

9    Judge Facciola out of Washington, Judge Shira Scheindlin

10   out of New York, George Peck out of New York,

11   Judge Moss out of Chicago, and various other -- various

12   other judges.  They will be attending these conferences

13   and taking part in the panel discussions that I'll be

14   giving out there.

15           So there is a -- there is an evolving -- long

16   answer to your question, but there is an evolving

17   understanding of metadata, and there's an evolving

18   understanding of how -- the importance of metadata in

19   eDiscovery process and in -- in the ESI world and the

20   electronically stored information world.

21       Q    When you talk -- you mentioned a term

22   "validate data" a few questions back.  What do you mean

23   by that, or what is your understanding of that term?

24       A    Well, one of the problems that is currently

25   being experienced -- that I perceive that's currently

1    being experienced and I have lectured on -- and there's

2    an agreement with many of the judges with me -- is that

3    data has been -- electronically stored information has

4    been misrepresented to the court in a number of

5    different cases.  I have participated in some of those

6    cases myself, and you rectify the situation.

7            The misrepresentation of the electronically

8    stored information frequently surrounds metadata in

9    understanding the files and -- or -- the files being the

10   information of interest, understanding the files,

11   understanding the -- simplistically, the creation date,

12   modified date, the last access date of those files under

13   different operating system conditions; what it entails

14   and what it means in the use of that data; but it also

15   extends far beyond that.

16           Where did that data reside?  Can you show that

17   the data that you are saying resided in a certain

18   location actually resided in that location?  Can you --

19   do you have a chain of custody indicating how that data

20   was developed and existed and was being presented; and

21   is that data in truth from, say, a storage unit or

22   whatever that you're saying that that data was from.

23   Has that data been modified?  Has that data been

24   corrupted?

25           We've had a number of e-mail cases where we

Page 33

1    have been able to show that e-mails have actually been

2    modified, changed after their creation.  And, in fact,

3    there are some famous cases on Westlaw discussing

4    metadata and proving the validity of files and proving

5    the validity of e-mails that -- that -- that relied on

6    understanding the metadata and being able to diagnose

7    the actual validity of that file by using the metadata

8    not only -- I'm not only talking about the metadata, the

9    information about the information; but I'm talking about

10   the extended information associated with that data:

11   Maybe the file structure, the paths -- the file paths

12   that are associated with it, what occurred on the

13   computer or supposedly occurred on the computer what

14   applications were running on the computer, when those

15   applications ran.

16            So this -- this complex subject has proven

17   itself to assist in determining the truthful -- the

18   truth level of the data that's being presented to the

19   court and actually does that data that's being presented

20   to the court represent what people say it represents.

21   Q    Now, did you take any -- well, strike that.

22            You graduated from the tri-service school?

23   A    Yes.

24   Q    Did you take any postgraduate courses?

25   A    NSA asked me to take a postgraduate course at

Page 34

1    the naval postgraduate school in California.

2         Q    What years?

3         A    Oh, dear.  Sometime in the early '80s.

4         Q    What was the subject matter, if you can

5    recall?

6         A    Resource management course.

7         Q    What is a resource management course?

8         A    It was -- it was a flag-level officer course

9    to hone your skills in essentially handling management

10   of funds, personnel, and time associated with very large

11   projects.

12        At the time, I was responsible for a -- over a

13   hundred million dollar project involving what's called

14   overhead techniques, and I was selecting and -- I was

15   responsible for selecting equipment -- I'm having a

16   problem because I have to be careful what I say.  This

17   is highly classified.

18        I was responsible for selecting equipment that

19   was part of this OH project --

20             MR. RASCO:  Okay.  I'm going to object.

21             If it's highly classified, I can't

22        cross-examine him on it.

23             MR. TROUBLEFIELD:  He's not talking about the

24        classified part.  He's talking about --

25             MR. RASCO:  I'm referring to his whole

Page 35

```
 1      statement.
 2              MR. TROUBLEFIELD:  -- the non-classified
 3      portions.
 4              MR. RASCO:  I object and move to strike.
 5              THE WITNESS:  I am talking about the
 6      non-classified portion of this.
 7              MR. RASCO:  If he wants to open the door, I
 8      have the right to get into it.  If he doesn't want
 9      to testify about it, he shouldn't either.
10  BY MR. TROUBLEFIELD:
11      Q    You can continue, and focus on the
12  non-classified portion.
13      A    It's actually the management of the selection
14  of equipment for the OH project, the management of the
15  funding reserves and the funding responsibilities
16  associated with it, and the management of the personnel
17  and time scheduling of this project in order to
18  implement it.
19      Q    Did any of your coursework at the Navy
20  postgraduate school relate to the digital data and
21  forensic analysis field?
22      A    No, not really, other than from a management
23  point of view.
24      Q    Did you take any other coursework in the areas
25  of either computer science or digital data forensic
```

Page 36

1   analysis?

2       A    Well, most of those courses are listed in

3   the -- in my CV, and those are NSA courses again.

4       Q    Okay.  I want to show you what's been marked

5   as Trial Exhibit D-900.  Can you identify what's been

6   presented as D-900?

7       A    Yes.  That looks like my CV.

8       Q    Let's go through and make sure it's accurate.

9       A    Okay.

10      Q    Now, this document has your CV as well as that

11  for Mr. Waldhalm, correct?

12      A    Correct.

13      Q    Okay.  I just want to focus on yours.  Where

14  does yours start and where does yours end?

15      A    It ends with the Florida private investigator

16  license number.

17      Q    So that's the third page of Exhibit D-900,

18  correct?

19      A    I think that's the fourth page.

20      Q    That's the fourth page, correct.

21           MR. RASCO:  Objection to the document.

22  BY MR. TROUBLEFIELD:

23      Q    Have you heard the term "X-Ways software"?

24      A    Yes, I have.

25      Q    What's your understanding of that term?

Page 37

1        A    X-Ways is a -- and I forgot about that school,

2    but X-Ways is a software suite that we use primarily in

3    our forensics analysis of digital data.  We also use

4    EnCase, FTK, F-Response, and a few other software suites

5    for the direct forensic analysis for forensic analysis

6    tools.

7        Q    Describe -- so what is X-Ways?

8        A    X-Ways is a software suite to perform

9    forensics analysis on digital data.

10       Q    What is EnCase?

11       A    Same.

12       Q    What is FDK?

13       A    FTK.

14       Q    F-T.

15       A    It's the same.  Same -- same, just a different

16   tool.

17       Q    And F-Response?

18       A    F-Response is more of -- it's the collection

19   of -- of digital data remotely to perform forensic

20   analysis.

21       Q    During the course of your work for the

22   Sylint Group, have you personally used the X-Ways

23   software?

24       A    Yes, I have.

25       Q    Have you personally used EnCase, FTK, and

Page 38

1    F-Response?

2        A    Yes, I have.

3        Q    Have you personally used those software -- or

4    that collection of software as part of your work in

5    performing a digital data and forensic analysis?

6        A    Yes, I do.  In fact, I have focused the

7    Sylint Group on using X-Ways primarily because X-Ways is

8    a -- what can be called a data-centric software tool,

9    forensics tool, as opposed to EnCase which is a more

10   report-centric software tool.

11          And the problem with using a report-centric

12   software tool is you're reliant on the report output of

13   that particular software rather than relying on the data

14   that's produced and your ability to properly analyze

15   that data and what it means as far as the forensic

16   analysis that you're performing.

17          So I've focused Sylint Group -- and we have

18   special arrangements with X-Ways because of this.  I

19   focused Sylint Group on using X-Ways, and that focus has

20   gone to such an extent that one of my forensic engineers

21   was -- was appointed by the commissioner of Florida to

22   rebuild the FDLE forensics lab, and he is using X-Ways

23   in the rebuild of the forensics lab just because of that

24   reason, because it gives more -- I think it forces you

25   to be more analysis conscious and investigative

Page 39

1   conscious, and it provides -- in the end, it provides

2   better results than a report-centric tool.

3       Q    Well, does the X-Ways software have any

4   bearing to the work you performed in the XTec vs.

5   CardSmart case?

6       A    Actually, we did not use X-Ways in that case

7   because we were never given the ability to get a

8   forensic image that we could investigate.  If we had

9   given -- been given a forensic image of the PCOLA

10  server, we would have used X-Ways to perform forensic

11  analysis on that in order to resolve all of the metadata

12  associated with the files to validate the data that

13  supposedly came from the PCOLA server.

14      Q    Were there any particular software that you,

15  in fact, used in the XTec vs. CardSmart case as part of

16  your analysis?

17      A    We weren't provided with the ability to use

18  any software as opposed to Jan Eiras who stated in his

19  deposition that he used various software tools to

20  perform his analysis.  Those tools were not made

21  available to us when we performed our analysis.

22           The only thing that we did do was we did a

23  forensic image of the laptop and the -- what's called

24  the purple thumb drive that had additional information

25  on it that we were originally not provided in our review

Page 40

1    of the data in October.

2         Q    Did you use any software in creating the

3    forensic image of the laptop or the purple thumb drive?

4         A    We used hardware for that particular case.  We

5    also have hardware, we have Image MASSter Solos, we have

6    Falcons, we have various other hardware that will allow

7    us to do forensic imaging of hard -- of hard drives or

8    storage devices.

9         Q    The -- so you use a hardware to create the

10   forensic image on the laptop?

11        A    In that particular case, I believe we did.

12   You can also use FTK or X-Ways or EnCase to also build

13   what are called evidence files, e01 files, from these

14   devices -- from the storage devices, but I believe we

15   just used the hardware at that time.

16             THE NURSE:  Excuse me.  We're approaching the

17        hour mark Mr. Jorgensen's been testifying.  If we

18        can find a breaking point in the next five minutes.

19             MR. TROUBLEFIELD:  We are.  She's almost -- I

20        know.  She told me.  Thank you.

21             THE NURSE:  Awesome.

22   BY MR. TROUBLEFIELD:

23        Q    Just one question before we take a quick

24   break.  Do you hold any professional licenses,

25   Mr. Jorgensen?

1       A    I hold a PI license, private investigators

2  license.  I hold some professional memberships.  I'm

3  director -- I'm a -- on the board of directors for the

4  FBI Tampa Bay Infragard Group.  I'm associated with the

5  American Bar Association EDDE committee.  And off the

6  top of my head, I can't think of what else may be there.

7              MR. TROUBLEFIELD:  Okay.  We can take a break

8        here.

9              THE VIDEOGRAPHER:  Okay.  We are going off the

10        record.  The time's approximately 1:24 p.m.

11              (A brief recess was taken.)

12              THE VIDEOGRAPHER:  We're back on the record.

13        The time's approximately 1:37 p.m.

14  BY MR. TROUBLEFIELD:

15       Q    Mr. Jorgensen, have you worked on any cases

16  for clients in your capacity as president of the

17  Sylint Group in the area of forensic analysis of source

18  code from a server?

19       A    A couple of cases that I've worked on.  The

20  most recent one is a case where the -- both parties to

21  the case, the plaintiff and the defendant -- their

22  forensic experts and the court selected me personally as

23  the escrow agent for a code review being done by both

24  parties' software code reviewers.

25              The reason why I was selected, I'm told -- or

Page 42

1    the reason why I believe I was selected is because they

2    wanted to ensure that the code -- the source code would

3    be properly validated and that the process to do the

4    source code review would be properly established.

5              MR. RASCO:  What type of review?

6              THE WITNESS:  Source code review.

7              MR. RASCO:  Oh, I'm sorry.  Excuse me.

8              THE WITNESS:  Would be properly established

9         and that the procedures would be fair and that the

10        procedures would be followed and that if there were

11        follow-on activity, that that follow-on activity

12        would be -- would be done in such a manner that it

13        would withstand potential criminal prosecution.

14             So I accepted the position as the escrow

15        agent, and we have proceeded to the point in the

16        case where the code review process has occurred;

17        both parties have expressed their happiness with

18        the process that has been set up; and we have been

19        able to continue the review process as point and

20        counterpoint have occurred between the plaintiffs

21        and the defendants in this particular case.

22   BY MR. TROUBLEFIELD:

23        Q    Do you know the name of the case or the title.

24        A    It's -- well, we know it as Trauberg vs. --

25   it's the Trauberg law firm.  We'll have to get the name

Page 43

1    of the case.  I can't remember the -- well, the lawyer

2    on the other side is Connolly, but I don't remember if

3    it was the Connolly law firm or it's another law firm

4    that's actually representing their client but Trauberg

5    vs. Connolly.

6            MR. RASCO:  Could you spell "Trauberg."

7    BY MR. TROUBLEFIELD:

8        Q    And in what state --

9        A    T-r-a-u-b-e-r-g.  It's a law firm, major law

10   firm.

11       Q    Greenberg Traurig?

12       A    Greenberg Traurig.

13       Q    Is that in state court or federal court?

14       A    That is in state court.

15       Q    How many cases have you personally handled in

16   the area of digital data and forensic analysis in which

17   you're reviewing code from a server?

18       A    It's probably three, four, five cases.  And I

19   say that because frequently we get into a case where

20   we're doing digital data forensics and, all of a sudden,

21   we've got a problem with some of the software or

22   applications that are running on the -- on that

23   particular server.  But if you're talking about code

24   comparison, there's probably three cases that I have

25   been involved in directly.

Page 44

1    Q    Do you remember the name of those cases and

2    where they're pending or were pending?

3    A    One was with Microsoft.  One was with AEG.

4    I'd have to -- I'd have to get the case names, that

5    particular case.

6    Q    Let me show you a document -- strike that for

7    now.

8         I want to cover some of your employment

9    history.  Can you describe some of the employment that

10   you have held since working for the NSA or ASA.

11   A    I left the National Security Agency.  I came

12   down to Florida to take a position with Fairchild Weston

13   as director of research and development and program

14   management.  Two different director positions but I held

15   both of them at the same time.

16        The reason why was because the systems that I

17   had designed while I was at NSA were being built by

18   Fairchild Weston down here in Florida.

19   Q    And what's the type of work that you were

20   performing?

21   A    I was overseeing the engineers and software

22   developers for these systems that I had designed while

23   at NSA.

24   Q    Did any of your work involve writing source

25   code?

Page 45

1      A     No, it did not involve directly writing source

2   code; but it did involve reviewing source code,

3   reviewing software requirements, interfacing with the

4   government, discussing the software requirements, and

5   discussing implementation of various software

6   applications which were developed by us for the control

7   of these systems and also, in particular, the processing

8   of certain digital signals in some very unique and

9   complex demodulation equipment.

10     Q     What was your title?

11     A     Director of research and development and

12  director of program management.  I was also -- while

13  working for Fairchild Weston, which became Loral Data

14  Systems, I was also the director of international

15  electronic warfare.

16     Q     How long did you hold the title of director of

17  program development?

18     A     Program management.

19     Q     Program management.  I apologize.

20     A     I'd say the majority of time that I was with

21  Fairchild Weston.  Probably around six years.

22     Q     Was Fairchild Weston known by any other name?

23     A     It was Schlumberger Fairchild Weston, and this

24  was the data systems division.

25     Q     Have you ever heard the term Loral Data

Page 46

1   Systems?

2       A    That was the division I worked for when Loral

3   purchased Fairchild Weston.  And these are NSA projects

4   that I worked on during that entire period of time.

5              MR. TROUBLEFIELD:  Can I have a sticker,

6       please.

7              Thank you.

8              (Deposition Exhibit No. D900-A was marked for

9   identification.)

10  BY MR. TROUBLEFIELD:

11      Q    I'm showing you a document that I have marked

12  as D-900A.

13             MR. TROUBLEFIELD:  Mr. Rasco.

14  BY MR. TROUBLEFIELD:

15      Q    Can you just identify that for me?

16      A    This is my qualification sheet that goes along

17  with the CV.

18      Q    Can you look at it and make sure it's accurate

19  to the best of your knowledge?

20      A    I believe so.

21      Q    Does this document refresh your recollection

22  regarding some names of cases that -- or one of the

23  cases that you couldn't recall?

24      A    I believe that the Deman Data Systems vs.

25  March Schessel is a code review case.

Page 47

1          MR. RASCO:  What page?

2          THE WITNESS:  The second page.

3   BY MR. TROUBLEFIELD:

4      Q    Is that Deman Data Systems, LLV vs. March --

5      A    Schessel.

6      Q    -- Schessel?

7      A    Right.

8      Q    Sitting here today, can you recall how many

9   instances that you were qualified as an expert in

10  federal court in the area of digital data and forensic

11  analysis?

12     A    It's got to be over a dozen times.  I haven't

13  sat down and counted them up, but it's got to be between

14  a dozen and 20 times.

15         MR. RASCO:  Objection.

16  BY MR. TROUBLEFIELD:

17     Q    Now, Mr. Jorgensen, in the field of digital

18  data and forensic analysis that you've personally

19  performed, have you read source code?

20     A    I've reviewed source code.  I'm able to

21  understand, generally speaking, source code, source code

22  modules, GetStatements, IfStatements, and EndStatements,

23  those type of statements that would be seen in C, C++, C

24  sharp, PHP.

25         I would -- to actually sit down and go line by

Page 48

1    line and tell you what the executable result is of the

2    line, I'd probably have to do some refreshing of that

3    particular language that we're talking about at the

4    time, but I've -- I've reviewed source code enough to

5    understand how software is structured, how software

6    modules are structured, how software calls are

7    structured.

8            In some of the earlier work that I did -- in

9    fact, it's a case I did do.  In some of the earlier work

10   that I did, one of the cases involved the financial

11   industry and copying of source code in that particular

12   case.  And I forget which one it is.  It's some time

13   ago.  But I understand enough about software to

14   understand how algorithms are used inside of the

15   software and how the calls are made to particular

16   algorithms.

17           In that particular case, the graphical user

18   interface, the GUI, was very different between the

19   two -- the two softwares that were being compared;

20   however, the call to the algorithm showed that the

21   actual algorithms that were being used in both the

22   financial packages were exactly the same and performed

23   the same functions.  And it was because of that that we

24   essentially won the case because I was able to show that

25   the -- that they had copied -- it didn't matter about

Page 49

```
 1    the GUI, the graphical user interface.  Anybody can
 2    change the GUI, but the actual processing of the data
 3    through the algorithms was exactly the same.
 4         Q    Do you have an ability to understand data
 5    being used by a software program and data being
 6    generated by a software program?
 7         A    Yes.
 8         Q    And what's your basis for saying that?
 9         A    Well, it's just my experience understanding
10    databases, how databases are used, how data's moved into
11    databases, how data's processed from the databases,
12    scripts that are used to collect the data from the
13    databases and perform functions on that particular day
14    and provide an output.
15              That's very similar to, say, the DRIL program
16    that we developed in-house and how we're handling that
17    data in-house to process it in the SQL database that we
18    use for DRIL.  It's also true in the Stalker program,
19    being able to parse the data before it goes into the
20    database because if we allow the data to flow into the
21    database at the current output out of the client's
22    system, it would -- it would overwhelm -- it would
23    overwhelm the particular database and the -- in the
24    sense that it would take forever to process the data and
25    provide an output.
```

1          So the decision to externally parse that data

2     before it was processed and put into the database was

3     key to getting some reasonableness into the data storage

4     process and then processing the data for an output.

5          So those types of problems are problems I'm

6     very familiar with.

7          Q    And what does your testimony in the XTec vs.

8     CardSmart case concern, what field?

9          A    It's really the digital data forensics field

10    and not the source code comparison.  You know, Don

11    Waldhalm is a -- is a computer programmer who's very

12    familiar with writing source code, understanding source

13    code.  And I know enough about software and source code

14    that I'm not going to say for one moment that I can sit

15    down and write source code.  It would -- it makes much

16    more sense to have somebody who's an expert in that

17    particular area concentrate in that area.

18          My area of expertise is computer data

19    forensics and reviewing the data to determine the

20    validity of the data and whether -- as an example,

21    whether or not the data files that we are looking at

22    that contain the source code actually are part of the

23    same source code set that we're supposed to be

24    reviewing.  And Don's expertise is not necessarily in

25    that particular forensics area.  My expertise is in that

Page 51

1    area.

2        Q    Do you believe your analysis that you

3    performed in the CardSmart case could have been done by

4    an average layperson without your type of education and

5    experience?

6            MR. RASCO:  Objection.

7            THE WITNESS:  No, definitely not.  They don't

8        understand -- they don't understand critical things

9        like path analysis for the file's structure.  They

10       don't understand the importance of the relative

11       metadata, the way that metadata is affected by

12       moving it from file to file and what happens to the

13       subdirectories when a movement of a file -- or

14       movement of a directory occurs and the impact of

15       moving data around.  They wouldn't be able to

16       recognize when backups are being made by the time

17       instance it's occurring within the metadata.  They

18       don't have that background to understand the backup

19       process and what would be occurring in the backup

20       process to change the metadata associated with it.

21           So there's a number of things that, you know,

22       a layman would not understand when looking at the

23       data.

24   BY MR. TROUBLEFIELD:

25       Q    Do you feel that your testimony in the

Page 52

1    CardSmart case could aid the trier of fact?

2          MR. RASCO:  Objection.

3          THE WITNESS:  Pardon me?  Could?

4    BY MR. TROUBLEFIELD:

5       Q    Could it aid the trier of fact --

6       A    Yes.

7       Q    -- to understand --

8       A    Yes.  Oh, certainly.

9       Q    Let me show you a document that is a

10   plaintiff's exhibit but doesn't have a number on it.

11   Let me show you a copy of the report that was issued on

12   behalf of plaintiff.

13          MR. TROUBLEFIELD:  Mr. Rasco.

14          MR. RASCO:  Thank you.

15          MR. TROUBLEFIELD:  I'll have to get the

16      plaintiff's number.  I just don't have it with me.

17      For the record, I believe it is a trial exhibit

18      that's on plaintiff's list.

19   BY MR. TROUBLEFIELD:

20      Q    Can you identify that document, please,

21   Mr. Jorgensen.

22      A    It is the XTec Intellectual Property Code

23   Review Report done by Jan Eiras, E-i-r-a-s, as prepared

24   for Malloy & Malloy on April 30th, 2013.

25      Q    Did you read --

Page 53

1        A     This is --

2        Q     Go ahead.

3        A     This is a report that we reviewed and then

4    rebutted in our rebuttal reports.

5        Q     And when you say "in our rebuttal reports,"

6    let me show you what's marked as D-899 and Exhibit

7    D-930.

8              MR. TROUBLEFIELD:  Can you pass this to

9         Mr. Jorgensen, please.

10              Court Reporter, I'll give this to you.

11    BY MR. TROUBLEFIELD:

12        Q     You referred to a preliminary report.  Is that

13    correct, Mr. Jorgensen?

14        A     That's correct.

15        Q     Can you identify for the record D-899.

16        A     That is a preliminary digital data forensics

17    rebuttal report and -- excuse me -- and source code

18    analysis July 29th, 2013; and this report was prepared

19    by myself and Don Waldhalm.

20        Q     Can you turn to page 61 of 65, please.

21              MR. TROUBLEFIELD:  Mr. Waldhalm, can you help

22         him, please.

23              MR. WALDHALM:  Do you want me to get that for

24         you?

25    BY MR. TROUBLEFIELD:

Page 54

1      Q     Do you recognize your signature?

2      A     Yes, I do.

3      Q     Is that your signature on page 61 of 65?

4      A     Yes, it is.

5      Q     And did you read the report before you signed

6   it?

7      A     Yes, I did.

8      Q     Does the report contain your personal

9   conclusions and findings?

10      A     Yes, it does.

11      Q     I'll show you -- turn to Exhibit D-930.  Can

12   you identify that for the record.

13      A     It's a supplemental report, a follow-up to the

14   preliminary rebuttal report.  And it was issued

15   November 4th, 2013; and it's a report that was jointly

16   done by myself and Don Waldhalm.

17            MR. RASCO:  What's that exhibit number for

18        identification?

19            MR. TROUBLEFIELD:  The supplemental report is

20        D-930.

21            MR. RASCO:  Oh, I see, you're just going with

22        the number that's on the bottom?

23            MR. TROUBLEFIELD:  Yeah.  That's the trial

24        exhibit number.

25            MR. RASCO:  Okay.  That's for ID?

1          MR. TROUBLEFIELD:  Yes.

2     BY MR. TROUBLEFIELD:

3          Q    If you can turn to page 70 of 75,

4     Mr. Jorgensen.

5          A    Okay.

6          Q    Can you identify the signatures on page 70 of

7     75?

8          A    It's my signature and Don Waldhalm's

9     signature.

10         Q    Did you participate in the preparation of the

11    report that's D-930?

12         A    Yes, I did.

13         Q    Did you read the report prior to you issuing

14    it?

15         A    Yes, I did.

16         Q    Getting back to the Kennedy report, did you

17    review the Kennedy report, Mr. Jorgensen?

18         A    Yes, I did.

19         Q    Did you review the facts and material relied

20    upon by Mr. Eiras?

21         A    Yes, I did.

22         Q    Did you review any source code in connection

23    with your task as the expert that I retained?

24         A    Yes, I did.

25         Q    Okay.  Now, describe for me, if you can, what

Page 56

1   was the methodology that you used in performing the

2   digital data and forensic analysis in this case.

3        A     Well, the -- we were very limited in the

4   analysis that we were able to perform.  Normally, we

5   would have a forensic image of the source code or a

6   forensic image of the server, which we would prefer to

7   have, on which the source code resided.

8             In this particular case, we were provided

9   source code supposedly, and we received no chain of

10  custody for the source code.  We don't know essentially

11  where that source code came from because there was no

12  formal chain of custody to say where it came from.

13            We were told that it was source code that was

14  put in escrow that we were evaluating.  However, one of

15  the things that you need to do is validate your data

16  before you begin your analysis on that data, whether it

17  be the actual code -- source code line-for-line

18  comparison of the code or whether it be to determine

19  whether that source code is from the source that it's

20  claimed to be from.

21            In this particular case, we began to see -- or

22  I began to see that we had file modification dates, last

23  save dates that were all over the road map -- 2008,

24  2009, 2010, 2011, 2012 -- and we understood the source

25  code that was to be reviewed was from 2009; so

Page 57

1    immediately the validity of this code was called into

2    question.

3            We also noticed that -- what apparent -- what

4    appeared to be -- or I noticed what appeared to be

5    version numbers associated with various files that were

6    non-consistent, which would -- being familiar with

7    source code development and version verification and

8    version updates, I find very strange.  It would indicate

9    to me that the source code that was being provided to us

10   was coming from different sources.

11           And there were many other inconsistencies

12   within the versions themselves to -- that would indicate

13   that the -- that the source code that we were provided

14   was not forensically imaged, although there were

15   depositions where Mr. Fernandez says they were

16   forensically copied, it was in no way forensically

17   copied.  And since XTec is supposedly a forensic firm,

18   it surprises me.

19           A forensic image, as an example, is an image

20   that is taken that cannot be corrupted, cannot be

21   changed, where the metadata is not changed, and provides

22   a baseline for you to review that allows you to

23   determine where the data came from, when the data was

24   created, and when the forensic image was created.  We

25   were never given any documentation for the forensic

1    image.  When a forensic image is created by a forensic

2    software routine, it creates a log.  That log will tell

3    you that that forensic image was created on a certain

4    date, a MD-5 or a SHA-1 hash value, SHA-2 hash value is

5    associated -- SHA-3 hash value is associated with --

6        Q    You have to slow down.

7        A    I'm sorry.

8        Q    You have to go slower, please.

9        A    MD -- I'm sorry.  MD5 -- dash 5.  SHA is

10   capital S, capital H, capital A, 1, 2, 3.

11           These are -- these are algorithms that are

12   used to verify and assign a value to a piece of

13   information so that if that information is changed in

14   any way, the algorithm will compute a new MD5 hash value

15   or SHA hash value, and you will know that the

16   information has been corrupted.

17           This is the manner in which forensic analysis

18   is conducted in order to validate and verify

19   information.

20       Q    How do you know that in terms of the manner in

21   which an analysis should be conducted?

22       A    This is forensic methodology that's followed

23   by forensic digital analysis experts.

24       Q    And how did you develop your understanding of

25   this methodology?

Page 59

```
1         A    Well, it's a requirement -- when I was doing
2    some of the work for the government, it was a
3    requirement from the government, but it is also a
4    practice that is stated in many documents such as the
5    EnCase manual and the X-Ways manual and all of these
6    forensics manuals that talk about how a forensic image
7    is properly taken.
8         Q    Do you know whether or not the methodology you
9    described is generally accepted in the forensic analysis
10   field?
11        A    Yes, it is.
12        Q    And your basis for saying, "yes, it is"?
13        A    Is from the documentation and publications as
14   well as the various lectures and conferences that we've
15   given as well as attended.
16        Q    How often have you used -- strike that.
17             In fact, let me show you a document that's
18   marked Defense Exhibit D-929.
19             MR. TROUBLEFIELD:  Mr. Rasco.
20   BY MR. TROUBLEFIELD:
21        Q    Mr. Jorgensen.
22             Take a look at what I've marked as Defense
23   Exhibit D-929, please.
24        A    Yes, I see that.
25        Q    Can you identify this document?
```

Page 60

1     A     This is our general methodology that we have

2  internally developed and published and which we -- our

3  forensic engineers follow in doing a forensic

4  investigation.

5     Q     Where is it published?

6     A     It's published on our system.

7     Q     The Sylint Group system?

8     A     Yes.

9     Q     Have you used the methodology set forth in

10 Document D-929 in other cases?

11    A     Yes, we do, in all of our cases.

12    Q     For how many years has this methodology been

13 used?

14    A     This methodology was originally put in place

15 in early 2000.

16    Q     Have you used this methodology continuously

17 from early 2000 to the present?

18    A     Yes, we do.

19    Q     Have you personally used this methodology?

20    A     Yes, I do; and I enforce it.

21    Q     When you say you enforce it, what do you mean

22 by that?

23    A     The forensic engineers that bring their

24 results to me as part of our peer review process had

25 better follow these techniques, or I am going to be very

1   upset to the point of discussing other employment

2   options with them.

3          Now, this is updated continually to include

4   the latest software that we're using, to include the

5   latest computer systems, applications, any other

6   techniques that we may have developed.  Some of the

7   techniques we've developed internally, and we've also

8   published them publically, new techniques, like in

9   shellbag technology and things like that.

10      Q    Do you still -- strike that.

11         Presently, do you teach or lecture in the

12  field of forensic analysis?

13      A    Yes, I do.

14      Q    Can you describe what you teach or what you've

15  provided instructing?

16      A    I provide instruction at Ave Maria Law School

17  as part of a class taught there by Professor Steven

18  Teppler.  I provide instruction there in at least two,

19  if not more, of the classes during a semester.  I also

20  lecture the American Bar Association, Electronic

21  Discovery Committee, sometimes as many as five times a

22  year, sometimes as few as three times a year.  I also

23  hold panel discussions and lectures at the RSA

24  conference.

25         I've also lectured in particular subjects

Page 62

1   before the Tampa Bay FBI Infragard group, before the FBI

2   Eastern Regional group, before various other elements of

3   the FBI.  I have also lectured before other government

4   agencies.  I think that that encompasses all of it.

5        Q    And those are in the area of forensic analysis

6   you just described?

7        A    Yes, in the area of forensic analysis.  I also

8   lecture on cyber security, but that encompasses forensic

9   analysis in the cyber security arena.

10       Q    Did you utilize the methodology that you

11  discussed previously in connection with the code review

12  or analysis you performed for CardSmart in this case?

13       A    Yes, I did.  It's just various steps that you

14  must take to validate the data and then to ensure that

15  the data that you're looking at is what you believe

16  you're looking at.

17       Q    Did you personally perform an examination?

18       A    Yes, I did.  I personally performed that

19  examination.

20       Q    Where did you perform the examination or how

21  did you perform it?

22       A    Excuse me.  We performed that -- or I

23  performed that examination, I believe it was October 7th

24  through the 10th.

25       Q    Where?

Page 63

1      A    At Mr. Rasco's law offices.  And then again in

2   January of 2013.

3      Q    And what tools or equipment did you use to

4   perform the analysis?

5      A    Well, we took screen shots of the various

6   source code files that were available to us.  We did not

7   have, I believe, the tools made available to us that

8   would normally be used in code analysis.

9           Later on it was very disappointing for us to

10  find out from deposition from Jan Eiras that he did use

11  various tools to do code analysis that we did not have

12  made available to us.  Of course, he had the data long

13  before we did as well, both Enabler 3 or the CardSmart

14  code as well as the --

15           MR. RASCO:  Objection.

16           THE WITNESS:  -- as well as the Enabler 1

17       code.

18           MR. RASCO:  Objection.  Move to strike.

19       Foundation.

20           THE WITNESS:  And I believe that was stated by

21       Mr. Eiras both in his -- in his expert report as

22       well as in later papers that were produced of

23       Mr. Eiras's.

24  BY MR. TROUBLEFIELD:

25       Q    What was made available to you at Mr. Rasco's

Page 64

1    office in October 2013?

2        A    Essentially a laptop computer with the source

3    code files on that laptop computer, and all we had

4    available to us was the ability to do screen shots and a

5    text editor.

6        Q    And is there a particular name for this text

7    editor that you used?

8        A    I don't remember which one it was.

9        Q    Okay.  And what is the purpose of a text

10   editor?

11       A    It's merely to take notes for the -- for the

12   source code and to flip pages through on the source

13   code.

14       Q    In utilizing the text editor, did you reach

15   any -- strike that.

16            Were you able to capture any data or examine

17   any of the data?

18       A    Well, yes, we did.  And we were able to see --

19   open up the source code files and see the modification

20   dates of the source code files.  So we were -- and we

21   were also able to see the versions of the source code

22   that were being provided to us.

23            And I was particularly interested in -- and my

24   attention focused on -- the metadata -- the last

25   modified date that was present and the last save date

Page 65

1    that was present -- of the source code files.  And I

2    also focused on what appeared to be backups that were

3    being created over time.

4           And if you received -- the reason why that

5    stuck out is because if you supposedly received a

6    forensic image of a source code file, why are you seeing

7    successive backups on successive dates at the same time

8    for that source code file?  You have not received an

9    image of a source code file that's frozen in time.

10   You've received a list of files that were created on

11   some server at some point in time that was running

12   backups, and the backups exceed the date of the supposed

13   source code that's being presented as the code to be

14   compared.  So that was the -- one of the things that

15   struck me right away.

16          Another thing that struck me was the fact that

17   we had various versions that had different metadata

18   dates, different modified dates associated with it right

19   up until 2012.  And one of the -- one of the files that

20   stuck out in my mind more than any other file was a RBS

21   file that -- that we saw, I believe, in 2008, 2009,

22   2010, and 2011; and it was in the December 22nd, 2011.

23   And all of a sudden in this file -- we have seen the

24   same file.  This is the same source code file, same

25   exact source code file, RBS file.  We see it a number of

Page 66

1  different times.  And all of a sudden on December 22nd,

2  2011, we see a copyright 2001 stamp present in that

3  file.

4         Now, how could that occur if we're looking

5  at -- if we're looking at source code files that

6  supposedly existed prior to this date and none of them

7  had that copyright stamp in it?  And all of a sudden, in

8  2011, we get a version of it that has a copyright 2001

9  stamp in it.  That means that these files have been

10  modified over time and that we're seeing a compilation

11  of files over an extended period of time.  There is no

12  forensic image here.  There is no forensic copy that

13  we're looking at.  We're looking at a compilation of

14  files that ran right up to changes made in 2012.

15         So this whole idea is that we're comparing

16  software that was written in 2009 to software that

17  existed in Enabler 3 is ludicrous.  It is just not

18  factually true.

19         MR. RASCO:  Objection.  Form.  Move to strike.

20  BY MR. TROUBLEFIELD:

21    Q    I'll show you a document that -- it's marked

22  as Exhibit D-666.  Can you identify this document for

23  me, Mr. Jorgensen, after you have had an opportunity to

24  look at it.

25    A    Excuse me.  These are screen shots that were

Page 67

1   made by us when we reviewed the source code, and these

2   screen shots were made because they demonstrate what I

3   just -- just talked about.

4           And, in fact -- in fact -- where is that?  In

5   fact, page 14 on the left-hand side shows a copyright

6   2001 stamp that I was talking about.  And you see the

7   last save date was December 22nd, 2011.  And the pages

8   before that are versions of the very same software that

9   we were provided within the source code that shows that

10  copyright stamp doesn't exist on the previous versions

11  of this software.

12      Q    And these are screen shots that you personally

13  made?

14      A    Well, it was a combination of Mr. Waldhalm and

15  myself making screen shots and recording the screen

16  shots.  In fact, that's my writing that's on each of

17  these pages.

18      Q    Oh, your handwriting?

19      A    That's my handwriting.

20          MR. TROUBLEFIELD:  We're going to take a break

21      here.  I think we're getting close to the end of

22      the tape and give the witness a break.

23          THE VIDEOGRAPHER:  Okay.  We're going off the

24      record.  The time's approximately 2:26 p.m.

25              (A brief recess was taken.)

1          THE VIDEOGRAPHER:  We're back on the record.

2      The time's approximately 3:14 p.m.

3          This begins Media Unit No. 2.

4  BY MR. TROUBLEFIELD:

5      Q    Mr. Jorgensen, did you perform -- strike that.

6          Did you do what is necessary to perform a

7  digital forensic analysis of the source code and data

8  that was presented to you on October 13th -- I mean

9  October 2013?

10     A    With the limited facilities, capability, and

11 information that I had to work with, yes.

12     Q    And are you prepared to testify at trial once

13 you appear regarding your analysis and the conclusions

14 that you reached?

15     A    Yes, I am.

16         MR. TROUBLEFIELD:  Oh, for the record, before

17     I forget, I'm going to move into evidence the --

18     what I have marked with the exception of I think

19     expert reports are hearsay, but the other documents

20     I'm going to move into evidence.

21         MR. RASCO:  And I object.  You're not seeking

22     to admit the expert report, though, correct?

23         MR. TROUBLEFIELD:  No.

24         MR. RASCO:  You would agree?

25         MR. TROUBLEFIELD:  Right.  The expert records

Page 69

1      are hearsay.

2           MR. RASCO:  And it was also stricken, in large

3      part, by the magistrate.  You would agree?

4           MR. TROUBLEFIELD:  Yeah, they're subject to

5      what the magistrate judge ruled, and I think

6      generally expert -- written expert reports are not

7      evidence, and they don't go in.  To the extent that

8      you seek to admit your written expert report, then

9      I reserve my right to submit mine.

10   BY MR. TROUBLEFIELD:

11     Q    Now, Mr. Jorgensen, other than the material

12   that was presented at Mr. Rasco's office in

13   October 2013, was there any other material that you

14   reviewed in advance of the inspection?

15     A    Well, we received the directory listing of the

16   source code that we had requested in October and

17   January, but we didn't receive that -- and I forget when

18   but months after -- after the fact from opposing

19   parties.

20           And we reviewed the directory listing looking

21   for -- I was looking for file attribution as well as

22   file metadata, path names, associated versions of the

23   source code within the directory listing that we had

24   originally requested in the October and January time

25   frames.

Page 70

```
 1      Q    Okay.  I want to show you a document that's
 2  marked as Exhibit D-806.
 3           MR. TROUBLEFIELD:  Pass that to Mr. Jorgensen,
 4      please.
 5  BY MR. TROUBLEFIELD:
 6      Q    I'm showing you what's been marked as Exhibit
 7  D-806.  Can you identify that for the record,
 8  Mr. Jorgensen.
 9      A    These are directory listings from various, it
10  appears, computers and servers that purportedly
11  contained the source code of interest.
12      Q    Do you know who prepared or how this document
13  was prepared?
14           MR. RASCO:  Did you produce this before?  Is
15      it --
16           MR. TROUBLEFIELD:  D-806, your office produced
17      this.
18           MR. RASCO:  No, but I didn't know if it was an
19      exhibit.
20           MR. TROUBLEFIELD:  It is.
21           MR. RASCO:  Okay.
22           THE WITNESS:  We had requested the directory
23      listing.  We didn't run the directory listing
24      per se, but we requested a directory listing be
25      produced.
```

Page 71

```
 1    BY MR. TROUBLEFIELD:

 2        Q    "We" being?

 3        A    Don Waldhalm and myself.

 4        Q    And requested who?

 5        A    Requested this from counsel -- plaintiff

 6    counsel's office.  I think it was Mr. Bimston that we

 7    actually requested it from.

 8              MR. TROUBLEFIELD:  Okay.  I'm going to move

 9        D-806 into evidence.

10              MR. RASCO:  Objection.

11    BY MR. TROUBLEFIELD:

12        Q    Did you review any other material?

13        A    We reviewed the original source listing.  We

14    reviewed the additional data that was supplied.  Once we

15    recognized we didn't have all of the source code files

16    that Mr. Eiras had looked at, we requested those.  Those

17    were supplied on the purple thumb drive.  We reviewed --

18    or I reviewed the notes that Mr. Eiras had produced as a

19    result of his review of the source code prior to the

20    September time frame of 2012.  We reviewed the source

21    code itself, of course, on the laptop computer.  And we

22    got these files.  And I can't remember what else we may

23    have reviewed.

24        Q    Did you review any material produced during

25    discovery?
```

Page 72

1        A     Well, we also reviewed depositions, e-mails.

2    We reviewed depositions of Mr. McClain, Mr. Fernandez;

3    reviewed the deposition of Bill Mitchell; reviewed the

4    deposition of Dave Fisher.  I reviewed the deposition of

5    Mr. Waldhalm, my own.  And there may have been one or

6    two other depositions that I reviewed.

7             And also I should say I reviewed various

8    Enabler documents, programmer -- programmer guide for

9    Enabler 3, the original for Enabler 1.  I reviewed some

10   DOD documents concerning RBS and various other

11   background materials in preparation of producing the

12   rebuttal reports.

13       Q     Let me show you a document that was previously

14   marked or is marked as Exhibit D-924, which are excerpts

15   from a larger document.  Please identify that document

16   for the record.

17             MR. RASCO:  Objection.

18             THE WITNESS:  This is -- this is called

19        Enabler Design Document, and it's a design document

20        for the -- description for the -- it's a Navy

21        document, so it's a design document of the

22        description of the Enabler system overall.  It

23        would be Enabler 1.

24   BY MR. TROUBLEFIELD:

25        Q     Is this a complete document?

Page 73

1         A    Well, it's -- it's an Enabler Design Document.

2    It says "Enabler Framework."   I would imagine there are

3    other documents that go along with this.

4              MR. RASCO:   Objection.

5              THE WITNESS:   This is not the only document --

6              MR. RASCO:   Move to strike.

7              THE WITNESS:   -- associated with this.

8              MR. TROUBLEFIELD:   Let the witness finish

9         answering.

10             MR. RASCO:   I'm objecting to his answer.

11   BY MR. TROUBLEFIELD:

12        Q    Did you review any material -- strike that.

13             I'll show you Exhibit D-927.   Can you identify

14   that for the record, please.

15        A    It's the Real Time Broker Service Batch Broker

16   Service Software Development Guide.

17        Q    Did you --

18        A    And -- okay.

19        Q    Did you review the document that's D-927?

20        A    Yes.

21        Q    Let me show you what's marked as D-926.

22             MR. RASCO:   This is -- oh, I see it.   Never

23        mind.

24   BY MR. TROUBLEFIELD:

25        Q    Can you identify Exhibit D-926 for the record,

Page 74

1    please.

2         A     Yeah.  This is a Power Point presentation that

3    describes XTec's AuthentX architecture, and it goes into

4    fairly deep detail about what is described as AuthentX.

5         Q     Did you review document D-926 as part of your

6    investigation?

7         A     Yes, I did.

8         Q     Was there any other material that you

9    reviewed?

10        A     Well, there are other design documents that I

11   reviewed as well.  The programmer design document is

12   another one -- I was particularly interested in that --

13   and the Statement of Work for Enabler 1 and the

14   documentation that goes along with the Statement of Work

15   for Enabler 1 and the Statement of Work for Enabler 3

16   and the document that goes along with the Enabler 3

17   Statement of Work and also the Navy document that

18   describes -- that calls out the RBS formatting for

19   making RBS calls, their system.  I reviewed that

20   document because of the RBS argument that -- that

21   Mr. Eiras made.

22        Q     I'm showing you what's been marked as

23   Exhibit D-920.

24             MR. TROUBLEFIELD:  Mr. Rasco?

25             MR. RASCO:  Thanks.

Page 75

BY MR. TROUBLEFIELD:

1

2       Q     Can you identify that document for the record.

3       A     This is the Enabler 3 Multi-application IT

4   Framework.

5       Q     Did you review this document as part of your

6   investigation?

7       A     Yes, I did.

8       Q     What was the purpose of reviewing this

9   document?

10       A     Well, it gives you -- it gives one a

11   conceptual idea of how Enabler 3 works and what the

12   intention of the Navy is in moving from the Enabler 1

13   architecture to the Enabler 3 architecture.  And it's

14   fairly obvious that there was a strong intent --

15             MR. RASCO:  Objection.

16             THE WITNESS:  -- to move away from --

17             MR. RASCO:  Objection.

18   BY MR. TROUBLEFIELD:

19       Q     Well, Mr. Jorgensen, you can't -- you're not

20   here to offer your opinion regarding someone else's

21   intent.

22       A     There is -- there is -- there is a divergence

23   between the architecture of the two documents, the

24   Enabler 1 and Enabler 3.

25             Enabler 1 is a system --

Page 76

1           MR. RASCO:  Again, I'm going to object.

2       There's no question pending.

3    BY MR. TROUBLEFIELD:

4       Q    Well, I asked about the review of the document

5    and the purpose why you reviewed the document.  Just

6    finish your answer to that.  You cannot testify

7    regarding someone else's intent.

8       A    I reviewed the document because I wanted to

9    determine if the architecture structure for Enabler 3

10   was the same as the architecture for Enabler 1.

11      Q    Did you conduct any interviews as part of your

12   investigation?

13      A    I spoke with Mr. McClain.  I spoke with

14   Mr. Fisher.

15      Q    Did you attend any depositions, personally

16   attend any depositions?

17      A    I attended Mr. Eiras' deposition and

18   Mr. McClain's deposition.  Well, no.  His testimony.

19   Sorry.  Mr. Eiras' deposition.

20      Q    Did you review what was represented to be

21   Enabler 1.0 source code?

22      A    Yes.

23      Q    When did that occur?

24      A    Between October 7th and October 10th, I

25   believe.

1      Q     Who was present during your inspection between

2   October 7th and October 10th, 2013?

3      A     Mr. Bimston, is it, from the plaintiff's

4   counsel's office.  Mr. Waldhalm, of course, was present.

5   We also spoke with Mr. Fernandez by phone.  And, of

6   course, Mr. Rasco was also present part of the time.

7      Q     With regard to Exhibit 806, which is the

8   printout of the directory that was in front of you --

9            THE NURSE:  This one?

10           THE WITNESS:  Uh-huh.  (Indicates

11      affirmatively).

12   BY MR. TROUBLEFIELD:

13      Q     Can you just help us to explain how that

14   document related to the digital data and forensic

15   analysis that you performed.

16      A     Well, we did not have this document in

17   electronic format.  And when we finally did get it in

18   electronic format, we were -- which was months after

19   requesting it, we were able to do some searches on it to

20   zero in on some of the claims that Mr. Eiras was making

21   in his report.

22           One of those areas of interest was in the F

23   number -- FN -- the Function-GetNumber routine.  And in

24   searching --

25           MR. RASCO:  I'm going to object to his

Case 1:11-cv-22866-FAM   Document 470-1   Entered on FLSD Docket 12/17/2014   Page 79 of 220

Page 78

1          testimony in that Mr. Jorgensen was unable to

2          articulate any of this information during his

3          deposition.

4    BY MR. TROUBLEFIELD:

5          Q    Well, continue, Mr. Jorgensen.  The judge will

6    take this up.

7          A    During the search, we came across -- or I came

8    across the Function-GetNumber routine, and surprisingly

9    to me it only showed up in one subdirectory in one

10   version.  And upon further analysis, we -- I was looking

11   at the path that was described for the subroutine and

12   realized that it appeared to be describing a CardSmart

13   subroutine.

14              And, in fact, when we asked CardSmart about

15   it, I realized that that subroutine was unique to

16   CardSmart and that CardSmart had wrote it; therefore,

17   upon further investigation and review, it became

18   apparent to me that CardSmart code had been copied by

19   XTec and that that code was, in fact, being presented in

20   Mr. Eiras' report as XTec code when, in fact, it was

21   actually CardSmart code.

22         Q    During the course of your investigation, was

23   a -- well, the PCOLA server -- strike that.

24              Was the PCOLA server ever made available to

25   you during the course of your investigation?

Page 79

1      A    No.

2      Q    Do you know what the PCOLA server is?

3      A    Yes.

4      Q    Describe what the PCOLA server is.

5      A    The PCOLA server, according to the depositions

6  of Mr. Fernandez and Mr. Mitchell, was the Pensacola

7  server that was in possession of the Navy that Enabler

8  was running on in Pensacola and that supposedly

9  contained the Enabler 1 code and also contained code

10  written by CardSmart.

11          And the PCOLA server, as it was described by

12  Mr. Fernandez in his deposition, was the server that was

13  protected by a PuTTY key and was the server that had a

14  trip wire ADS service on it and was the server that

15  alerted XTec to the fact that code had been changed on

16  that PCOLA server.

17      Q    Was any backup of the PCOLA server presented

18  to you for investigation?

19      A    Not that we were made aware of.

20      Q    Was a forensic image of the PCOLA server ever

21  presented to you?

22      A    No.

23      Q    Is there any -- strike that.

24          With regard to your overall analysis that you

25  performed, that is, your digital data and forensic

Page 80

```
1    analysis, was there any impact in not having either a
2    backup or the PCOLA server to examine?
3         A    Yes.  And that's you cannot validate that data
4    and determine that it actually came from the PCOLA, or
5    Pensacola, server.
6         Q    Why do you say that?
7         A    If a forensic image had been taken of the
8    PCOLA server, you would have an image that described
9    that server --
10             MR. RASCO:  Objection.  The magistrate already
11        ruled that he's not allowed to testify as to chain
12        of custody.
13             THE WITNESS:  I didn't mention chain of
14        custody.
15             MR. TROUBLEFIELD:  We're not talking about
16        chain of custody.  I'm asking about his analysis
17        and what he reviewed, so this is not about chain of
18        custody.
19             MR. RASCO:  Yes, it is.
20    BY MR. TROUBLEFIELD:
21        Q    Continue.
22        A    A forensic image of the PCOLA server would
23    provide you with the identification information of the
24    server.  It would provide you with the dates that the
25    image was taken.  It would provide you with the dates of
```

Page 81

1   the software that was on the server.  It would provide

2   you with a complete directory listing of what was on

3   that server, what applications were running, what

4   software was present, what source code was present.  And

5   we have none of that information; therefore, you

6   can't -- you can't -- except for hearsay, you can't say

7   what was on that server.

8       Q    Well, and you're not -- you're not offering

9   yourself as a legal expert, are you?

10      A    No, I'm not.  I shouldn't have used the word

11  "hearsay."  I should have said you would have to take

12  somebody's word for what was on that server because

13  there is no forensic information available to indicate

14  that, in fact, any software came from the PCOLA server.

15      Q    And how, if any, did that form your

16  conclusions in reviewing the Kennedy report?

17      A    Mr. Kennedy, in his report, appeared to ignore

18  the fact that the data that he was reviewing could not

19  be validated as coming from the PCOLA server -- could

20  not be validated forensically as coming from the PCOLA

21  server.

22      Q    You said Mr. Kennedy.  Do you mean Mr. Eiras?

23      A    I mean Mr. Eiras.  I'm sorry.

24      Q    Jan P. Eiras, correct?

25      A    Yes, that's correct.  Mr. Eiras.

Page 82

1      Q      And his report is reflected on a document I

2    presented to you previously?

3      A      That's correct.

4            MR. TROUBLEFIELD:  Okay.  And, for the record,

5            I think it's P-179.  I believe that's the exhibit

6            number for the Kennedy report.

7    BY MR. TROUBLEFIELD:

8      Q      As a result of your investigation, did you

9    reach any conclusions within a reasonable degree of

10   digital data and forensic analysis?

11           MR. RASCO:  Objection.  Form.

12           THE WITNESS:  That the source code --

13           reviewing the source code in its entirety that was

14           provided to us and the metadata information, the

15           backup information, copyright information, the

16           source code that we were provided to review could

17           not have been from the PCOLA server.

18   BY MR. TROUBLEFIELD:

19     Q      And why do you say that?

20     A      Because of the dates associated with it.  If

21   the -- if we were supposed to be looking at the PCOLA

22   server software as of a certain date and it was prior to

23   the lawsuit, prior to 2011, then why do we have 2012

24   dates present?  Why do we have changes in the actual

25   data in the source code after the date of the lawsuit?

Page 83

1          And initially the argument was that the data

2     that we were to review was Enabler 1 from 2009, so none

3     of the dates that -- of the source code that we were

4     given and the dates when the lawsuit was initiated and

5     the dates that the source code that we were supposed to

6     be reviewing matched.

7          Q    You testified previously about a term

8     "modified" and specifically "date modified."  Do you

9     remember that?

10         A    That's correct.

11         Q    What's your understanding in your expertise of

12    the term "date modified"?

13         A    Well, the metadata -- the last access date,

14    the last modified date, there's a create date.  There's

15    also a last save date.  Depending upon the operating

16    system, those dates were affected by various operations

17    that occur on the computer.

18         You have to be careful when you're looking at

19    the dates that you are looking at the last modified

20    dates for the subdirectories versus the last modified

21    date for a directory that has been moved and -- because

22    you potentially could change the date for the last

23    modified date for a directory -- a primary directory

24    that has been moved, but the subdirectories that were

25    inside it do not change their last modified dates so

Page 84

1  that when you start looking at the data listing or the

2  file listing, and you start seeing subdirectories that

3  have last modified dates that don't coincide with other

4  dates you're looking at, then what you're actually

5  seeing is a directory that has been moved, but there are

6  files with -- inside that directory that have been

7  modified outside of the movement of that one directory.

8      Q    And what is the effect, if any, on a date

9  modified in the context of the analysis that you

10 performed?

11     A    Well, it calls into question the validity of

12 the data.

13     Q    Why is that?

14     A    Because it means that somehow that file has

15 been modified, either it's a file that's been moved into

16 that directory at some later time or it's a file that

17 has undergone various changes over a period of time.

18         So if you have a date that's been established

19 and said, you know, this is the -- this is the date that

20 this information is supposed to represent but yet you

21 have dates that exceed that, then you know that what

22 you're getting is some composite of something, and it's

23 not really the data that is purported to represent

24 information that you're supposed to be analyzing within

25 a certain date/time group or a certain time frame.

Page 85

1      Q     And did you find any date modifieds in

2   connection with either Enabler 1 or Enabler 3 code that

3   you were reviewing?

4      A     Yes.

5      Q     Tell us about that.

6      A     Well, the copyright date is a perfect example

7   of that, and we've already covered that.  We have got a

8   date for a file that -- source code file that we can

9   follow over a number of different iterations, a number

10  of different versions.  And all of a sudden

11  December 22nd in 2011, we have got a copyright stamp

12  within that file where we didn't have one previous to

13  that.  So that would indicate that that source code set

14  has been modified at least by that date of

15  December 22nd -- I think it's December 22 of 2011.

16     Q     With regard to -- well, you read Mr. Eiras's

17  report, correct?

18     A     Yes.

19     Q     Did Mr. Eiras express any opinion regarding

20  the impact of metadata on his analysis?

21     A     I believe early on in his report -- and I

22  don't have his report in front of me -- but early on in

23  his report, he seemed to discount metadata as being of

24  importance because dates can change.  It's obvious that

25  Mr. Eiras doesn't understand when those changes occur

Page 86

1   and how those changes occur.

2        Q    And --

3        A    He just, in total, threw out the metadata as

4   not having any value.

5        Q    Do you agree with his conclusions?

6        A    No, I do not agree with his conclusions,

7   and -- and there are a number of court cases in Westlaw

8   that don't agree with those conclusions.  And the Sedona

9   conference in the -- three years or so ago came out and

10  stated that metadata is an important element in

11  validating information.  And the Sedona conference, of

12  course, is a conference held by federal judges and local

13  judges and lawyers and forensic experts that occurs

14  multiple times during the year in Sedona and other

15  places, and we are participants in the Sedona

16  conference.

17       Q    Are you aware that Mr. Eiras, I believe,

18  concludes in his report that Enabler 3 code was copied

19  by Ms. Suzette Diaz allegedly from the PCOLA server?

20            MR. RASCO:  Objection.  Form.

21            THE WITNESS:  That's correct.

22  BY MR. TROUBLEFIELD:

23       Q    Based upon your investigation, did you form

24  any opinion regarding the code that was copied by

25  Ms. Diaz from the PCOLA server?

1          MR. RASCO:  Objection.  Form.

2          THE WITNESS:  I can't -- I can't tell when

3      that supposedly was done.  It wasn't done

4      forensically.  I can't tell if it was a copy of all

5      the code from the PCOLA server.  I can't tell if it

6      was a partial copy.  A forensic -- a forensic image

7      would have allowed me to be able to determine that.

8      So I can't validate when that copy was supposedly

9      made and where it was actually made from.

10  BY MR. TROUBLEFIELD:

11      Q    Just so we have some clarity on the record,

12  you have in front of you Exhibit D-60 -- 666.

13      A    Yes.

14      Q    I'm going to direct your attention to a page

15  that's Bates stamped 9334.

16          MR. RASCO:  Hold on.

17  BY MR. TROUBLEFIELD:

18      Q    On the upper right-hand corner, there's a

19  handwritten 26 on the right and the left side --

20          MR. RASCO:  Could you wait a minute because I

21      have to get it and then you have to do it again.

22          MR. TROUBLEFIELD:  I'm going to direct you to

23      it.  I'm just going to put it on the record.

24          A page 19 with a slash and a 20.

25          MR. RASCO:  I have the document.  Please tell

Page 88

1      me what you're looking at.  Page?

2              MR. TROUBLEFIELD:  Bates stamp XTec Bates

3      stamp 9334.  In the upper right-hand corner --

4              MR. RASCO:  Hold on.

5              MR. TROUBLEFIELD:  -- there's a handwritten

6      26.  That may help you.

7              MR. RASCO:  Hold on.  Okay.

8              MR. TROUBLEFIELD:  Okay?

9              MR. RASCO:  Now, what else are you referring

10      to?

11              MR. TROUBLEFIELD:  No, just that page.

12              MR. RASCO:  Okay.

13   BY MR. TROUBLEFIELD:

14      Q    Mr. Jorgensen, do you see the name -- well, do

15   you see the -- there are a number of columns on this

16   page; is that correct?

17      A    Yes.

18      Q    Do you see under the column titled "Folder"

19   the name "CardSmart" or part of the name "CardSmart"?

20              If you want, I can --

21              MR. TROUBLEFIELD:  I'm going to approach the

22      witness.

23              THE WITNESS:  Yes, I see that.

24   BY MR. TROUBLEFIELD:

25      Q    Yes.  Okay.  Thank you.

```
                                                   Page 89

 1              Moving from right -- let me get the
 2      microphone.
 3              MR. RASCO:  Where is this?  I don't see it.
 4              THE WITNESS:  Approximately a third of the way
 5          down the page under "folder."
 6      BY MR. TROUBLEFIELD:
 7          Q    All right.  Read the full name, please, so
 8      we're clear on the record.
 9          A    It says -- the first one says "CardSmart
10      user."  It says "C:" -- or it's a parenthetical, open
11      parentheses, C:  Backslash users backslash --
12              MR. RASCO:  Let me see where you're reading
13          from.
14              THE WITNESS:  (Witness indicates.)
15      BY MR. TROUBLEFIELD:
16          Q    Okay.  Go all the way down to before the name
17      "users."  Again, I'll direct you to make it easier.  You
18      got it.
19              MR. RASCO:  How about you show me?
20              MR. TROUBLEFIELD:  If I could jump over the
21          table, I would; but I'm going to show you.
22              It's right there.
23              MR. RASCO:  I see.  Okay.  "Size," "file
24          size."
25      BY MR. TROUBLEFIELD:
```

Page 90

1      Q    Can you read that folder name, please.

2      A    "CardSmart JGS."

3      Q    Okay.

4      A    And above that is "CardSmart Enabler."

5      Q    And what's the size of the folder that you

6   identify as CardSmart JGS?

7      A    It's 67076 kilobits.

8      Q    Moving from right to left, is there a date

9   modified associated with that file?

10     A    10/18/2012.

11     Q    And based upon your expertise, what, if any,

12  significance or effect does the date modified suggest to

13  you regarding that file?

14     A    That that is the time that that file was

15  copied in a stream of individual files that were copied

16  and was copied into -- it was copied into a file that

17  says "Search results to Enabler Pensacola."  It looks

18  like -- I can't read the rest of that, but "Pensacola

19  files from 2012 10/19 from Suzette."

20     Q    And what is the date modified for that file?

21     A    10/18/2012.

22     Q    Turn to the next page, please.  Do you see the

23  name CardSmart on that page?

24     A    Yes.

25     Q    Do you see folders with the name CardSmart?

Page 91

1     A     Yes.

2     Q     And what is the -- or what are the

3  modification dates that you see associated with the

4  files -- some of the files?

5     A     4/1/2012.  And, again, it looks like it was a

6  batch copy.

7     Q     Go down from -- the fifth line from the

8  bottom.

9     A     Okay.

10    Q     Do you see the word "CardSmart user"?

11    A     Yes.

12    Q     What is the date -- is there a modification

13  date associated with that file?

14    A     Yes.  It's 9/25/2010.

15    Q     Okay.  What, if any, significance is the date

16  modified, based upon your expertise?

17    A     Well, there's been files that have been copied

18  in batch that appear to have existed in 2010 that were

19  copied into a directory along with other files that were

20  copied in 2012.  So you've got somebody collecting

21  files, essentially, and these files have different last

22  modified dates associated with them.  And these files

23  are being grouped together by somebody and dumped into a

24  directory called "Search results Enabler Pensacola

25  forensic files."  Obviously there's nothing forensic

Page 92

1     about this.  These are just dumped into -- being dumped

2     into a directory from -- it says here "2012 10/19 from

3     Suzette."

4              So this is a conglomeration of files with

5     different modification dates that are being dumped into

6     a directory, and some of these files go back with last

7     modification dates to 2010.  Some are in 2012 and so

8     forth.

9         Q    And what, if any, conclusions did you reach as

10    a result of having the screen shot of these files and

11    looking at the modification dates?

12        A    Well, in forensic analysis, this makes

13    unreliable any conclusion about the validity of these

14    files representing files from the Pensacola server at

15    any certain time.

16        Q    Why is that?

17        A    Because the dates are inconsistent with that

18    period of time, and they're also inconsistent with one

19    another.  And from the way that they're dropped in and

20    the times associated with them, it appears that these

21    files were -- it appears that these files were combined

22    at a certain time, and -- looking at the times, this may

23    be -- I just have to look at this a little bit.

24             There were backups that were being run, batch

25    backups.  And you could tell they were batch backups

Page 93

1    because of the time frame associated with them.  Batch

2    backups occurred at 11:00 p.m. at night, and these may

3    have been part of the batch backups that were run.

4         Q    And what are batch backups?

5         A    That means you schedule a backup to be run on

6    a server, as an example, where it's going to back up --

7    you can select that you want to back up directories or

8    file folders or individual files or whatever.  And we --

9    I noted in the -- in our screen shots that they were

10   sequential -- we could see sequential directories being

11   run at 11:00 p.m. at night, and they were --

12             MR. RASCO:  Page, please?

13             THE WITNESS:  I'm looking for the page right

14        now.

15             MR. RASCO:  Oh.

16             THE WITNESS:  Let me see if I can find that

17        easily.

18             And we noticed that -- I noticed at 11:00 p.m.

19        we got a production of files.

20             MR. RASCO:  Page, please?

21             THE WITNESS:  And it seemed to occur on a

22        periodic basis monthly.

23             MR. RASCO:  What page?

24   BY MR. TROUBLEFIELD:

25        Q    Well, Mr. Jorgensen, maybe I can -- if you'd

Page 94

1    turn to page handwritten 22 on the left, handwritten 28

2    on the right -- I'll get you there.

3        A    Oh.  There's a sequence -- there's a sequence

4    of date/time groups that appear to be backups being run.

5        Q    In your expertise, were backups being run

6    between the time period 2009 and 2012?

7        A    We noticed this sequence for a period of time

8    within that time frame, yes.

9        Q    Would that suggest that XTec had access to the

10   PCOLA server during that time period?

11       A    Well, if they've got the backups, it would

12   certainly indicate that.

13       Q    Based upon your expertise and knowledge of

14   this case, were backups being made after the lawsuit was

15   commenced?

16       A    It appears that's the case, yes.

17            MR. RASCO:  Page, please?

18            MR. TROUBLEFIELD:  We're still on page upper

19       left 22.

20            MR. RASCO:  That's before the lawsuit was

21       commenced.

22            THE WITNESS:  There's a 4/12.

23            MR. TROUBLEFIELD:  4/12, it's after the

24       lawsuit.

25            THE WITNESS:  4/20/12.  And on a couple of

Page 95

1        other pages, you'll see the 4/20/12 also.  Backups

2        extend over a number of years.

3    BY MR. TROUBLEFIELD:

4        Q    For the record, if you look at page 21 -- or

5    upper left 21, then to the right handwritten 27, Bates

6    stamp 9335, there's a column under "Date Modified."  Do

7    you see that, Mr. Jorgensen?

8        A    Yes, I do.

9        Q    And what are the approximate dates?

10        A    It's -- well, you see 4/1/2012.  You see the

11    11:00 p.m. date/time group.  And then you see 9/25/2010

12    as a group also.  That was another backup that was run.

13            Then on the next page, you see -- down on the

14    bottom you see 8/25/2010, so there's -- it's obvious

15    we're getting a number of backups being run at the same

16    time, and those files are being dumped into this group

17    of files.

18        Q    So, Mr. Jorgensen, what, if any, conclusions

19    did you reach regarding the analysis that was performed

20    by Mr. Eiras from the perspective of your digital data

21    and forensic analysis that you performed?

22        A    Proper forensic analysis procedures were not

23    followed in determining the validity of the data that he

24    was reviewing.

25        Q    Do you know whether or not Mr. -- in your

Page 96

1    opinion, Mr. Eiras followed any methodology in

2    performing his analysis from a digital data and forensic

3    analysis point of view?

4        A    I did not see any documentation.

5        Q    Do you know whether or not Mr. Eiras, based

6    upon reading his report, made any attempt to

7    forensically verify the code presented to him?

8        A    I saw no attempt to do that, no, in his

9    report.

10        Q    What, if any, impact does that have in your

11   conclusions in your report?

12        A    Mr. Eiras didn't -- well, our reports are

13   rebuttal to Mr. Eiras's.

14        Q    Right.

15        A    So he didn't follow proper forensic procedures

16   in determining the validity of the data and didn't

17   address the issue.  So as a forensic analyst, that

18   negates much of what Mr. -- much of what Mr. Eiras

19   concludes.

20        Q    And what, if any, impact does that have on the

21   source code analysis that he performed?

22             MR. RASCO:  Objection.  Form.

23             THE WITNESS:  Well, the source code

24        analysis -- as an example, part of the source code

25        analysis was identifying the Function-GetNumber

Page 97

1          sequence as being similar between CardSmart code

2          and XTec code.  And from our analysis, we know that

3          that was actually a comparison of CardSmart code to

4          CardSmart code, so his conclusion was erroneous.

5          And that certainly calls into question his

6          validation of the code that he was looking at.

7     BY MR. TROUBLEFIELD:

8          Q    Did you draw any conclusions with regard to

9     the RBS portion of the code that was cited to by

10    Mr. Eiras solely from a digital data and forensic

11    analysis point of view?

12         A    Well, the only thing that I noted was that in

13    the programmer's manual, there were numerous

14    recommendations on the format and the manner in which

15    the RBS calls should be made.  And those calls appear to

16    be strikingly similar to the RBS calls that were in

17    the --

18         Q    Was that more --

19              MR. RASCO:  Let him finish his answer.

20              In the what?  In the design review document?

21              THE WITNESS:  They were -- and that is

22         Mr. Waldhalm's purview.  It's not my purview.

23         There was -- and from the forensics point of view,

24         in the -- there was something in the RBS area.  I'm

25         trying to remember.

Page 98

1          MR. RASCO:  I object to the extent he's

2      testifying as to what Mr. Waldhalm would have

3      testified to.

4          THE WITNESS:  I withdrew that comment.

5  BY MR. TROUBLEFIELD:

6      Q    I'll strike that question.

7      A    I'm -- I can't remember what it was now; but I

8  think that there is something in the RBS area, and I

9  can't remember what it is.

10     Q    Let me see if I can find it.

11         With regard to the copyright that you

12  indicated that you found, in what portion of the code

13  did that appear?

14     A    Well, that appeared in the RBS -- that

15  appeared in the RBS code area, the copyright stamp.

16         MR. TROUBLEFIELD:  Okay.  Thank you.  Right

17      now I have no further questions because you are

18      going to be testifying in court.  I'll tender the

19      witness to Mr. Rasco.

20         THE VIDEOGRAPHER:  And I have four --

21         THE NURSE:  Is this a good breaking point?

22         MR. TROUBLEFIELD:  Yes.

23         MR. RASCO:  She has four minutes.  Let's take

24      a break.

25         THE VIDEOGRAPHER:  Okay.  We're going off the

Page 99

1      record.  The time's approximately 4:10 p.m.

2                  (A brief recess was taken.)

3              THE VIDEOGRAPHER:  We're back on the record.

4      The time's approximately 5:00 p.m.

5                       CROSS-EXAMINATION

6  BY MR. RASCO:

7      Q      Good afternoon, Mr. Jorgensen.

8      A      Good afternoon.

9      Q      You indicate that you're an expert in the area

10  of digital forensics; is that correct?

11     A      That's correct.

12     Q      Digital forensics applies to the comparison of

13  digital images, for example, two photographs?

14     A      It can.

15     Q      Digital forensics applies to comparisons of

16  music to determine if there's been copying?

17     A      It can.

18     Q      Digital forensics applies to areas in which

19  you're trying to determine the percentage of

20  similarities between two competing products, correct?

21     A      Could you ask that question again, please.

22     Q      Digital forensics is the type of science that

23  compares the percentage of similarities between two

24  things such as images or music, digital recording,

25  et cetera, correct?

Page 100

1          A    It can.

2          Q    And that's generally -- the digital forensics

3    area is used for copyright infringement for music,

4    correct?

5          A    No, it's not.

6          Q    Where they don't -- when you're determining if

7    music has been copied, they run it through computer

8    software to determine the number of similarities,

9    correct?

10         A    They might do that.

11         Q    And if they reach a certain amount of

12   similarities, there's a determination that it was

13   copied, correct?

14         A    That is a very simplistic question, and the

15   answer is much more complicated than that.

16         Q    Okay.  You said that digital forensics is

17   divergent from computer science.  Do you recall making

18   that statement?

19         A    Digital forensics, yes.  It's more complicated

20   than computer science in itself, yes.

21         Q    What do you mean by it's divergent?  It's

22   different than computer science; is it not?

23         A    It has certain marked differences; and I

24   stated those in my earlier comments, some of those

25   differences between computer science versus digital data

Page 101

1    forensics, yes.

2        Q    What you do is not recognized as computer

3    science, is it?

4        A    In courses taught in colleges, digital data

5    forensics is typically a separate course of study than

6    computer science.

7        Q    Exactly.  Because it's not recognized by the

8    computer scientific community?

9        A    That's not true.  That's why in colleges they

10   establish it as a separate course of study because they

11   recognize the differences between the two.

12       Q    Under what --

13       A    If the computer science department didn't

14   recognize that, they wouldn't establish computer

15   forensics departments.

16       Q    What science -- what area of science -- could

17   you identify for me the area of science -- the type of

18   scientists that would recognize digital forensics?

19       A    Computer -- I don't understand why you say

20   that computer science doesn't recognize digital

21   forensics because they're taught in the same schools as

22   two separate subjects.

23       Q    Please answer my question.  My question is:

24   What area of science is digital forensics?

25       A    Generally speaking, it's probably under the

Page 102

1    computer sciences.

2         Q    You've already told me it's divergent from the

3    computer sciences and it's different.  And you say in

4    schools it's not the same.

5         A    It's divergent in the same way that

6    programming under the computer sciences is a different

7    course of study than network design, computer design --

8         Q    What course of study --

9         A    -- processor -- processor development and

10   design.

11        Q    Tell me in what course of study is digital

12   forensics.

13              MR. TROUBLEFIELD:  Let the witness answer

14        first.

15   BY MR. RASCO:

16        Q    What is the course of study?

17        A    Pardon me?

18        Q    What is the course of study for your digital

19   forensics?

20        A    It's digital forensics.

21        Q    I see.

22        A    There are degrees that are awarded in digital

23   forensics.

24        Q    And --

25        A    And computer forensics and digital forensics.

Page 103

1      Q     Does that require programming knowledge?

2      A     I'm sure that there are some programming

3   courses that are associated with it just like there are

4   programming courses associated with any engineering

5   degree in today's world.

6      Q     In order to receive a digital forensics

7   degree -- is that the right terminology?  You indicate

8   that one exists.

9      A     Computer forensics, yes.

10     Q     A computer forensics degree?

11     A     Right.

12     Q     Does that exist?

13     A     Yes, it does exist.

14     Q     Do you know what college?

15     A     As an example, Florida Central -- Central

16   Florida University awards a computer forensics degree.

17     Q     Are you required to know how to program as a

18   condition of receiving this degree?

19           MR. TROUBLEFIELD:  Object to the form of the

20      question.

21           THE WITNESS:  I am sure that programming is

22      some of the sub-courses in that -- in that course

23      of study.

24   BY MR. RASCO:

25     Q     Okay.  You're not a programmer, are you?

Page 104

1      A    I have programmed, yes.

2      Q    You have told me you're not a programmer;

3  isn't that correct?  You even said that today.

4           MR. TROUBLEFIELD:  Objection to the form of

5      the question.

6           THE WITNESS:  I told you that I don't do

7      programming today; but I also have told you that I

8      have done programming, and I have done programming

9      in language -- COBOL, BASIC, FORTRAN -- and I have

10      reviewed programs written in C, C+, and C sharp.

11  BY MR. RASCO:

12      Q    Do you know how to read code?

13      A    To some extent, yes.

14      Q    Didn't you tell me in your deposition that you

15  do not know how to read code?

16      A    I didn't -- I never said that.

17      Q    Didn't you tell me that Don Waldhalm was your

18  Seeing Eye dog for reading code?

19      A    Don Waldhalm's responsibility in this case was

20  to do the source code evaluation.

21      Q    Did you tell me that Don Waldhalm was your

22  Seeing Eye dog for purposes of reading code?

23      A    I did not use those terms, no.

24      Q    Your deposition was taken on January 24th,

25  2014.  Do you recall that?

Page 105

1         A     Yes.

2         Q     You swore to tell the truth on that date; did

3    you not?

4         A     Yes, I did.

5         Q     Did you tell the truth?

6         A     Yes, I did.

7         Q     I'm going to read to you from page 54, line 9:

8               Question:  But you wouldn't consider yourself

9    an expert in reading code?

10              Answer:  No, I would not.

11              I'm going to ask you again:  Do you consider

12   yourself an expert in reading code?

13              MR. TROUBLEFIELD:  Objection to the -- object

14        to the form of the question.

15              THE WITNESS:  I have never said that I was an

16        expert in reading code, and that is not the

17        question that you previously asked me.

18   BY MR. RASCO:

19        Q     Okay.  All right.  So we will establish, you

20   are not an expert witness for purposes of reading code;

21   is that a correct statement?

22        A     That's correct.

23        Q     Okay.  On line 22, page 54:

24              Question:  Don is like your Seeing Eye dog for

25   code?

1           Answer:  Yes, exactly.

2           Do you remember saying that?

3       A    Those are your words.  I did not say that.  I

4    said "yes" to your question.

5       Q    Okay.  When you said "yes," was that true?

6       A    Generally speaking, yes.

7       Q    Then Don is your Seeing Eye dog for purposes

8    of reading code, yes?

9       A    I personally would not use those words to

10   describe his expert position in this, but I was willing

11   to accept your words in the description.

12      Q    Okay.  Do you no longer accept my words and

13   wish to change your testimony?

14           MR. TROUBLEFIELD:  Objection to the --

15           objection to the form of the question.  Improper

16           impeachment.

17           THE WITNESS:  I'm not changing my response to

18           your question, but I did not use those words.

19   BY MR. RASCO:

20      Q    Okay.  But you agreed with them?

21      A    I agreed with the generalization that you were

22   making.

23      Q    Okay.

24      A    You misrepresented what I said and told me

25   that I had said those words.

1      Q     Sir, you indicated that computer science

2  doesn't understand digital forensic data.  You said that

3  today; did you not?

4      A     I don't know what the exact comment was.

5      Q     That's what I wrote:  Computer

6  science doesn't --

7      A     That doesn't mean it's correct, but I would

8  like to have my statement read back if we are going to

9  play with statements like that.

10      Q     Okay.  Does computer science recognize digital

11  forensic data?

12      A     Of course it does.

13      Q     You said they don't recognize it because they

14  are not involved in reverse engineering.  Do you

15  remember that statement?

16      A     I would have to have the statement read back

17  to me to understand exactly what was said.

18      Q     Okay.  Assuming that's what you said, is that

19  a correct statement?

20      A     Say it again.

21      Q     That computer science doesn't understand

22  digital forensic data because they are not involved in

23  reverse engineering.

24      A     I would say that computer science doesn't

25  necessarily -- computer scientists and computer science

Page 108

1    doesn't necessarily understand computer forensics.  I'm

2    sure that there are some computer scientists that do,

3    but I'm also sure that there are computer scientists

4    that don't understand what's involved in computer

5    digital data forensics work.

6        Q    So your position is that, generally speaking,

7    computer scientists don't understand?

8        A    I don't know what the percentage is, but I

9    just gave you a definition of some of them do and some

10   of them don't.  I do not know what the percentages are.

11       Q    Is it a small percentage or a large percentage

12   that understand it?

13       A    I don't know.  I just know that some don't and

14   some do.

15       Q    Do you have any reference to any recognized

16   treatise or scientific compilation, peer review, that

17   discusses computer digital forensics data as you are

18   describing it in this deposition?

19       A    Could you ask that question again, please.

20       Q    Yes.  Can you point me to any recognized

21   scientific treatise or article or textbook that

22   recognizes computer digital forensic data as you have

23   defined it in this deposition today?

24       A    I believe the EnCase book that you were

25   looking at out there does.  I believe that Mandiant's

1  book also does.  And I believe the X-Ways book does.

2     Q     And these books are manuals for computer

3  software; is that correct?

4     A     Negative.  They are not.  You looked at them.

5  They're not manuals for computer software.

6     Q     Are they -- are they -- is X-Case software?

7     A     Either you're talking about X-Ways or EnCase,

8  one or the other.

9     Q     Okay.  Thank you for correcting me.  Let's

10  talk first about EnCase.  Is that software?

11     A     EnCase is a suite of software that performs

12  forensic analysis.  The books that you looked at both

13  discuss how to use the data that is developed using that

14  suite of software, how to use it in reports, and the

15  types of reports that it produces, and how to go about

16  doing forensic analysis using that information.

17     Q     It's -- so that book is not a recognized

18  scientific treaty.  It is a private manual to assist a

19  user of a suite of software products sold by a

20  particular company?

21     A     You asked me for books, and I gave you a book.

22     Q     I understand that.  Now I'm going to ask you

23  for not a private software manual but a scientific

24  treatise.  Do you know of any scientific treatise or

25  textbook not associated with the sale of software that

```
                                              Page 110
 1    recognizes digital forensic data the way you have

 2    described it today?

 3         A    I pointed one out to you, and that's the book

 4    by Mandiant that's out there.  And that just discusses

 5    forensics and forensics analysis, and it does not talk

 6    about software.  It's not written for any specific

 7    software.

 8         Q    Who is the author?

 9         A    Kevin Mandiant.

10         Q    How do you spell that?

11         A    M-a-n-d-i-a-n-t, I believe.

12         Q    And do you know whether that -- whether his

13    writing was peer reviewed?

14         A    No, I do not; but it is an accepted standard

15    in the industry.

16         Q    Much like you say you're an accepted standard?

17              MR. TROUBLEFIELD:  Objection.

18    BY MR. RASCO:

19         Q    Correct?

20         A    I never said I was an accepted standard.

21         Q    We'll get to that.

22              You talked about DRIL software to review

23    metadata; is that correct?

24         A    I talked about DRIL software that encompasses

25    the collection of the metadata along with the
```

Page 111

1    information in the files, yes.

2        Q    And then does it assign values to create hash

3    numbers for comparisons?

4        A    No.  That's done in the forensic software.

5        Q    Okay.  What does DRIL do?

6        A    DRIL allows you to load files into a review

7    system so that the files and the information within the

8    files can be reviewed along with the metadata and the

9    other associated data associated with that particular

10   file.

11       Q    It's a software tool for eDiscovery in native

12   format; is that a correct statement?

13       A    Not only in native format, you can review a

14   TIFF, and you can review in other formats as well.

15       Q    Okay.  But it is a -- it is a software tool

16   used by lawyers for eDiscovery, correct?

17       A    Yes.

18       Q    EDiscovery being electronic discovery,

19   correct?

20       A    That is correct.

21       Q    It is not -- it is -- when you receive

22   thousands of documents, it allows you to perform

23   analytical searches and to search for relevant

24   documentation for a legal proceeding; isn't that

25   correct?

Page 112

1          A    Simplistically, yes.

2          Q    Okay.  It's not a tool used by scientists.

3    It's a tool used by lawyers, correct?

4          A    It's a tool used by lawyers and by eDiscovery

5    people, yes.

6          Q    All right.  Paralegals use it, right?

7          A    Forensic people use it.  We use it all the

8    time.

9          Q    You use it for litigation support?

10         A    That's correct.

11         Q    You don't use it for any other scientific

12   purpose, do you?

13         A    No.

14         Q    Okay.  And law firms know how to use DRIL,

15   right?

16         A    The law firms that are using it, yes.

17         Q    So are the law firms -- are the lawyers now

18   expert witnesses and they can testify in

19   misappropriation cases because they know how to use

20   DRIL?

21              MR. TROUBLEFIELD:  Object to the form of the

22         question.

23   BY MR. RASCO:

24         Q    Does that make a lawyer an expert witness now?

25         A    I don't understand the question.  It's

Page 113

1   nonsensical.

2       Q    You claim to be familiar with the use of DRIL,

3   a legal software, correct, a legal assistant software?

4       A    I claim -- yes.

5       Q    And you use that.  And the fact that you use

6   that software, which lawyers and paralegals and legal

7   secretaries use, is that part of your expertise, knowing

8   how to use DRIL?

9       A    I brought up the DRIL program as an example of

10  my oversight of software development within the company

11  and the fact that I understand the software development

12  process.  I didn't make any other claims --

13      Q    Okay.

14      A    -- for DRIL other than that.

15           MR. TROUBLEFIELD:  Finish your question.

16      Finish answering the question before you answer

17      another one.

18           MR. RASCO:  I think he did.

19           MR. TROUBLEFIELD:  Take your time.

20  BY MR. RASCO:

21      Q    Did you finish?

22      A    Yes.

23      Q    Would you agree with me that your knowledge of

24  DRIL is irrelevant to this case?

25      A    I just spoke to you about DRIL provides a

Page 114

1    demonstration of my understanding of the software

2    development process, the software development

3    requirements, the manner in which software is

4    structured, the -- the necessity for modular structure

5    of a software product; and that is all that I intended

6    to do by bringing up DRIL, and I think I did it at the

7    time that I discussed it.

8         Q    I understand.  But, see, when you sit here and

9    you say that, "Oh, I know about this, and I know about

10   that," it makes you seem, to a juror, like you're a very

11   highly educated person that's very familiar with the

12   scientific methodologies.  And so when you give an

13   opinion, they don't -- which they don't understand

14   because they're not scientists, they tend to give you

15   credence and weight because you know this, for example,

16   DRIL methodology.  So my question to you is -- and I

17   want to be clear --

18             MR. TROUBLEFIELD:  Move to strike the

19        statement that you just made.

20   BY MR. RASCO:

21        Q    My question to you is:  Your knowledge of DRIL

22   does not -- is not -- does not give you an expertise

23   that you are applying in this case, does it?

24             MR. TROUBLEFIELD:  Objection.  Asked and

25        answered.

Page 115

1           THE WITNESS:  My involvement in the

2       development of a software program that I oversaw

3       does provide me with an understanding of software

4       development, software development techniques,

5       methodology, and --

6   BY MR. TROUBLEFIELD:

7       Q    Is that a "yes" or a "no"?

8           MR. TROUBLEFIELD:  Stop.

9           Answer the way you want to answer the

10      question.

11          THE WITNESS:  -- and any software development

12      effort that is properly conducted.  And the way

13      that I have directed that DRIL be developed follows

14      the software development guidelines that I used as

15      a program manager while I was working for the

16      government.

17  BY MR. TROUBLEFIELD:

18      Q    I understand that, but I need a yes-or-no

19  answer.  Let me try to rephrase it, and if you could

20  please answer with a "yes" or "no," I would greatly

21  appreciate it.

22          Does your specialized knowledge of DRIL -- was

23  that applied in any way in this case?

24          MR. TROUBLEFIELD:  Object to the form of the

25      question.

Page 116

```
 1            THE WITNESS:  Are you asking me if my
 2       specialized knowledge of DRIL and its operation, or
 3       are you asking me specialized knowledge in DRIL in
 4       its development?
 5  BY MR. RASCO:
 6       Q    I don't know how -- DRIL.  It's -- DRIL is
 7  your company's software, correct?  You sell it?
 8       A    Yes, but you're asking a question that doesn't
 9  make sense.
10       Q    Okay.  Every expert has a skill set.  They
11  take that skill set, and they apply it to facts in a
12  particular case.  And that skill set applied to the
13  facts creates an opinion.
14            My question is:  Did you use your skill set,
15  which is embodied with DRIL, whatever it is -- I know
16  it's a private software that your company created and
17  sells.  Did you use your skill set from DRIL and apply
18  it to a fact of this case?
19            MR. TROUBLEFIELD:  Object to the form of the
20       question.
21  BY MR. RASCO:
22       Q    Yes or no?
23       A    I used my --
24       Q    Yes or no, and then you can explain if you
25  want.
```

Page 117

1           MR. TROUBLEFIELD:  No, no.  No.  Answer the
2       way --
3           MR. RASCO:  I object.  Nonresponsive.
4           MR. TROUBLEFIELD:  -- you want to answer the
5       question.  Answer the question.
6           THE WITNESS:  I used my experience in software
7       code development of DRIL to assist me in asking
8       questions about the development process in this
9       case.
10  BY MR. RASCO:
11      Q    Development by CardSmart?
12      A    Both CardSmart and XTec.
13      Q    So you're going to have an opinion as to how
14  CardSmart developed its code?
15      A    I did not say that.  I said I used it to
16  assist me in understanding information in this case.
17      Q    Okay.  What information?
18      A    The development process used by CardSmart and
19  the development process used by XTec.
20      Q    How does that relate into an opinion?
21          MR. TROUBLEFIELD:  Objection.
22          THE WITNESS:  There are lots of pieces of
23      information that assist you in understanding the
24      data being presented in the case and the arguments
25      being used in the case by the various individuals

Page 118

1          involved.

2     BY MR. RASCO:

3          Q     You can't pinpoint any particular opinion or

4     any fact to which you've applied your knowledge -- your

5     specialized knowledge to form an opinion, can you, other

6     than generalized it makes you a smarter person?

7               MR. TROUBLEFIELD:  Objection.  Argumentative.

8     BY MR. RASCO:

9          Q     Can you identify a skill --

10         A     It assists me in understanding --

11         Q     A fact.

12         A     -- the development process that may have been

13    applied by CardSmart and XTec.

14         Q     So this is just your general education, your

15    general knowledge, that makes you a very smart person?

16    Is that what you're saying?

17         A     It is a particular knowledge about how

18    software is developed and the process used in developing

19    software that assists me in understanding the

20    development process for CardSmart and for XTec.

21         Q     I'm going to move on.  Shumaker -- the

22    Shumaker Loop.

23         A     Shumaker Loop.

24         Q     Shumaker Loop, tell me what that is.

25         A     Shumaker Loop is a law firm.

1     Q    It's a law firm.  And what does that law firm

2    have to do with this case?

3     A    I mentioned that -- Shumaker Loop, as an

4    example, was a firm that uses DRIL extensively, and

5    that's all.  That's --

6     Q    And so by using DRIL extensively, do they

7    become digital forensics experts, these lawyers?

8     A    I didn't say that.

9     Q    I'm asking you that.  I'm not suggesting you

10    said that.  I'm asking you:  Does a lawyer who knows how

11    to use DRIL, does he become a digital forensics expert?

12     A    No.

13     Q    And neither did you --

14          MR. TROUBLEFIELD:  Objection.

15    BY MR. RASCO:

16     Q    -- correct?  Your use of DRIL does -- your

17    knowledge of DRIL does not make you a digital forensics

18    expert either, does it?

19     A    No.

20     Q    Let's talk about Stalker.  You said that's

21    cyber security software?

22     A    That's its application, yes.

23     Q    And that's like to protect from hackers,

24    right?

25     A    That's a pretty simplistic view of it.

Page 120

1     Q     Hackers, phishing.  It keeps -- it's like a

2  firewall?

3     A     No, it's not like a firewall.

4     Q     Does it protect your sensitive information?

5     A     It helps a company protect their sensitive

6  information, yes.

7     Q     Does your knowledge of Stalker -- is that in

8  the skill set that you applied in reaching expert

9  opinions in this case?

10     A     Again, my oversight of Stalker and the

11  software development effort assisted me in understanding

12  software development in general, and that's what the

13  reference was to when I mentioned Stalker.

14     Q     So you have programmers that you employ that

15  created this software?

16     A     I have programmers that I employ indirect that

17  create the software.

18     Q     You don't create it, correct?

19     A     No, I do not create it.

20     Q     Because you're not a programmer, correct?

21          MR. TROUBLEFIELD:  Objection.

22          THE WITNESS:  If I wanted to take the time to

23       learn the programming, again --

24          MR. TROUBLEFIELD:  Answer the question.

25          Don't interrupt the witness, please.

1    BY MR. RASCO:

2         Q    Go ahead.

3         A    If I wanted to take the time to learn the

4    programming again, I could do that; however, it will be

5    a waste of my time.  I hire programmers to do that.

6         Q    Okay.  Let me explain something to you.  This

7    deposition could take two hours, or it could take five

8    hours.  Sometimes I ask a question that could be

9    answered with a "yes" or "no."  It's okay to say "yes"

10   or "no."

11             MR. TROUBLEFIELD:  Excuse me.

12   BY MR. RASCO:

13        Q    You don't have to defend yourself by giving a

14   defensive answer.

15        A    Are you instructing me, Counselor?

16        Q    I am.  I'm asking you to be responsive to my

17   question.  If a judge were here, the judge would order

18   you to be responsive.  And so I'm asking you, as a

19   courtesy, if you could please respond to my question.  I

20   understand that sometimes you may have to explain your

21   answer, but if you can give me a yes or no --

22        A    I am responding to your questions, but I will

23   not --

24             MR. TROUBLEFIELD:  For the record, if we

25        were -- this is for -- will be reviewed by the

Page 122

1          judge.  You don't instruct this witness or give

2          statements on what he -- and how he should answer.

3          If we were before Judge Moreno or Judge Hunt, you

4          would be stopped.  So I wish you to stop, listen to

5          the questions -- or the answers that he gives, and

6          move on.

7                    MR. RASCO:  Because Judge Moreno would

8          instruct him to say "yes" or "no."

9                    MR. TROUBLEFIELD:  He would instruct you, too.

10   BY MR. RASCO:

11         Q     You said you have a degree -- you have a

12   degree from Northeastern University in --

13         A     I did not say that.

14         Q     You do not have a degree from Northeastern

15   University?

16         A     I do not have a degree from Northeastern

17   University.  I never said I did.

18         Q     You took electrical engineering courses,

19   correct?

20         A     Yes.

21         Q     You are not an electrical engineer, are you?

22         A     I misspoke.  I took chemical engineering

23   courses from Northeastern University.

24         Q     I just want to be clear with the record.  Are

25   you an electrical engineer?

Page 123

1        A     No, I am not a certified electrical engineer.

2        Q     Are you an electrical engineer?

3        A     I have been classified as an electrical

4    engineer by Fairchild Weston and Loral.

5        Q     After one year of class -- of college and a

6    four-year degree?

7        A     Pardon me?

8        Q     Isn't that a four-year degree?

9        A     Yes, it is.

10       Q     And yet you only took one year; isn't that

11   correct?

12       A     I told you I did not complete the course of

13   study.  I do not have a degree from Northeastern

14   University.

15       Q     So let's be clear, sir.  You're here under

16   oath.  You have to tell the truth.  You are not an

17   electrical engineer, are you?

18             MR. TROUBLEFIELD:  Objection.  Form.

19             Again, you know, Counselor, I think you are

20        crossing the line.  Examine him.  Don't preach and

21        don't state and don't try to reprimand him.  Ask

22        questions, and then we can move on.

23   BY MR. RASCO:

24       Q     Please answer the question, sir, yes or no.

25       A     I am not --

Page 124

1     Q    It's okay to say "no."

2     A    I told you I am not a certified electrical

3  engineer.

4     Q    See, but you qualify it.  That would lead

5  somebody to believe that you are an electrical engineer

6  but not a certified electrical engineer, and that is not

7  my question.  You are not an electrical engineer of any

8  kind, isn't that a correct statement:  Yes or no?

9     A    That is not entirely a correct statement.

10    Q    So after one year of college, you hold

11 yourself out to the general public as an electrical

12 engineer?  Is that a true statement, or is that a false

13 statement?

14    A    No, I do not hold myself out to the public as

15 an electrical engineer.

16    Q    Then why can't you just tell me you're not

17 one?  I'm not an electrical engineer, and that's okay.

18    A    Because --

19         MR. TROUBLEFIELD:  Objection.  Argumentative.

20    Move to strike.

21         THE WITNESS:  Because companies will sometimes

22    class their employees as engineers, electrical

23    engineers, for pay purposes as well as recognition

24    purposes.

25

Page 125

1   BY MR. RASCO:

2        Q    Have you ever -- strike that.

3             Are you a chemical engineer?

4        A    No, I am not.

5        Q    See how easy that was?

6             MR. TROUBLEFIELD:  Glad this is being

7        videotaped.

8   BY MR. RASCO:

9        Q    You said that you were trained by the NSA how

10   to program in machine language.

11        A    Yes.  I said assembly language, but that's all

12   right.

13        Q    I wrote "machine."  But whatever you said, you

14   said.

15             But, sir, isn't it true that you are not an

16   expert in programming machine language?

17        A    I am not -- I am not currently an expert in

18   programming assembly language, no.

19        Q    And you did not use any expertise in

20   programming assembly or machine language in this case;

21   is that correct?

22        A    That's correct.

23        Q    Okay.  So the fact that you were trained by

24   NSA and at one time may have been -- may have considered

25   yourself someone who knows how to program in assembly

Page 126

1    language, that's irrelevant to this case, correct?

2        A    No, it's not irrelevant.

3        Q    Well, tell me how -- which skills did you

4    use --

5        A    Having actually done programming at one

6    time --

7        Q    Makes you a smarter person, is that what

8    you're saying?

9            MR. TROUBLEFIELD:  You know, Mr. Rasco, if

10           you're going to continue to make mis-handed,

11           backhanded and unnecessarily abusive statements --

12           it's getting tiring.  We're late in the day.

13           Please treat this witness who had open-heart

14           surgery with respect.  He deserves it.

15   BY MR. RASCO:

16       Q    Sir, you did not use any of your NSA training

17   in assembly -- in assembly programming in this case, did

18   you?

19       A    Yes, I did.

20       Q    Tell me which machine language or assembly

21   language did you read in this case?

22       A    If you know anything about programming, you

23   understand that there are certain flow, there's a

24   certain terminology that's used, there's a certain

25   programming formatting that's used.  And when

Page 127

1  Mr. Waldhalm was looking through the code and he would

2  find something of interest, he would say to me, "See,

3  this is happening in the code."  And I could understand

4  what Mr. Waldhalm -- what Mr. Waldhalm was talking

5  about.  So it assisted me in better understanding

6  Mr. Waldhalm's expert evaluation of the source code.

7      Q    Sir, assembly language is all zeros and ones,

8  isn't it?  It's not --

9      A    It also has -- no, it's not.  And it also has

10  programming -- program formatting that is similar to

11  other languages.

12      Q    Tell me about that.  I would like to know.

13  Tell me what programming formatting it has, if you're

14  able.

15      A    Just the commands.  Just the way the commands

16  are structured and how the commands are executed.

17      Q    But you don't have expertise in what

18  happens -- if I understood correctly your direct,

19  what -- how -- what that functionality translates into;

20  isn't that correct?

21      A    In some cases, I understand what the command

22  line is talking about, yes.

23      Q    Okay.  In some cases.

24      A    Yes.  I can follow Mr. Waldhalm's analysis.

25      Q    Sir, isn't it true that when you were taught

Page 128

1    by the NSA, you were taught to interpret signal

2    technology?

3         A    That was a small part of the data technology

4    that was taught by NSA.

5         Q    What is signal technology?

6         A    It's the transmission of digital information.

7         Q    Over what medium?

8         A    What do you mean by "what medium"?

9         Q    How is it being transmitted?

10        A    It can be transmitted via landline.  It can be

11   translated via microwave.  It can be transmitted by

12   satellite.  It can be transmitted by HF.  Whatever.

13        Q    Okay.  And you -- you talked about a case that

14   you broke some code or some -- you -- what was it that

15   you did?  You indicated you got an award for it.

16        A    I got several awards by NSA.

17        Q    Some communication that you intercepted, I

18   believe.  Is that what you said?

19        A    I intercepted a communication signal, yes.

20        Q    And how was -- what form was that signal?

21        A    It was a digital high data rate signal and

22   complex modulation.

23        Q    Is that like a -- what is that, like a -- is

24   that a laser beam, or is that an x-ray?  What type of --

25   what exactly is that?

Page 129

1     A     It was a signal that was transmitted by radio

2   frequency.

3     Q     What frequency was it on?

4     A     I can't tell you.

5     Q     Was it a microwave frequency?

6     A     I can't tell you.

7     Q     Did you -- why not?

8     A     Because collection sources are classified.

9     Q     What year was this in?

10    A     This was in -- well, there were several times.

11    Q     What years were they in?

12    A     Throughout '71 through 1993.

13    Q     It was over 40 years ago.

14    A     That doesn't change sources.

15    Q     That has nothing to do with code -- source

16  code comparison in this case, does it?

17    A     I never said that I was doing source code

18  comparison in this case.

19    Q     All right.  Tell me how your signal technology

20  expertise assisted you in this case.

21    A     When you say "signal technology" --

22    Q     Yeah.  I mean --

23    A     -- you have to consider and you have to

24  recognize that embedded in a transmitted signal is other

25  data.  Frequently that other data is computer data.

Page 130

1   Analyzing, demodulating, de-interleaving, identifying

2   that computer data and forensically analyzing it is

3   similar to the work that we do right now in data

4   forensics.

5       Q    But that technology does not have metadata

6   with dates that you can look at to determine whether

7   something is on one date or another.  That's not what

8   we're talking about.

9       A    It most certainly does.

10      Q    Oh, it does?  And how is that metadata

11  captured?

12      A    You capture the transmission string that is

13  being communicated.

14      Q    And --

15      A    It's frequently embedded within other signals.

16      Q    And you used that technology in this case?

17      A    I used the basic forensic investigative

18  methods and procedures in this case.

19      Q    Did you use software to capture that data?

20      A    You can use software or hardware.

21      Q    Did you?

22      A    Did I when?

23      Q    When you did that.  When you got that award

24  for breaking that signal, what you said.

25      A    I used hardware, and then I used software to

1    help perform the analysis and processing.

2         Q    Two things which did not occur in this case,

3    correct?  You did not use hardware, you did not use

4    software to analyze the technology in this case; is that

5    a correct statement?

6              MR. TROUBLEFIELD:  Objection.

7              THE WITNESS:  We did not have software made

8         available to us to perform any analysis.

9    BY MR. RASCO:

10        Q    That's a "yes" --

11             MR. TROUBLEFIELD:  Answer the question as you

12        see fit.

13   BY MR. RASCO:

14        Q    -- to my question, right?

15             MR. TROUBLEFIELD:  Objection.

16             THE WITNESS:  And we were unable to

17        investigate the hardware that supposedly carried

18        and stored this -- this digital data.

19   BY MR. RASCO:

20        Q    So, therefore, the skill and expertise that

21   you used at the time that you did that project for the

22   NSA or that work for the NSA or the Army -- I'm not sure

23   where you were at -- that was not the same skill set

24   that you employed today, other than the fact that it

25   makes you a very smart person because you know how to do

Page 132

1    all these things?  Is that a correct statement?

2              MR. TROUBLEFIELD:  Object to the form of the

3         question.

4              THE WITNESS:  Are you being insulting, sir?

5    BY MR. RASCO:

6         Q    No, sir.  No, sir.  But the purpose of a

7    Daubert examination is to determine whether you are

8    taking the skills that you possess and applying them to

9    the facts of this case.  If you are very skilled at

10   open-heart surgery, you should not be testifying about

11   the gallbladder.  So my question is -- and that's as

12   simplistic as I can put it.

13             MR. TROUBLEFIELD:  That's a bad example, too.

14   BY MR. RASCO:

15        Q    I'm trying to determine which of your skill

16   sets you applied to formulating an opinion in this case.

17   That's why I'm asking the question.

18        A    When you intercept a signal, receive a signal,

19   and you begin to demodulate the data and you start

20   looking at the underlying data and investigating the

21   underlying data, you start collecting information about

22   that data to try to determine its origin, try to

23   determine the time frame of interest that this data is

24   carrying information for.  There is an investigative

25   process used in any digital data analysis that is very

Page 133

1    similar for all digital data.  Validation of the data --

2         Q    Forensic validation?

3         A    -- determination -- forensic validation, yes.

4         Q    Which was not done in this case; is that a

5    correct statement?

6         A    Was not done in which case?  In the CardSmart

7    case?

8         Q    XTec vs. CardSmart, yes, sir.

9         A    I would contend that the evaluation of the

10   metadata and the file structures and the file paths and

11   the associated production of data over a period of time

12   and associated files and relating those to one another

13   is part of a forensic investigation, and I would say

14   it's definitely applied to this case.

15        Q    Sir, you said at least ten times during your

16   direct examination that there was no forensic validation

17   of the data.  Do you remember saying that?

18        A    That's absolutely correct.

19        Q    Okay.  So that's my question.  There was no

20   forensic validation of data in this case, correct

21   statement, yes or no?

22        A    I don't think you understand what that means.

23        Q    Sir, it's not for me to understand.  It's for

24   you to answer the question, respectfully.

25        A    Forensic validation --

Page 134

1      Q     There's no question pending.

2             MR. TROUBLEFIELD:  No, no, no.  You asked him

3      a question.

4             Answer --

5             No, you asked him a question.

6             Answer the question.

7   BY MR. RASCO:

8      Q     My question is:  There was no forensically

9   validated software in this case; is that correct?

10     A     Your statement is wrong in a couple of

11  aspects.  First of all, we're talking about source code.

12  Secondly, I said that there was no forensic validation

13  of the source code, and I explained previously that

14  forensic validation of the source code would entail

15  determining where that source code came from, when that

16  source code was created, and that that source code had

17  maintained its authenticity from the time that it was

18  copied.  Forensic analysis of the information shows that

19  there was no forensic validation.

20     Q     How did you receive the CardSmart code that

21  you used to compare to the XTec code?

22     A     We received --

23     Q     Or rather that Mr. Waldhalm used to compare to

24  the XTec code?  How did you receive it?

25     A     We received it on a laptop.

Page 135

1      Q    You received the CardSmart code -- you

2   received -- you received CardSmart's code from CardSmart

3   in a FedEx package, didn't you?

4      A    We received it on a CD.

5      Q    In FedEx.  It came by FedEx.  That's what you

6   said during your deposition.

7      A    That's correct.

8      Q    How is that forensically validated if you just

9   got it on a CD from FedEx?

10     A    Because the argument was that CardSmart had

11  copied XTec code.

12     Q    I'm talking about the code --

13          MR. TROUBLEFIELD:  No, no.  No.

14          MR. RASCO:  I'm not talking about XTec's code

15      right now.

16          MR. TROUBLEFIELD:  Finish answering the

17      question.

18          THE WITNESS:  And the CardSmart code was

19      placed in escrow and the XTec code was placed in

20      escrow, and we were supposedly comparing the codes

21      to one another that were placed in escrow.

22  BY MR. RASCO:

23     Q    CardSmart provided your company code to

24  review/compare, right, yes or no?

25     A    CardSmart provided us code --

Page 136

1     Q     For the code comparison?

2     A     -- that we reviewed as Enabler 3 code.

3     Q     That's a "yes," isn't it?

4     A     But we --

5     Q     Is that a "yes"?

6     A     We were using the escrow code for the

7   comparison purposes.

8     Q     No, sir.  You've never looked at the escrow

9   code.  Nobody has; isn't that a correct statement?  That

10   was sent by Mr. Troublefield to Mr. Lichter, and it was

11   sent by my law firm to Mr. Lichter.  You did not review

12   that code.  You -- did you?  You did not review the

13   escrowed code?  That is in escrow.  It's sealed; isn't

14   that a correct statement?

15     A     We reviewed the code that was provided to us

16   by your firm on a laptop computer.

17     Q     I understand that.  And that would be the XTec

18   code that you reviewed, correct?  "Yes"?

19     A     Yes.

20     Q     Okay.  Now, you have to take that XTec code

21   that we provided to you on a computer, and you have to

22   compare it to the CardSmart code, correct?

23     A     Correct.

24     Q     And the CardSmart code that you were going to

25   compare it to was provided by CardSmart; was it not?

Page 137

1      A      It was also provided by your firm.

2      Q      Was it provided by CardSmart?

3      A      There was code provided by CardSmart, yes.

4      Q      Okay.  And that came to you on a CD ROM in a

5   FedEx package, correct?

6      A      Yes.

7      Q      Was it a forensic image from a server?

8      A      I'm sure that it was the image of a code from

9   a server, but that wasn't the code comparison that was

10  done from the code -- the Enabler 3 code and the Enabler

11  XTec code that was on the laptop computer.

12     Q      I need to talk to you first about the

13  CardSmart code that was provided by CardSmart.  I don't

14  want you to confuse it; therefore, right now, I only

15  want to talk about the CardSmart code.

16     A      But you are making it seem like we are

17  comparing the CardSmart code to XTec code, when, in

18  fact, what we're doing is trying to understand the

19  comparison that your expert made between the CardSmart

20  code and the XTec code, both of which your expert had

21  months before we ever saw the code.

22     Q      Sir?

23     A      And -- and we wrote a rebuttal report to the

24  Eiras report based upon the information that was

25  provided in the Eiras report identifying those two code

Page 138

1    sets.

2         Q    So is it your testimony today that your

3    company -- yourself and Mr. Waldhalm -- never compared

4    CardSmart code to XTec code -- CardSmart-provided code

5    to XTec-provided code?  Is that your testimony?

6         A    That's not what I just said.

7         Q    Okay.  Well, so -- sir, it's a yes or a no.

8    Did you provide -- did you compare -- did you and/or

9    Mr. Waldhalm make a comparison -- well, let me strike

10   that.  You didn't make any code comparison.

11   Mr. Waldhalm did.

12        A    That's correct.

13        Q    Did Mr. Waldhalm compare CardSmart code

14   provided by CardSmart, the one that came in the FedEx

15   package on DVD, to XTec code?  Yes or no?

16             MR. TROUBLEFIELD:  Objection.  Objection.

17        Beyond the scope of the direct examination.  Beyond

18        the Daubert scope.

19             THE WITNESS:  I cannot speak for Mr. Waldhalm.

20   BY MR. RASCO:

21        Q    You don't know what he compared, do you?

22        A    That's not true.

23        Q    Okay.  So did he compare the code that was

24   provided by CardSmart that came on a DVD by FedEx to the

25   code that XTec provided for the code comparison?

1          MR. TROUBLEFIELD:  Objection.

2     BY MR. RASCO:

3          Q    Yes or no?

4          MR. TROUBLEFIELD:  Objection.  Beyond the

5     scope of this witness and why he's being tendered

6     as an expert.

7          THE WITNESS:  I know that he could not make a

8     line-for-line comparison because the code that was

9     provided by XTec on the laptop computer did not

10    have the tools and the capability to make such a

11    comparison for a line-by-line code.

12    BY MR. RASCO:

13         Q    Sir, I need you to answer my question.

14         MR. TROUBLEFIELD:  He is answering your

15    question.

16         THE WITNESS:  I just did.

17    BY MR. RASCO:

18         Q    I have two sheets of paper.  One has CST,

19    which stands for CardSmart.  And I want you to imagine

20    that this is the code, this DVD, that came in the

21    Federal Express package from CardSmart; and that is the

22    Cardsmart code.  And then there's XTec code, which is a

23    separate code, that was provided for the review on a

24    laptop.  And this XTec code is what was provided to you.

25              Did you compare the CardSmart code that came

1   in a DVD with the XTec code that was provided by XTec?

2           MR. TROUBLEFIELD:  Objection.

3   BY MR. RASCO:

4       Q    And I rephrase the question to did

5   Mr. Waldhalm do it because you've already said that you

6   didn't do it.

7           MR. TROUBLEFIELD:  Objection.  He's not here

8       to comment on what Mr. Waldhalm did.  He's in a

9       different area.

10          Don't answer the question.

11          Call Judge Moreno right now.  This is beyond

12      the scope of his direct and his subject matter.

13      This is a Daubert.

14  BY MR. RASCO:

15      Q    Sir, did you compare the code that was

16  delivered to you by Cardsmart with the code that was

17  provided by XTec?

18          MR. TROUBLEFIELD:  Same objection.

19          Don't answer that.

20          It's beyond the scope, unless you can give me

21      a proffer.

22          THE NURSE:  Do you need a break?

23          THE WITNESS:  No, I'm fine.

24  BY MR. RASCO:

25      Q    Do you know what Mr. Waldhalm was looking at;

Page 141

1    in other words, what code he was looking at during the

2    code review?

3         A    Yes.

4         Q    Tell me.  What was he looking at and how many

5    versions?

6              MR. TROUBLEFIELD:  Object to the form of the

7         question.

8              THE WITNESS:  How many versions of what?

9    BY MR. RASCO:

10        Q    Of Enabler were provided for review.

11        A    The code that we reviewed was what was

12   supplied to us on the laptop computer.

13        Q    Do you --

14        A    They were --

15             MR. TROUBLEFIELD:  Finish, please.

16   BY MR. RASCO:

17        Q    Go ahead.

18             MR. TROUBLEFIELD:  Thank you.

19             THE WITNESS:  There were multiple versions of

20        that code on that computer.  There were multiple

21        versions of code files that were provided on that

22        computer.

23   BY MR. RASCO:

24        Q    Are you aware that Cardsmart's attorney --

25             MR. TROUBLEFIELD:  Did you finish?

Page 142

1    BY MR. RASCO:

2        Q    -- requested every version of Enabler for the

3    code review?

4              MR. TROUBLEFIELD:  Objection.

5              Are you asking him to speculate on what I

6         requested?

7              MR. RASCO:  No, sir.  I'm asking if he was

8         aware.

9              MR. TROUBLEFIELD:  Do you have my specific

10        document request or notice to inspect?

11             MR. RASCO:  Counsel, I'm going to suggest that

12        you keep your objections to form.

13             MR. TROUBLEFIELD:  I'm going to suggest that

14        you make a proper statement and do not badger my

15        witness, too.

16   BY MR. RASCO:

17        Q    Sir, please answer the question.

18        A    I don't know what this has to do with a

19   Daubert examination, but I don't know what -- what

20   counsel requested.

21        Q    Are you an expert on Daubert?

22        A    I just said I don't know what this has to do

23   with a Daubert examination because I don't know what

24   counsel requested.

25        Q    Are you an expert on Daubert?

Page 143

1      A     No.

2            THE VIDEOGRAPHER:  I have five minutes, sir.

3   BY MR. RASCO:

4      Q     If counsel requested, let's say, 18 different

5   versions of the code -- of XTec's code, wouldn't it be

6   important to know that before giving an opinion?

7            MR. TROUBLEFIELD:  Objection to the form of

8         the question.

9            THE WITNESS:  If the versions were properly

10        separated and identified, it would not be a

11        difficult problem to understand there are various

12        versions.  However, in a phone conversation where

13        either you or Mr. Bimston were present, we asked

14        Mr. Fernandez over the phone to tell us how to

15        identify the various versions, and Mr. Fernandez

16        couldn't tell us.

17  BY MR. RASCO:

18     Q     Sir, isn't it more accurate to say that

19  Mr. Waldhalm couldn't understand the code and called

20  Mr. Fernandez for an explanation of what it was he was

21  looking at?

22     A     No.  That's wrong.  That's a misrepresentation

23  of what happened.  Mr. Waldhalm -- I remember the

24  situation exactly.  Mr. Waldhalm and I were discussing

25  the various versions and the numbering schemes for the

Page 144

```
 1    versions and that they didn't make sense.  Maybe
 2    Mr. Fernandez could tell us what the numbering scheme
 3    for the versions meant and what the sequence of the
 4    versions was, and Mr. Fernandez could not tell us.
 5         Q    You didn't understand what versions you were
 6    looking at at the time of the examination; isn't that a
 7    correct statement?
 8         A    We understood that we were looking at various
 9    versions of the code.
10         Q    Through what dates?  From what date to what
11    date did you look -- what was the creation date of the
12    code that you examined?  What is the date range?
13         A    I don't remember the date range because it
14    covered a vast period of time.
15         Q    Are you aware that you were provided code
16    through 2012 at the request of your lawyer?
17         A    I'm not aware, and nobody ever provided that
18    explanation when we were asking about the versions of
19    the code.
20         Q    So if you're looking at code with metadata of
21    2011, are you aware that that could have been code that
22    was part of some version created in 2011?
23         A    It is a version that was created in 2011.
24         Q    And you were looking at it, and you're
25    assigning -- and you're saying that because of the
```

Page 145

1    metadata date of 2011 and 2012, that indicates to you

2    that it was changed; that something was changed,

3    correct?

4         A    Possibly, yes.

5         Q    And possibly it could just be a version that

6    is an updated version in 2011; isn't that correct?

7         A    We were never told by XTec, any documentation,

8    that we were receiving updated versions of the code.

9              MR. TROUBLEFIELD:  We need to take a break for

10        the tape.

11   BY MR. RASCO:

12        Q    So you didn't know you were looking at 2011

13   code.  You thought you were looking at 2009 code,

14   correct?

15        A    No.  We knew that we were looking at 2011

16   code.

17             MR. TROUBLEFIELD:  We need to end here.  She

18        has to switch the tape.

19             THE VIDEOGRAPHER:  Okay.  We're going off the

20        record.  The time's approximately 5:58 p.m.

21             (A brief recess was taken.)

22             THE VIDEOGRAPHER:  We're back on the record.

23        The time's approximately 6:14 p.m.  This begins

24        Media Unit No. 3.

25

Page 146

1    BY MR. RASCO:

2        Q    Sir, would you agree with me that there was no

3    forensic validation of the code that CardSmart delivered

4    to you in the FedEx package?

5        A    That's correct.

6        Q    Okay.  Are you aware that the code was

7    reviewed pursuant to a procedure or stipulated to by

8    counsel for CardSmart and XTec embodied in a court

9    order?

10       A    What code was reviewed?

11       Q    The code comparison review, that was done in

12   accordance with a process stipulated -- partially

13   stipulated/partially ordered which is embodied in the

14   protective order?

15             MR. TROUBLEFIELD:  Objection to form.

16             THE VIDEOGRAPHER:  His mike's not on.

17             Thank you.  Go ahead.

18             THE WITNESS:  Yes.

19   BY MR. RASCO:

20       Q    Okay.  And you're aware that it was -- that

21   XTec's code was produced in accordance with that

22   protective order?

23       A    I know that XTec produced source code in

24   accordance with that protective order.

25       Q    And you're aware that that protective order

Page 147

1    provided for the code to be produced in a manner which

2    is different than the forensically validated method that

3    you have described in your direct examination; is that

4    correct?

5            MR. TROUBLEFIELD:  Objection to the form.

6            THE WITNESS:  I'm sorry.  Could you ask that

7        question again, please.

8            MR. RASCO:  Yes.  Actually, I'd rather have it

9        read back.

10                       (Record read.)

11           MR. TROUBLEFIELD:  Note my objection to the

12       form of the question.

13           THE WITNESS:  I don't know that.

14   BY MR. RASCO:

15       Q    Well, it was provided by XTec to counsel and

16   by counsel to the experts.  That's the way it's provided

17   in the -- that's the way it was provided.

18           MR. TROUBLEFIELD:  Objection.

19   BY MR. RASCO:

20       Q    You know what?  Strike -- I withdraw that

21   question.  That was a horrible question.

22           What do you mean you don't know that?  What is

23   your understanding of the manner in which XTec's code

24   was provided for the code review?

25       A    My understanding was that we would be

Page 148

1    reviewing code from XTec that represented the state of

2    Enabler 1 at some time preceding the execution of the

3    lawsuit.

4        Q    Okay.  That is partly correct, but that's not

5    my question.  My question is:  Are you familiar with the

6    manner in which the code was delivered for the code

7    comparison examination done by yourself and

8    Mr. Waldhalm?

9             MR. TROUBLEFIELD:  Objection.

10            THE WITNESS:  As specified by who?

11   BY MR. RASCO:

12       Q    In the manner in which it was actually

13   delivered.

14       A    I know what we were looking at.  I don't know

15   what was -- I don't know if the manner in which it was

16   delivered was according to the understandings of counsel

17   and the stipulation.

18       Q    You described a validated forensic image.  Do

19   you remember talking about a validated forensic image?

20       A    In a forensic investigation, that's what one

21   would expect to be reviewing.

22       Q    That was not what the protective order

23   provided for in this case, isn't that correct, by either

24   party?

25            MR. TROUBLEFIELD:  Object to the form.

Page 149

1          THE WITNESS:  I would have to review the

2       protective order in order to know exactly what it

3       stated.  It's been a long time since I have seen

4       that protective order.  However, my understanding

5       was the code was supposed to represent code as of a

6       certain date that preceded the filing of the

7       lawsuit.

8    BY MR. RASCO:

9       Q    What date?

10      A    I believe it was Enabler 1 as it existed in

11   2009; but, again, I'd have to look at the protective

12   order to refresh my mind.  I don't remember exactly what

13   it said.

14      Q    Other than the version of the code as it

15   existed in Enabler 1 in 2009, was there any other code

16   delivered to Mr. Waldhalm for his examination?

17      A    Are you talking about the source code from

18   XTec?

19      Q    Yes.

20      A    Okay.  We received the code set on the laptop

21   computer which Mr. Waldhalm reviewed in January of 2012

22   and then again we reviewed it in October of 2012.  And

23   at that time, we had identified additional code that was

24   provided to Mr. Eiras, and that code was provided on the

25   purple thumb drive.

Page 150

1    Q    Okay.  Let me see if I -- I want to try to
2    correct a statement you made.  You said January 2012.
3    You actually did the code review in October of 2012 and
4    January of 2013; is that a correct statement?
5    A    I believe Mr. Waldhalm independently did a
6    code review prior to the October time frame.
7    Q    Really?  When?
8    A    Early on in the code review process.
9    Q    Are you saying he reviewed code in January of
10   2012?
11   A    At the same time Mr. Eiras did.
12   Q    Are you saying he did it January 2012?
13   A    I'm not sure of the dates right now.  I -- but
14   he -- I know that he attended a independent -- he
15   attended independent of me a code review, I believe it
16   was for one day, early on in the code review process.
17   Q    Wouldn't that have been October 2012?
18   A    No.  That -- that was the time frame that both
19   Mr. Waldhalm and I performed the code review.
20   Q    Why don't you look at your report and tell me
21   the dates and help you refresh your recollection, the
22   dates that you reviewed code.  It's right here.
23        THE WITNESS:  Don, could you get my glasses
24     from the other room?  Sorry.
25

Page 151

1    BY MR. RASCO:

2         Q    Take a look at page 20.  I'm sorry.  If you

3    look at paragraph 4.4.1 of your report, it says, "On

4    January 19th, 2013, Mr. Waldhalm traveled to the office

5    of Rosenthal, Rosenthal & Rasco to review source code."

6         A    Right.

7         Q    Okay.  So that was the one time that you did

8    not appear?

9         A    That's correct.

10        Q    Okay.  Now, the next one was in October of

11   2013; is that correct?

12        A    The 7th through the 10th, I believe it was.

13        Q    That's correct.  So there was two code

14   source reviews -- two source code reviews, in January of

15   2013 and October of 2013; is that a correct statement?

16        A    Correct.

17        Q    All right.  In January of 2013, could you tell

18   me what versions of XTec source code were reviewed?

19        A    Don made that review.  I don't know what he

20   reviewed at that time.

21        Q    All right.  So when you're looking at, for

22   example, this big book that's Exhibit D-806 for

23   identification --

24        A    Yes.

25        Q    That's the big book in front of you.

Page 152

1        A     Yes.

2        Q     It has how many pages?  I believe it's a

3    double-sided book.

4        A     500, almost 600 pages, probably.

5        Q     Okay.  Do you know what source code these

6    directories relate to?  What year or what versions of

7    source code this directly relates to, Exhibit D-806?

8        A     It relates to various versions of the source

9    code.

10       Q     I need to know which ones, sir.  Tell me what

11   is the -- tell me the inventory of source code that

12   D-806 includes.

13       A     I'd have to go through it and pull out the

14   numbers for each of the versions.

15       Q     You need to do that.  I need to know.  I need

16   to know what versions you looked at.

17             Let me ask a question.  You don't know what

18   versions D-806 includes, do you?

19       A     Well, just in the first page, it appears that

20   there's a Version 19 that was one of the versions.

21       Q     Okay.  And the very first page has a directory

22   of January 18th, 2013.  And you attribute some meaning

23   to that date; do you not?

24       A     In this particular case, these are higher

25   order directories.  It's probably the time when the

Page 153

1    directory was copied.

2        Q    That's correct.  In fact, that was the date of

3    the code review, wasn't it?

4        A    Right.

5        Q    So the metadata on the very first page of

6    Exhibit D-806 is meaningless?

7        A    No, that's not true.  It tells me that the

8    data was copied.  It tells me what the directories are.

9    I should be able to look in the subdirectories for these

10   directories and see some other metadata that indicates

11   when modifications were made.

12       Q    Okay.  Show me -- show me how you would do

13   that by looking at this, and then tell me what version

14   you're looking at, if you can.

15       A    The very next page is subdirectories.  If you

16   follow the path names and the -- the subdirectory is

17   called "Images," and you see the metadata on the

18   left-hand side says 1/16/2006.  That was probably the

19   original time when this directory and the files in that

20   directory were last modified.

21       Q    Okay.  And what does that tell you?  How does

22   that -- how does that help you in explaining to the jury

23   some complex scientific theory of fact?  What does that

24   tell us?

25       A    As you go through each one of the

Page 154

1    subdirectories, you can see when the last modification

2    date of that subdirectory occurred.

3        Q    Well, it would be a modification date or a

4    date that it was transferred?

5        A    The date it was copied, yes.

6        Q    Okay.  So -- so the fact that software is on

7    Server No. 1 and, at XTec, they moved it to Server

8    No. 2, that's going to change the date -- the metadata

9    date, correct?

10       A    No.  It would only change the -- as it shows

11   here for the directory, when it moved was 1/18/2013.  So

12   the original date for these particular files, creation

13   of these files, modification -- original modification of

14   the files is 1/16/2006.

15       Q    Right.  And if they changed one word in that

16   program, it would -- the date would change, correct?

17       A    If they changed --

18       Q    Is that correct?

19       A    If they changed information in the file, not

20   one word in the program.  If they changed information in

21   that particular file, then it would change in that

22   particular file.

23       Q    Are you aware of how many versions of

24   Enabler 1 XTec has in its sub-version directory?

25       A    It appears there's quite a few.  It appears

Page 155

1   that there's quite a few.  The problem is that we see

2   changes in the files right up to 2012, which means that

3   there's changes after the period of time which these

4   files were supposed to represent Enabler 1 or Enabler --

5   Enabler 1 program.

6        Q    Are you aware that you and Mr. Waldhalm were

7   provided a sub-version up to the date of your

8   examination, which is 2013?  So that would include

9   sub-version for 2010, sub-version files for 2011,

10  sub-version files for 2012?  Are you aware of that?

11       A    I'm aware that we're supposed to be making

12  code comparisons of code from 2009, and why we were

13  provided sub-versions are -- indistinct changes in the

14  code and asked to make comparisons with those code

15  changes that were made up to, as you say, 2011 or 2012

16  doesn't make a whole lot of sense to me if the code that

17  we were comparing was supposed to be from 2009.

18       Q    Well, now we agree with each other, but your

19  attorney insisted on all the versions up to the date of

20  the examination; and that's what was provided.

21  Apparently you didn't know that, did you?

22            MR. TROUBLEFIELD:  Objection.

23            THE WITNESS:  I would have expected to see --

24       actually, I would expect -- the common practice

25       would be to provide the versions separately and not

Page 156

 1          combine them -- provide the versions compiled

 2          together as one pile of source code.

 3     BY MR. RASCO:

 4          Q    Okay.  I need you to answer my question.  Do

 5     you remember my question?

 6          A    Please repeat it.

 7               MR. RASCO:  Madam Court Reporter.

 8                    (Record read.)

 9     BY MR. RASCO:

10          Q    Could you answer that question?

11          A    I was actually aware that the various -- that

12     all versions had been requested because I remember

13     reading that.  However, I -- as I stated, I would not

14     have expected to see the -- all of the versions thrown

15     together and provided as one source code.

16          Q    Well, while I disagree with your description

17     of how it was provided, would it be an accurate

18     statement to say that you anticipated or believed at the

19     time that you did your code review and at the time that

20     you wrote your report that you were reviewing files from

21     2009 and prior?

22               MR. TROUBLEFIELD:  Objection to the form of

23          the question.

24               THE WITNESS:  Could you read back the

25          question, please.

1          MR. RASCO:  If the court reporter could please

2      read back the question.

3                    (Record read.)

4          MR. TROUBLEFIELD:  Objection.

5          THE WITNESS:  I didn't know ahead of time what

6      we would be reviewing, what I would be seeing.

7  BY MR. RASCO:

8      Q    Okay.  What about at the time of your review?

9  Did you know then?

10     A    At the time --

11     Q    At the time of your review, did you know what

12 years you were looking at, or did you anticipate that

13 they were -- and believe that they were 2009 files and

14 previous versions?

15     A    I believe that we would have seen a unified

16 source code set from the period of time that we were

17 supposed to be doing the code review.  I didn't know

18 what to expect as far as the production was concerned.

19 Productions can be provided in different forms, but I

20 certainly didn't expect to see all of the versions

21 rolled up together because without the proper tools, it

22 would be hard -- difficult, pretty near impossible, to

23 separate out the various versions.  And that is why we

24 asked Mr. Fernandez if he could describe to us the

25 versioning process so we could sort that out.  And it

Page 158

1    was not described to us.

2        Q    So would it be an accurate statement that at

3    the time of the code review, you were unaware that you

4    were looking at code that was created subsequent to

5    2009?

6        A    It wasn't unexpected, but I would have --

7            MR. TROUBLEFIELD:  Finish.

8            THE WITNESS:  Really, I --

9    BY MR. RASCO:

10       Q    Did you know it or not?

11           MR. TROUBLEFIELD:  Please allow the witness to

12       finish his answer.

13           THE WITNESS:  I didn't know what I would be

14       receiving for a code set.

15   BY MR. RASCO:

16       Q    Sir, that is a statement in anticipation of

17   the code review, that you did not know.  I accept your

18   answer.

19           Now you've attended the code review, and so

20   did Mr. Waldhalm.  You sat in a room for days and looked

21   at code.  My question is:  Did you know that you were

22   looking at code that was created subsequent to 2009, or

23   did you believe that you were looking at code that was

24   created -- that was already in existence as of 2009 and

25   previously?

Page 159

1        A     Looking at the directory information, I knew
2    that I was looking at code that encompassed a longer
3    period of time than the 2009 time period.  It was
4    obvious.  I have stated that all along.
5        Q     So what is the significance of a metadata date
6    in 2011 if you're reviewing code that was created in
7    2011?
8        A     The significance is that no differentiation
9    was made for us and the ability to make a code review of
10   all of those versions without them being separated into
11   their own version category made it extremely difficult
12   for us to understand how the code fit together.
13       Q     So you really didn't know -- you couldn't
14   tell -- based upon the inability to apply your tools and
15   your software that you typically use, you were -- you
16   were unable to ascertain what code you were looking at;
17   would that be a correct statement?
18       A     That's not what I said.
19       Q     Okay.  Please explain to me, then.
20       A     We knew that we were looking at code for
21   various time periods.
22       Q     Did you know that they --
23       A     We knew that we were looking at various
24   versions of the code.  That, again, is why we asked
25   Mr. Fernandez what was his versioning process.

Page 160

1      Now, if he's not able to tell us what his
2  versioning process is, how are we able to differentiate
3  the versions to be able to define what was the code set
4  for 2009?
5      Q    So you were unable to do that; is that a
6  correct statement?
7      A    We were not supplied with the tools that would
8  enable us to do that easily.  We could only look at
9  pieces of the information and derive various conclusions
10  from that information about the versions of code that we
11  were looking at and what dates they represented.
12      Q    So you were unable to determine what the dates
13  were of the code?
14      A    No.  I didn't say that at all.  I said -- I
15  said we were unable to determine how the different code
16  files fit together to give us a version that was from
17  2009; and that's because we weren't given the tools, the
18  versions were not separated for us, and Mr. Fernandez
19  couldn't tell us what the versioning process was.
20      Q    So what did that -- what result?  What does
21  that result -- what consequence?
22      A    I think we stated that essentially in our
23  report.
24      Q    What is -- what is -- what is the conclusion
25  that you gather from being unable to determine what

Page 161

1   versions you were looking at because you didn't

2   understand the versioning process?

3        A    It wasn't that we didn't understand the

4   versioning process.  We were not told what the

5   versioning process was.

6        Q    What consequence is there as a result of that?

7        A    When we're doing the code review, the only

8   thing that we could -- well, the thing -- one of the

9   things that we concluded was that we were looking at

10  various versions of the code and that the versions had

11  modifications right up until 2012 and that it was --

12       Q    And what's the consequence?

13       A    With the code -- with the software sets that

14  we -- that we were -- or the software tools that we were

15  provided, it was a lengthy task -- not an impossible

16  task, I can't say that; but it was certainly a very

17  lengthy task for us to go back and try to separate out

18  the versions of the code that were provided.

19       Q    So what's the consequence of that?

20       A    The consequence is I believe we can't validate

21  the code for 2009.

22       Q    So you have no opinion because you were unable

23  to validate the code for 2009 as to whether the 2009

24  code was copied; is that a correct statement?

25            MR. TROUBLEFIELD:  Objection.  Beyond scope.

Page 162

1            THE WITNESS:  We would know that we were

2        provided with code -- the opinion is we know that

3        we were provided with code that represent changes

4        up to 2012, and we were not provided any

5        identification that told us which code was --

6        represented 2009 code.

7  BY MR. RASCO:

8        Q     So you had no way of ascertaining in the code

9  review what code was the code that was the subject of

10 this lawsuit?

11       A     No, that's not true because we were able to

12 separate out some of the code that was representative

13 for 2009.  We certainly couldn't go through, as you

14 said, some 6- or 700 pages of directory logs in order to

15 determine which of those files were related to 2009 and

16 which weren't.  We did find some of them that were

17 related to 2009.  We found some that were related to

18 2011, 2012, 2010, 2008; but we could not recombine the

19 files associated with the directory listing to give us a

20 2009 code set as it existed in 2009 with the tools that

21 were available to us and the time that was available to

22 us.

23       Q     And what does that mean?  What is the

24 consequence of that fact?

25       A     That we could not say that we had a validated

Page 163

1   code set for 2009.

2      Q   When you say "validated code set," that means

3   that the code as it existed at the Pensacola server at

4   the time Mr. Fisher had access to it?

5          MR. TROUBLEFIELD:  Objection.

6   BY MR. RASCO:

7      Q   Is that what you're referring --

8      A   That's the code that we were supposed to be

9   reviewing, yes.

10      Q   And is your position that because XTec didn't

11   make a forensic image of that particular server that

12   there is no forensically validated code and, therefore,

13   any comparison is meaningless?  Is that your testimony?

14      A   I did not say that any comparison is

15   meaningless, but I am saying that we do not have a

16   validated code set from the Pensacola server in 2009.

17      Q   Are you aware that XTec didn't have access to

18   that server either?

19          MR. TROUBLEFIELD:  Objection to the form.

20          THE WITNESS:  I'm sorry, but I have seen

21      depositions going back and forth about that

22      subject; and I don't know the answer to that --

23   BY MR. RASCO:

24      Q   Are you aware that --

25      A   -- question.

Page 164

1      Q    -- CardSmart had access -- had possession of

2    that server?

3      A    Again, I have seen depositions back and forth

4    concerning that.  I am not personally aware of that.

5      Q    Are you aware that CardSmart had XTec's

6    Enabler 1 code running in their office?

7           MR. TROUBLEFIELD:  Objection.

8           THE WITNESS:  I'm not aware of that.

9    BY MR. RASCO:

10     Q    Did you ask CardSmart if they had access to

11   the Pensacola server?

12     A    I don't remember if that -- if that question

13   came up.  I --

14     Q    Did you --

15     A    -- do remember the deposition testimonies

16   about that fact, though.

17     Q    And the answer is?

18     A    I believe the answer is they had access to

19   that server.

20     Q    To the Pensacola server?

21     A    Yes.

22     Q    And the Pensacola server contained XTec's

23   Enabler 1 code on it; did it not?

24          MR. TROUBLEFIELD:  Objection.

25          THE WITNESS:  I don't know that.

Page 165

1    BY MR. RASCO:

2         Q    Did you ask your client?

3              MR. TROUBLEFIELD:  Well --

4              THE WITNESS:  I don't think that that was in

5         the purview of our -- our analysis.

6    BY MR. RASCO:

7         Q    It's a yes or no.

8              MR. TROUBLEFIELD:  No, no, no, no, no, no.

9    BY MR. RASCO:

10        Q    Whether it is or not, it's a yes or no.

11             MR. TROUBLEFIELD:  Counsel, I retained --

12             MR. RASCO:  I understand.  I just want to know

13        if he asked them that because it would seem to me

14        the obvious question:  "Did you look at the code?"

15   BY MR. RASCO:

16        Q    Did you ask them:  "Did you look at their

17   code?"  Did you ask CardSmart, "Did you look at XTec's

18   code," a fundamental question --

19             MR. TROUBLEFIELD:  Objection.

20   BY MR. RASCO:

21        Q    -- to someone who's not a tech person.  Did

22   you ask that?

23        A    No, I did not.  I did not ask that question.

24        Q    Are you familiar with the fact that XTec's

25   code is denominated as E1 and CardSmart's code is

1   denominated as E3?  Are you familiar with that fact?

2           MR. TROUBLEFIELD:  Objection.  Form.

3           THE WITNESS:  Yes.

4   BY MR. RASCO:

5       Q   Okay.  Let me show you an e-mail dated

6   September 28th, 2012, from Corey Denton to Larry

7   Hembree.  It says, "Both system E1 and E3 are set up in

8   the Jasper office."  Do you see that?

9           MR. TROUBLEFIELD:  Objection to the form of

10      the question.

11          Well, strike that.  Are you just asking him to

12      look at it?

13          MR. RASCO:  I'm asking him to look at it right

14      now.

15          MR. TROUBLEFIELD:  Okay.

16          THE WITNESS:  I'm looking at an e-mail, and --

17  BY MR. RASCO:

18      Q   I haven't asked the question yet.  I just

19  asked you to look at it.

20      A   Okay.

21      Q   Okay?

22      A   Yes.

23      Q   Are you aware that CardSmart had available to

24  it at the Jasper office XTec's Enabler 1 source code?

25      A   No.

Page 167

1      Q    Did you ask CardSmart if they copied XTec's

2   code or any portion of it?

3           MR. TROUBLEFIELD:  Objection.

4           THE WITNESS:  Yes, those conversations

5       occurred.

6   BY MR. RASCO:

7      Q    And what did they say?

8      A    "No."

9      Q    They said they did not copy it?

10     A    No.  I mean, yes, they said they did not copy

11  it.

12     Q    Did they tell you that they had access to it?

13          MR. TROUBLEFIELD:  Objection to the form of

14      the question.

15          THE WITNESS:  They -- they said that they had

16      access to the Pensacola server.

17  BY MR. RASCO:

18     Q    Did they tell you that they had access -- that

19  the Pensacola server that they had access to had XTec's

20  source code on it?

21     A    I believe I know that.  I don't -- I don't --

22  I can't say how I knew that; but, yes, I knew that.

23     Q    Well, how did you know that?

24     A    It may have been through the various

25  documentation that I had read.  It may have been through

Page 168

1    the claims of the -- of the plaintiff, but I understood

2    that -- that the Enabler software -- Enabler 1 software

3    was on the Pensacola server, and it was probably through

4    the deposition testimony.

5        Q    Did you ask CardSmart if they accessed that

6    code?

7        A    I didn't ask CardSmart if they accessed that

8    code.

9        Q    Why not?  Wouldn't that be -- I mean, you

10   could do your entire examination in one minute.  "Did

11   you access the code?"  "Yes, I did."  "Okay."  That's

12   it.

13       A    That does not mean that they copied the code

14   or they used the code or anything else.  That's not --

15   that was not the purpose of the source code evaluation.

16       Q    Did you prefer not to know?

17       A    No.

18       Q    Then why didn't you ask them the simple

19   question, "Did you access their code," which was sitting

20   on the server that you had access to?  It would seem --

21       A    Accessing -- again, accessing their code does

22   not mean they copied the code.  I did ask:  "Did you

23   copy the code," and they said, "No."

24       Q    Did you ask them if they looked at it?

25       A    I think that I was more concerned that they

Page 169

1      copied the code.  If they looked at it, there may have

2      been a myriad of reasons why they looked at the code.

3      They may have been interfacing with it.  They may have

4      been asked to look at it.  I don't know.  I was

5      interested in whether or not they had copied the code,

6      and that's the question I asked.

7           Q    You didn't ask them if they looked at it?

8           A    I don't remember asking them if they had

9      looked at it.  I had asked them if they copied it.

10          Q    Are you aware that XTec's claim is not that

11     they copied the code but rather that our -- that XTec's

12     know-how and processes and trade secrets were used by

13     CardSmart in developing the 3.0 code?

14          A    We were tasked --

15          Q    Answer my question.

16               MR. TROUBLEFIELD:  No, no.

17               Answer the question.

18               THE WITNESS:  -- with doing a source code

19          comparison.

20     BY MR. RASCO:

21          Q    You didn't do any source code comparison.

22     Mr. Waldhalm did, correct?

23          A    I did the forensic side of that, yes.

24               MR. RASCO:  Read back my last question,

25          please.

1           (Record read.)

2           MR. TROUBLEFIELD:  Object to the form of the

3      question.

4   BY MR. RASCO:

5      Q    Are you aware that's the claim?

6           THE WITNESS:  I probably read that as the

7      claim, but that was not what we were tasked to do

8      by counsel.

9   BY MR. RASCO:

10     Q    Do you have an opinion as to whether CardSmart

11  utilized XTec's know-how and trade secrets in developing

12  the CardSmart Enabler 3.0 code?

13          MR. TROUBLEFIELD:  Objection.  Beyond the

14     scope.

15  BY MR. RASCO:

16     Q    Well, that would be you don't have an opinion,

17  according to what your lawyer is saying.

18          MR. TROUBLEFIELD:  No.  Note my objection.

19          MR. RASCO:  I think he's -- well, never mind.

20          THE WITNESS:  I think that Mr. Waldhalm and I

21     discussed that, and Mr. Waldhalm has that opinion

22     concerning that.

23  BY MR. RASCO:

24     Q    I need you to answer my question.  I don't

25  think you answered it.  Did you know that XTec's claim

Page 171

1    is that CardSmart utilized XTec's know-how, trade

2    secrets, and processes to develop the CardSmart

3    Enabler 3.0 code?

4         A    I think I answered that question.

5         Q    Is that a "yes" or a "no"?

6         A    Yes, I believe I remember reading that

7    claim -- that in the complaint.

8         Q    Do you have an opinion as to whether CardSmart

9    utilized XTec's know-how, trade secrets, and processes

10   in developing the CardSmart Enabler 3.0 code?

11            MR. TROUBLEFIELD:  Objection.

12            THE WITNESS:  I don't have an opinion, but I

13        believe Mr. Waldhalm stated an opinion.

14   BY MR. RASCO:

15        Q    To what issue in the case does your opinion go

16   to?  What contested issue in this case are you opining

17   on?

18        A    I'm opining on the validity of the forensic

19   data, the value of the metadata, the -- some of the

20   issues concerning the files, the changes in the files

21   that were made, the postdating of the copyright -- the

22   copyright statement on the RBS file.  I'd have to look

23   back through my report to address all of the issues.

24            MR. RASCO:  Could you read back his answer.

25                   (Record read.)

Page 172

```
1            MR. RASCO:  Okay.  Thank you.

2            THE NURSE:  Excuse me one moment.

3            THE WITNESS:  I'm okay.  Yeah, it's not going

4       hypoglycemic yet.

5   BY MR. RASCO:

6       Q    Okay.  I'm going to go over some of those

7   things that you're opining on.  Let's start with the

8   validity of the forensic data.  What do you mean by

9   that?

10      A    That we are not able to ascertain whether or

11  not the source code was on the PCOLA server.

12      Q    And what effect or impact does that have on

13  your opinion?  What is -- what is -- what would you tell

14  the jury as a result of that?

15      A    The source code, if we don't know where --

16  what the origin of the source code was, the source code

17  could come from any source and not necessarily the PCOLA

18  server.

19      Q    And that's because the chain of custody is not

20  forensically validated?  And by that I mean taking an

21  image of the PCOLA server and then preserving it and

22  then examining that image; isn't that correct?

23      A    Chain of custody and forensic validation are

24  actually two separate issues.

25      Q    Okay.  Then explain to me what is the -- what
```

Page 173

1    is -- what is the purpose of forensic validation if it's

2    not to determine that you're looking at the right thing?

3         A    Chain of custody doesn't mean you're looking

4    at the right thing either.

5         Q    Well, at least you know what you're looking

6    at?

7         A    No, you don't.

8         Q    And you know its origin and its source.

9         A    All the chain of custody does for you is tell

10   you who had possession of the data.

11        Q    And where it came from.

12        A    Not necessarily.  If you do a forensic

13   analysis of the data or a forensic image, you know

14   exactly what server it came from, when it came from that

15   server, the applications that were present during that

16   time frame, the data that was present, the source code

17   that was present on that server, what the dates were for

18   that source code.  You would know if -- as an example,

19   if there was a trip wire on the Pensacola server because

20   we see no evidence of a trip wire in this directory

21   listing.  And we would see -- if PuTTY code was used --

22   if PuTTY was used as an access means indicator on the

23   server.  We don't see that on the server either.

24             So it would provide us with a very precise

25   description of the Pensacola server at the point of time

Page 174

1   of concern, and it would provide us information about

2   that server.  It would even provide you potentially,

3   through the various logs that are being kept by the

4   operative system, who had access to it when and what was

5   done during that access period.  None of that's

6   available because none of it was -- because an image

7   wasn't made.  The forensic image of the server wasn't

8   made.

9       Q    And so, therefore, Jan Eiras can't testify

10  that some of the code in Enabler 3 was copied from the

11  Pensacola server?  Is that what your position is?

12      A    Well, he obviously erroneously identified the

13  F-Get number routine as belonging to XTec.  It's

14  actually CardSmart code.

15      Q    Actually, isn't it true that that code --

16  well, strike that.

17          Are you aware that XTec has a call home

18  feature that when someone modifies its code, the

19  computer -- the server calls XTec and says -- and alerts

20  them that someone is modifying the code?

21          MR. TROUBLEFIELD:  Objection.

22          THE WITNESS:  I saw no evidence of that in

23      looking through the directory files, and we

24      specifically tried to find that when we actually

25      got these and we could take and review them

Page 175

1       electronically.

2               We were also told in deposition that there was

3       a PuTTY key for access to the Pensacola server;

4       however, Bill Mitchell's testimony in deposition

5       testimony said there was no PuTTY key.

6   BY MR. RASCO:

7       Q    So you're basing your expert testimony on what

8   Bill Mitchell said?

9       A    I'm telling you that I see no evidence of a

10  PuTTY key and that it calls into question whether or not

11  there was actually a PuTTY key or even a trip wire

12  service on -- or ADS or IDS service on the Pensacola

13  server.

14      Q    Well, now you're resolving disputed facts.

15               MR. TROUBLEFIELD:  Objection.

16  BY MR. RASCO:

17      Q    Aren't you?

18      A    I'm trying to understand what was said in

19  testimony in order to make a proper evaluation.

20      Q    So as part of your evaluation, you're

21  considering what Bill said, the depositions, the

22  e-mails, the documentation, you're taking all that

23  together --

24      A    I am telling you --

25      Q    -- and forming -- let me finish.  Let me

Page 176

1    finish.

2           You're taking the deposition testimony, what

3    Bill said, what you heard from this person, what you

4    heard from that person, what you saw in these documents,

5    and you're forming a conclusion based upon these facts;

6    is that right?

7        A    No.  We started this back and forth about why

8    a forensic image is important, and I'm telling you why

9    it is important because a forensic image would have

10   resolved all of these open questions.

11       Q    Okay.  And what opinion would you tell the

12   jury that as a result of there being no forensic image,

13   that means that -- finish the sentence.

14       A    Forensically I cannot verify anything that has

15   been said.

16       Q    How does that -- so the fact -- so, in other

17   words, we have been unable to prove to Mr. Jorgensen

18   that the code that was reviewed was actually the code

19   that sat on this Pensacola server; is that what you're

20   saying?

21       A    That's correct.

22       Q    Okay.  And because we can't prove to

23   Mr. Jorgensen, he expresses no opinion -- or he

24   expresses an opinion that because he has not been

25   convinced that the code that was reviewed by Mr. Eiras

Page 177

1    was the code that was on the Pensacola server,

2    therefore, you call into question Mr. Eiras's

3    conclusions, correct?

4            THE WITNESS:  Could I have that read back,

5        please?

6                    (Record read.)

7            MR. TROUBLEFIELD:  Object to the form of the

8        question.

9            THE WITNESS:  Could you restate that, please.

10       It's very confusing.

11   BY MR. RASCO:

12       Q    You state in your testimony that Mr. Eiras's

13   opinion is erroneous because he has no way of concluding

14   that the code he compared was the code that resided on

15   the Pensacola server in 2009, correct?

16       A    I believe I stated that he cannot come to the

17   conclusion that the code he's reviewing is the code that

18   was on the Pensacola server, which he does state in

19   his -- his -- his --

20       Q    And --

21       A    -- his report.

22       Q    And, therefore, you claim that his opinion

23   has -- lacks validity, correct, or is even erroneous?

24       A    I'm stating that -- that it was not validated.

25       Q    So, therefore, his opinion is in error and

Page 178

1    it's not --

2         A    His opinion that the code was on the Pensacola

3    server?

4         Q    His opinion that the code was copied -- that

5    some portions of the code were copied.

6              MR. TROUBLEFIELD:  Objection.

7              THE WITNESS:  I think that that is a broad

8         jump in that there were several opinions that go

9         into saying that -- several opinions going to

10        saying that we don't believe -- or I don't

11        believe -- for those opinions that are mine, I

12        don't -- I don't believe that he considered all of

13        the information when he came to his opinions, and

14        then that includes validating the code on the

15        Pensacola server and other issues such as the

16        copyright issue, the fact that there are various

17        versions that are being reviewed.  I think that we

18        address -- or that our report and supplemental

19        report addresses each of his conclusions

20        separately.

21   BY MR. RASCO:

22        Q    You really didn't answer my question.

23             MR. TROUBLEFIELD:  Objection.

24   BY MR. RASCO:

25        Q    What I want to know -- what I want to know

Page 179

1    is -- well, let's do it the other way around.

2            I would ask you to assume hypothetically that

3    the code that Mr. Eiras reviewed was the same code that

4    was residing in the Pensacola server.  Would his report

5    then have validity, if you make that assumption?  And I

6    know you don't.

7        A    No, because Mr. Waldhalm and I found other

8    errors in his report.

9        Q    Well, but as to the issue that it wasn't

10   forensically validated, if, in fact, Mr. Eiras was

11   comparing the version of the code as it existed in 2009

12   on the Pensacola server with CardSmart code, then all

13   your opinions regarding forensic validation would change

14   because that goes to whether or not he was actually

15   comparing the right code, correct?

16           MR. TROUBLEFIELD:  Objection.

17           THE WITNESS:  Just because Mr. Eiras is

18       comparing the right code, which he wasn't, doesn't

19       mean that his conclusions are correct.

20   BY MR. RASCO:

21       Q    And you opined on what code he was looking at.

22   Just now, you said "which he wasn't."  So you have an

23   opinion as to what he looked at?

24       A    No.  That's not what I said.

25       Q    You just said he didn't look at the Pensacola

Page 180

1    2009 code, right?

2             THE WITNESS:  Could you read back my response,

3       please.

4                      (Record read.)

5    BY MR. RASCO:

6        Q    You have an opinion that he was not looking at

7    the right code?

8        A    And an example of that is the F-GetNumber.

9        Q    That's a "yes," right?

10       A    An example of that is the F-GetNumber.

11       Q    So that's, "Yes, he was looking at the wrong

12   code"?  That's your opinion?

13       A    In that particular case, he was looking at the

14   wrong code.

15             THE VIDEOGRAPHER:  I have five minutes, sir.

16             MR. RASCO:  Okay.

17   BY MR. RASCO:

18       Q    Do you know what other -- do you know whether

19   any CardSmart code was provided by XTec for the code

20   review?

21       A    I know that there was Enabler code belonging

22   to CardSmart within the code that we reviewed.

23       Q    Okay.  And do you know why CardSmart code was

24   included in the XTec code provided for review -- the

25   code that XTec provided for review?

Page 181

1       A     No, I don't; but that is what caused the

2    problem with Mr. Eiras's report because he compared

3    CardSmart code to CardSmart code thinking that it was

4    XTec code to CardSmart code, so he drew a wrong

5    conclusion.

6       Q     You --

7       A     So I'm assuming that if you didn't tell

8    Mr. Eiras that, that you didn't tell us that, and it was

9    an error on your part.

10      Q     Are you aware that when CardSmart began to

11   change the code in Pensacola in the server called

12   "Home," XTec captured the CardSmart changes on their

13   sub-version?

14      A     If XTec knew that, then why didn't they say

15   that?

16      Q     My question is:  Are you aware, sir, at the

17   time of the code review and now?

18            MR. TROUBLEFIELD:  Objection.

19            THE WITNESS:  Nobody told us that.  That was

20      not --

21   BY MR. RASCO:

22      Q     And so --

23      A     That was not communicated to us.

24      Q     So if you were looking at CardSmart code,

25   which was contained within the code that was provided by

Page 182

1    XTec, that was captured during the call home --

2         A    It was not captured during the call home.

3         Q    How do you know that?

4         A    Because the call home function doesn't capture

5    code.

6         Q    Well, when it calls home, do they go back in

7    and look at the code, and did they go back and capture

8    that code?

9              MR. TROUBLEFIELD:  Objection.

10             THE WITNESS:  Mr. Fernandez stated that in his

11        deposition.  I don't know if they actually did that

12        or not.

13   BY MR. RASCO:

14        Q    Okay.

15        A    And a forensic image of the Pensacola server

16   would have told us that.

17        Q    Well, if, in fact, it was true and the code

18   that XTec provided to review included the CardSmart code

19   that was captured after the call home alert was made,

20   wouldn't that explain the CardSmart code you reviewed in

21   the XTec code -- that you saw in the XTec code?

22        A    The problem is we can't verify that the code

23   that you're talking about came from the Pensacola

24   server.

25        Q    Well, there's going to be testimony to that

Page 183

1     effect.

2             MR. TROUBLEFIELD:  Objection.

3     BY MR. RASCO:

4        Q    Let me ask you to -- let me ask you to --

5             MR. TROUBLEFIELD:  Do we have to break?

6             MR. RASCO:  Let's take a break.  Go ahead.

7        Let's take a break.

8             THE VIDEOGRAPHER:  Okay.  Perfect.  We're

9        going off the record.  The time is 7:13 p.m.

10                  (A brief recess was taken.)

11            THE VIDEOGRAPHER:  We're back on the record.

12       The time's approximately 7:44 p.m.

13            MR. TROUBLEFIELD:  For the record,

14       Mr. Jorgensen at the break had to go sit down.  His

15       blood pressure elevated to 145/85 and pulse was 98.

16       That was a medical concern by -- Patricia?

17            THE NURSE:  Patricia.

18            MR. TROUBLEFIELD:  -- by Patricia, his nurse,

19       who has been present all day because of the medical

20       concern.

21            I spoke with Mr. Rasco.  We are agreed that

22       we're going to adjourn the deposition for tonight.

23       We will reconvene at 9:30 a.m. here at the Sylint

24       offices to complete the deposition.

25            Is that accurate, Mr. Rasco?

Page 184

1          MR. RASCO:  Sadly.  True.

2          MR. TROUBLEFIELD:  Okay.  And we're going to

3      leave other comments off the record, but that's it

4      for now.

5          THE VIDEOGRAPHER:  We're going off the record.

6      The time's approximately 7:45 p.m.

7          (Deposition concluded at 7:45 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 185

1                         CERTIFICATE OF OATH

2

3    STATE OF FLORIDA          )

4    COUNTY OF HILLSBOROUGH )

5

6         I, Hillary S. Squire, RPR, CRR, Notary Public,

7    State of Florida, certify that JOHN JORGENSEN personally

8    appeared before me on this 15th day of December, 2014,

9    and was duly sworn.

10

11

12

13                    _____

                      HILLARY S. SQUIRE, RPR, CRR

14

                      Notary Public - State of Florida

15

                      My Commission Expires:  4/19/2015

16

                      Commission Number:  EE 077481

17

18

19

20

21

22

23

24

25

Page 186

1                    REPORTER'S CERTIFICATE

2

3    STATE OF FLORIDA          )

4    COUNTY OF HILLSBOROUGH )

5

6        I, HILLARY S. SQUIRE, Registered Professional
     Reporter and Certified Realtime Reporter, do hereby

7    certify that I was authorized to and did
     stenographically report the deposition of JOHN

8    JORGENSEN; that a review of the transcript was
     requested; and that the foregoing transcript, pages 4

9    through 184, is a true and complete record of my
     stenographic notes.

10

         I FURTHER CERTIFY that I am not a relative,

11   employee, attorney, or counsel of any of the parties,
     nor am I a relative or employee of any of the parties'

12   attorneys or counsel connected with the action, nor am
     I financially interested in the action.

13

         DATED this 16th day of December, 2014, at Tampa,

14   Hillsborough County, Florida.

15

16                    _____

                      HILLARY S. SQUIRE, RPR, CRR

17

18

19

20

21

22

23

24

25

| & | |
|---|---|
| **&** | 2:7 52:24 151:5 |

**0**

**07068-1739** 2:8
**077481** 185:16

**1**

**1** 1:25 58:4,10 63:16
72:9,23 74:13,15
75:12,24,25 76:10
79:9 83:2 85:2
148:2 149:10,15
154:7,24 155:4,5
164:6,23 166:24
168:2
**1.0** 76:21
**1/16/2006** 153:18
154:14
**1/18/2013** 154:11
**10** 13:8
**10/18/2012** 90:10,21
**10/19** 90:19 92:2
**10th** 62:24 76:24
77:2 151:12
**11-22866** 1:2 8:5
**11:00** 93:2,11,18
95:11
**12** 21:24,25
**12:15** 1:13
**12:29** 7:22
**13th** 68:8
**14** 67:5
**145/85** 183:15
**15** 1:12 13:8 19:23
**15th** 7:21 185:8
**16th** 186:13
**179** 82:5
**18** 143:4
**184** 186:9
**185** 2:20
**186** 1:25 2:21
**18th** 152:22
**19** 87:24 152:20

**1970** 12:23,24 13:14
**1993** 18:20 129:12
**1994** 18:20
**1996** 9:20 10:19
12:17
**19th** 151:4
**1:24** 41:10
**1:37** 41:13

**2**

**2** 58:4,10 68:3 154:8
**20** 15:19 47:14
87:24 151:2
**2000** 60:15,17
**2001** 66:2,8 67:6
**2008** 3:14 56:23
65:21 162:18
**2009** 56:24,25 65:21
66:16 83:2 94:6
145:13 149:11,15
155:12,17 156:21
157:13 158:5,22,24
159:3 160:4,17
161:21,23,23 162:6
162:13,15,17,20,20
163:1,16 177:15
179:11 180:1
**2010** 56:24 65:22
91:18 92:7 155:9
162:18
**2011** 56:24 65:22,22
66:2,8 67:7 82:23
85:11,15 144:21,22
144:23 145:1,6,12
145:15 155:9,15
159:6,7 162:18
**2012** 56:24 65:19
66:14 71:20 82:23
90:19 91:20 92:2,7
94:6 144:16 145:1
149:21,22 150:2,3
150:10,12,17 155:2
155:10,15 161:11
162:4,18 166:6

**2013** 52:24 53:18
54:15 63:2 64:1
68:9 69:13 77:2
150:4 151:4,11,15
151:15,17 152:22
155:8
**2014** 1:12 7:22
104:25 185:8
186:13
**20900** 2:3
**21** 95:4,5
**22** 85:15 94:1,19
105:23
**22,000** 30:17
**22nd** 65:22 66:1
67:7 85:11,15
**240** 1:15 7:23 9:9
**24th** 104:24
**26** 87:19 88:6
**27** 95:5
**28** 94:1
**28th** 166:6
**29th** 4:16 53:18
**2:26** 67:24

**3**

**3** 3:15 58:5,10 63:13
66:17 72:9 74:15,16
75:3,11,13,24 76:9
85:2 86:18 136:2
137:10 145:24
174:10
**3.0** 169:13 170:12
171:3,10
**30** 13:5
**30,000** 30:19
**305** 2:4
**30th** 2:3 52:24
**33180** 2:4
**34232** 9:10
**36** 3:4
**3:14** 68:2

**4**

**4** 186:8
**4.4.1** 151:3
**4/1/2012** 91:5 95:10
**4/12** 94:22,23
**4/19/2015** 185:15
**4/20/12** 94:25 95:1
**40** 129:13
**46** 3:5
**4:10** 99:1
**4th** 54:15

**5**

**5** 2:7 58:4,9
**500** 152:4
**52** 3:6
**53** 3:7,8
**54** 105:7,23
**59** 3:9
**5:00** 99:4
**5:58** 145:20
**5th** 4:17

**6**

**6** 162:14
**60** 87:12
**600** 2:3 9:9 152:4
**61** 53:20 54:3
**65** 53:20 54:3
**66** 3:10
**666** 3:10 66:22
87:12
**67076** 90:7
**68** 9:5 20:22,22
**69** 20:22 22:21
**6:14** 145:23
**6th** 1:15

**7**

**70** 3:11 13:4 55:3,6
**700** 162:14
**71** 129:12
**72** 3:12
**73** 3:13,14
**74** 3:15

**75** 55:3,7
**7:13** 183:9
**7:44** 183:12
**7:45** 1:13 184:6,7
**7th** 62:23 76:24 77:2
  151:12

**8**

**8** 2:18
**8/25/2010** 95:14
**800** 16:11
**806** 3:11 70:2,7,16
  71:9 77:7 151:22
  152:7,12,18 153:6
**80s** 34:3
**899** 3:7 53:6,15

**9**

**9** 105:7
**9/25/2010** 91:14
  95:11
**900** 3:4 36:5,6,17
**900a** 3:5 46:12
**920** 3:15 74:23
**924** 3:12 72:14
**926** 3:14 73:21,25
  74:5
**927** 3:13 73:13,19
**929** 3:9 59:18,23
  60:10
**93** 18:16
**930** 3:8 53:7 54:11
  54:20 55:11
**9334** 87:15 88:3
**9335** 95:6
**937-0300** 2:4
**94** 18:16
**96** 9:19 11:8
**973** 2:8
**98** 11:8 183:15
**99** 2:19
**994-1700** 2:8
**9:30** 183:23

**a**

**a.m.** 183:23
**ability** 22:12 25:1
  38:14 39:7,17 49:4
  64:4 159:9
**able** 6:6 25:16,20
  26:2,7 33:1,6 42:19
  47:20 48:24 49:19
  51:15 56:4 64:16,18
  64:21 77:19 87:7
  127:14 153:9 160:1
  160:2,3 162:11
  172:10
**absolutely** 133:18
**abusive** 126:11
**accept** 106:11,12
  158:17
**accepted** 42:14 59:9
  110:14,16,20
**access** 29:7 32:12
  83:13 94:9 163:4,17
  164:1,10,18 167:12
  167:16,18,19
  168:11,19,20
  173:22 174:4,5
  175:3
**accessed** 168:5,7
**accessing** 168:21,21
**accurate** 36:8 46:18
  143:18 156:17
  158:2 183:25
**acted** 29:21
**action** 27:6 186:12
  186:12
**active** 13:19
**activities** 13:20
  24:12,13
**activity** 30:2 42:11
  42:11
**actual** 20:8 33:7
  48:21 49:2 56:17
  82:24
**additional** 39:24
  71:14 149:23

**address** 9:8 22:12
  96:17 171:23
  178:18
**addresses** 178:19
**adjourn** 183:22
**admit** 68:22 69:8
**adr** 3:13
**ads** 79:14 175:12
**advance** 69:14
**adversarial** 19:16
**advised** 4:14 6:5
**aeg** 44:3
**affirmatively** 77:11
**afternoon** 8:24,25
  99:7,8
**age** 11:20 29:25
**agencies** 62:4
**agency** 13:15,16,22
  13:23 19:4 21:18
  22:17,19 44:11
**agent** 41:23 42:15
**agnello** 2:7
**ago** 48:13 86:9
  129:13
**agree** 7:18 68:24
  69:3 86:5,6,8
  113:23 146:2
  155:18
**agreed** 106:20,21
  183:21
**agreement** 5:5 32:2
**ahead** 53:2 121:2
  141:17 146:17
  157:5 183:6
**aid** 52:1,5
**air** 23:9
**al** 8:3
**alaska** 23:12,14
  24:15,20
**albert** 2:14
**alert** 182:19
**alerted** 79:15
**alerts** 174:19
**algorithm** 48:20
  58:14

**algorithms** 48:14,16
  48:21 49:3 58:11
**allegedly** 86:19
**allow** 40:6 49:20
  158:11
**allowed** 24:9 80:11
  87:7
**allows** 15:15,16
  16:24 57:22 111:6
  111:22
**american** 30:8 41:5
  61:20
**amount** 100:11
**analysis** 10:21 11:11
  11:14,18 12:2,10,14
  12:16,22 13:13,18
  14:4,25 19:8,21
  20:2,8 23:2,15 24:4
  24:9,10,11,11,17,24
  25:3 26:5,23 27:16
  27:21 28:24 35:21
  36:1 37:3,5,5,9,20
  38:5,16,25 39:11,16
  39:20,21 41:17
  43:16 47:11,18 51:2
  51:9 53:18 56:2,4
  56:16 58:17,21,23
  59:9 61:12 62:5,7,9
  62:12 63:4,8,11
  68:7,13 77:15 78:10
  79:24 80:1,16 82:10
  84:9 85:20 92:12
  95:19,21,22 96:2,3
  96:21,24,25 97:2,11
  109:12,16 110:5
  127:24 131:1,8
  132:25 134:18
  165:5 173:13
**analyst** 13:24,24
  23:13,14 24:15,16
  27:9 96:17
**analysts** 15:6
**analytical** 111:23
**analyze** 19:19 24:3
  38:14 131:4

**analyzed** 15:15
**analyzing** 12:6
13:25 14:11,21
84:24 130:1,2
**answer** 31:16 73:10
76:6 97:19 100:15
101:23 102:13
105:10 106:1
113:16 115:9,9,19
115:20 117:1,4,5
120:24 121:14,21
122:2 123:24
131:11 133:24
134:4,6 139:13
140:10,19 142:17
156:4,10 158:12,18
163:22 164:17,18
169:15,17 170:24
171:24 178:22
**answered** 114:25
121:9 170:25 171:4
**answering** 73:9
113:16 135:16
139:14
**answers** 122:5
**anticipate** 157:12
**anticipated** 4:12,12
156:18
**anticipation** 158:16
**antonio** 2:13
**anybody** 49:1
**apologize** 45:19
**apparent** 57:3 78:18
**apparently** 155:21
**appear** 5:13 68:13
91:18 94:4 97:15
98:13 151:8
**appearances** 2:1
**appeared** 57:4,4
65:2 78:12 81:17
98:14,15 185:8
**appears** 70:10 92:20
92:21 94:16 152:19
154:25,25

**application** 75:3
119:22
**applications** 29:11
33:14,15 43:22 45:6
61:5 81:3 173:15
**applied** 115:23
116:12 118:4,13
120:8 132:16
133:14
**applies** 99:12,15,18
**apply** 116:11,17
159:14
**applying** 114:23
132:8
**appointed** 38:21
**appreciate** 115:21
**approach** 88:21
**approaching** 40:16
**appropriate** 16:19
**approval** 18:24
**approximate** 95:9
**approximately** 7:22
9:19 13:8 22:20
41:10,13 67:24 68:2
89:4 99:1,4 145:20
145:23 183:12
184:6
**april** 30:17 52:24
**architecture** 74:3
75:13,13,23 76:9,10
**area** 10:24 11:10,14
12:21 13:3,9 14:3
18:4 41:17 43:16
47:10 50:17,17,18
50:25 51:1 62:5,7
97:24 98:8,15 99:9
100:3 101:16,17,24
140:9
**areas** 35:24 77:22
99:18
**arena** 16:14 62:9
**argument** 74:20
83:1 135:10
**argumentative**
118:7 124:19

**arguments** 117:24
**arm** 13:22
**army** 13:15,15,21
22:16,19 23:9 24:22
131:22
**arner** 2:13
**arrangements** 38:18
**article** 108:21
**articulate** 78:2
**asa** 22:15,16,18,22
27:4 44:10
**ascertain** 159:16
172:10
**ascertaining** 162:8
**asia** 30:14
**asked** 22:1 30:22
33:25 76:4 78:14
105:17 109:21
114:24 134:2,5
143:13 155:14
157:24 159:24
165:13 166:18,19
169:4,6,9
**asking** 80:16 116:1
116:3,8 117:7 119:9
119:10 121:16,18
132:17 142:5,7
144:18 166:11,13
169:8
**aspect** 27:14
**aspects** 16:1,16
134:11
**assembly** 21:20
125:11,18,20,25
126:17,17,20 127:5
**assign** 58:12 111:2
**assigned** 24:12
**assigning** 144:25
**assignment** 23:11
24:19
**assignments** 13:19
26:19
**assist** 5:22 22:11
33:17 109:18 117:7
117:16,23

**assistant** 113:3
**assisted** 120:11
127:5 129:20
**assists** 118:10,19
**associate** 4:8 25:17
**associated** 15:16,17
25:17 26:5,10 33:10
33:12 34:10 35:16
39:12 41:4 51:20
57:5 58:5,5 65:18
69:22 73:7 82:20
90:9 91:3,13,22
92:20 93:1 103:3,4
109:25 111:9,9
133:11,12 162:19
**association** 30:8
41:5 61:20
**assume** 179:2
**assuming** 107:18
181:7
**assumption** 179:5
**attacking** 19:14
**attempt** 96:6,8
**attend** 4:19 20:20
76:15,16
**attendants** 30:18,19
**attended** 59:15
76:17 150:14,15
158:19
**attending** 31:12
**attention** 64:24
87:14
**attorney** 2:5,9
141:24 155:19
186:11
**attorneys** 186:12
**attribute** 152:22
**attribution** 69:21
**audio** 7:16
**authenticity** 134:17
**authentx** 3:14 74:3
74:4
**author** 110:8
**authorized** 186:7

**available**  5:24 29:20
  39:21 63:6,7,12,25
  64:4 78:24 81:13
  131:8 162:21,21
  166:23 174:6
**ave**  61:16
**aventura**  2:4
**avenue**  2:3
**average**  51:4
**award**  128:15
  130:23
**awarded**  20:11
  102:22
**awards**  103:16
  128:16
**aware**  79:19 86:17
  141:24 142:8
  144:15,17,21 146:6
  146:20,25 154:23
  155:6,10,11 156:11
  163:17,24 164:4,5,8
  166:23 169:10
  170:5 174:17
  181:10,16
**awesome**  40:21

**b**

**b**  43:9
**back**  13:14 23:13
  24:23 31:22 41:12
  55:16 68:1 92:6
  93:6,7 99:3 107:8
  107:16 145:22
  147:9 156:24 157:2
  161:17 163:21
  164:3 169:24
  171:23,24 176:7
  177:4 180:2 182:6,7
  183:11
**background**  51:18
  72:11
**backhanded**  126:11
**backslash**  89:11,11
**backup**  51:18,19
  79:17 80:2 82:15

93:5 95:12
**backups**  51:16 65:2
  65:7,12,12 92:24,25
  92:25 93:2,3,4 94:4
  94:5,11,14 95:1,15
**bad**  132:13
**badger**  142:14
**bar**  30:8 41:5 61:20
**barrel**  28:25
**based**  5:18 11:9
  23:1 86:23 90:11
  91:16 94:13 96:5
  137:24 159:14
  176:5
**baseline**  57:22
**basic**  21:7,8,11,13
  104:9 130:17
**basing**  175:7
**basis**  49:8 59:12
  93:22
**batch**  73:15 91:6,18
  92:24,25 93:1,3,4
**bates**  87:15 88:2,2
  95:5
**bay**  41:4 62:1
**beam**  128:24
**bearing**  19:6 27:5
  39:4
**becker**  2:7
**began**  56:21,22
  181:10
**begins**  68:3 145:23
**behalf**  8:10,13 52:12
**believe**  18:16 27:8
  40:11,14 42:1 46:20
  46:24 51:2 52:17
  62:15,23 63:7,20
  65:21 76:25 82:5
  85:21 86:17 108:24
  108:25 109:1
  110:11 124:5
  128:18 149:10
  150:5,15 151:12
  152:2 157:13,15
  158:23 161:20

164:18 167:21
  171:6,13 177:16
  178:10,11,12
**believed**  156:18
**believes**  4:5
**belonging**  174:13
  180:21
**best**  46:19
**better**  39:2 60:25
  127:5
**beyond**  29:16 32:15
  138:17,17 139:4
  140:11,20 161:25
  170:13
**big**  151:22,25
**bill**  72:3 175:4,8,21
  176:3
**bimston**  4:8 6:2 71:6
  77:3 143:13
**bit**  5:7 22:9 92:23
**blood**  10:7 183:15
**board**  41:3
**body**  29:1
**book**  108:24 109:1,1
  109:17,21 110:3
  151:22,25 152:3
**books**  109:2,12,21
**bottom**  54:22 91:8
  95:14
**boulevard**  1:15 7:24
  9:9
**break**  40:24 41:7
  67:20,22 98:24
  140:22 145:9 183:5
  183:6,7,14
**breaking**  40:18
  98:21 130:24
**brief**  7:10 41:11
  67:25 99:2 145:21
  183:10
**bring**  6:25 60:23
**bringing**  6:22 114:6
**broad**  178:7
**brody**  2:7

**broke**  24:20 128:14
**broken**  24:21,25
**broker**  73:15,15
**brought**  113:9
**buffering**  20:9
**build**  40:12
**built**  17:22 44:17
**bullet**  28:24,25
**business**  11:22
**byrne**  2:7 8:13

**c**

**c**  47:23,23,23 89:10
  89:11 104:10,10,10
**calculations**  21:12
**california**  34:1
**call**  28:22 48:20
  140:11 174:17
  177:2 182:1,2,4,19
**called**  4:9 10:4
  13:23 16:13,23
  34:13 38:8 39:23
  40:13 57:1 72:18
  91:24 143:19
  153:17 181:11
**calls**  48:6,15 74:18
  74:19 84:11 97:5,15
  97:15,16 174:19
  175:10 182:6
**capabilities**  16:5
  17:19 20:7
**capability**  21:11
  68:10 139:10
**capacity**  10:18
  41:16
**capital**  58:10,10,10
**caption**  8:1
**capture**  64:16
  130:12,19 182:4,7
**captured**  130:11
  181:12 182:1,2,19
**cardsmart**  1:6 8:2
  8:14 27:6 39:5,15
  50:8 51:3 52:1
  62:12 63:13 78:12

**[cardsmart - code]**                                                                 Page 5

78:14,16,16,18,21
79:10 88:19,19 89:9
90:2,4,6,23,25
91:10 97:1,3,4
117:11,12,14,18
118:13,20 133:6,8
134:20 135:1,2,10
135:18,23,25
136:22,24,25 137:2
137:3,13,13,15,17
137:19 138:4,4,13
138:14,24 139:19
139:21,22,25
140:16 146:3,8
164:1,5,10 165:17
166:23 167:1 168:5
168:7 169:13
170:10,12 171:1,2,8
171:10 174:14
179:12 180:19,22
180:23 181:3,3,4,10
181:12,24 182:18
182:20
**cardsmart's** 135:2
141:24 165:25
**careful** 34:16 83:18
**carella** 2:7 8:13
**carried** 131:17
**carry** 25:15
**carrying** 132:24
**cascaded** 20:4
**case** 1:2 4:16 5:17
8:1,4 19:1 29:5,23
39:5,6,15 40:4,11
41:20,21 42:16,21
42:23 43:1,19 44:4
44:5 46:25 48:9,12
48:17,24 50:8 51:3
52:1 56:2,8,21
62:12 94:14,16
104:19 109:6
113:24 114:23
115:23 116:12,18
117:9,16,24,25
119:2 120:9 125:20

126:1,17,21 128:13
129:16,18,20
130:16,18 131:2,4
132:9,16 133:4,6,7
133:14,20 134:9
148:23 152:24
171:15,16 180:13
**cases** 10:1,2,3 16:11
32:5,6,25 33:3
41:15,19 43:15,18
43:24 44:1 46:22,23
48:10 60:10,11 86:7
112:19 127:21,23
**category** 159:11
**cause** 30:3
**caused** 181:1
**cd** 135:4,9 137:4
**cecchi** 2:7
**cell** 7:14
**central** 103:15,15
**centric** 38:8,10,11
39:2
**ceo** 9:15,17 13:7
**certain** 14:9,10,11
25:18,18,18,24
32:17 45:8 58:3
82:22 84:25,25
92:15,22 100:11,23
126:23,24,24 149:6
**certainly** 52:8 94:12
97:5 130:9 157:20
161:16 162:13
**certificate** 2:20,21
185:1 186:1
**certified** 123:1
124:2,6 186:6
**certify** 185:7 186:7
186:10
**cetera** 99:25
**chain** 27:11 32:19
56:9,12 80:11,13,16
80:17 172:19,23
173:3,9
**chance** 27:25

**change** 14:14 49:2
51:20 83:22,25
85:24 106:13
129:14 154:8,10,16
154:21 179:13
181:11
**changed** 33:2 57:21
57:21 58:13 79:15
145:2,2 154:15,17
154:19,20
**changes** 66:14 82:24
84:17 85:25 86:1
155:2,3,13,15 162:3
171:20 181:12
**changing** 106:17
**checked** 4:8
**chemical** 20:25 21:4
122:22 125:3
**chicago** 31:11
**choice** 6:22
**cited** 97:9
**civ** 1:2 8:5
**civil** 1:20
**civilian** 22:1
**claim** 113:2,4
169:10 170:5,7,25
171:7 177:22
**claimed** 56:20
**claims** 77:20 113:12
168:1
**clarity** 87:11
**class** 22:1 23:25
24:2,4,8,10,11,11
61:17 123:5 124:22
**classes** 23:21 61:19
**classified** 19:16
21:18 22:10 34:17
34:21,24 35:2,6,12
123:3 129:8
**classroom** 23:16
**clear** 89:8 114:17
122:24 123:15
**clearance** 18:13,18
18:21,25

**clearances** 18:9
**client** 43:4 165:2
**client's** 49:21
**clients** 10:14 15:13
17:4,25 41:16
**close** 67:21
**closely** 16:2
**closer** 15:19 30:18
**cnic** 3:15
**cobol** 21:7,9 104:9
**code** 10:13,14 41:18
41:23,24 42:2,2,4,6
42:16 43:17,23
44:25 45:2,2 46:25
47:19,20,21,21 48:4
48:11 50:10,12,13
50:13,15,22,23
52:22 53:17 55:22
56:5,7,9,10,11,13,17
56:17,18,19,25 57:1
57:7,9,13 62:11
63:6,8,11,14,17
64:3,12,13,19,20,21
65:1,6,8,9,13,13,24
65:25 66:5 67:1,9
68:7 69:16,23 70:11
71:15,19,21 76:21
78:18,19,20,21 79:9
79:9,15 81:4 82:12
82:13,16,25 83:3,5
85:2,8,13 86:18,24
87:5 96:7,21,23,24
97:1,2,3,4,6,9 98:12
98:15 104:12,15,18
104:20,22 105:9,12
105:16,20,25 106:8
117:7,14 127:1,3,6
128:14 129:15,16
129:17 134:11,13
134:14,15,16,16,20
134:21,24 135:1,2
135:11,12,14,18,19
135:23,25 136:1,2,6
136:9,12,13,15,18
136:20,22,24 137:3

137:8,9,10,10,11,13
137:15,17,17,20,20
137:21,25 138:4,4,4
138:5,10,13,15,23
138:25,25 139:8,11
139:20,22,22,23,24
139:25 140:1,15,16
141:1,2,11,20,21
142:3 143:5,5,19
144:9,12,15,19,20
144:21 145:8,13,13
145:16 146:3,6,10
146:11,21,23 147:1
147:23,24 148:1,6,6
149:5,5,14,15,17,20
149:23,24 150:3,6,8
150:9,15,16,19,22
151:5,13,14,18
152:5,7,9,11 153:3
155:12,12,14,14,16
156:2,15,19 157:16
157:17 158:3,4,14
158:17,19,21,22,23
159:2,6,9,12,16,20
159:24 160:3,10,13
160:15 161:7,10,13
161:18,21,23,24
162:2,3,5,6,8,9,9,12
162:20 163:1,2,3,8
163:12,16 164:6,23
165:14,17,18,25,25
166:24 167:2,20
168:6,8,11,13,14,15
168:19,21,22,22,3
169:1,2,5,11,13,18
169:21 170:12
171:3,10 172:11,15
172:16,16 173:16
173:18,21 174:10
174:14,15,18,20
176:18,18,25 177:1
177:14,14,17,17
178:2,4,5,14 179:3
179:3,11,12,15,18
179:21 180:1,7,12

180:14,19,19,21,22
180:23,24,25 181:3
181:3,4,4,11,17,24
181:25 182:5,7,8,17
182:18,20,21,21,22
**codes** 135:20
**coding** 25:24,25,25
**coincide** 84:3
**coined** 20:3
**collect** 19:18 24:1
   27:23 49:12
**collected** 15:14
**collecting** 14:11,23
   22:14 91:20 132:21
**collection** 14:17
   19:21 20:8 23:2
   24:17 37:18 38:4
   110:25 129:8
**collects** 16:15
**college** 103:14 123:5
   124:10
**colleges** 101:4,9
**column** 88:18 95:6
**columns** 88:15
**combination** 67:14
**combine** 156:1
**combined** 92:21
**come** 172:17 177:16
**coming** 30:17 57:10
   81:19,20
**command** 127:21
**commands** 127:15
   127:15,16
**commenced** 94:15
   94:21
**commendation**
   24:22
**comment** 98:4 107:4
   140:8
**comments** 100:24
   184:3
**commission** 185:15
   185:16
**commissioner** 38:21

**committee** 30:9 41:5
   61:21
**common** 155:24
**communicated**
   130:13 181:23
**communication**
   12:1 26:14 128:17
   128:19
**communications**
   19:15 24:21
**community** 101:8
**companies** 10:8
   28:6 124:21
**company** 11:21 13:8
   16:17,18 109:20
   113:10 116:16
   120:5 135:23 138:3
**company's** 116:7
**compare** 134:21,23
   135:24 136:22,25
   138:8,13,23 139:25
   140:15
**compared** 48:19
   65:14 138:3,21
   177:14 181:2
**compares** 99:23
**comparing** 66:15
   135:20 137:17
   155:17 179:11,15
   179:18
**comparison** 43:24
   50:10 56:18 97:3
   99:12 129:16,18
   136:1,7 137:9,19
   138:9,10,25 139:8
   139:11 146:11
   148:7 163:13,14
   169:19,21
**comparisons** 99:15
   111:3 155:12,14
**competing** 99:20
**compilation** 66:10
   66:13 108:16
**compiled** 156:1

**complaint** 171:7
**complete** 72:25 81:2
   123:12 183:24
   186:9
**completed** 24:10,19
**completely** 28:1
**complex** 20:2,5
   21:12 22:12,13 26:6
   33:16 45:9 128:22
   153:23
**complicated** 31:2
   100:15,19
**composite** 84:22
**compute** 58:14
**computer** 10:24
   11:7,25 14:4,6,7,16
   14:18 19:15 21:1
   22:23 23:3 25:11,12
   25:13 26:1,3 33:13
   33:13,14 35:25
   50:11,18 61:5 64:2
   64:3 71:21 83:17
   100:7,17,20,22,25
   101:2,6,8,13,14,19
   101:20 102:1,3,6,7
   102:25 103:9,10,16
   107:1,5,10,21,24,25
   107:25 108:1,2,3,4
   108:7,17,22 109:2,5
   129:25 130:2
   136:16,21 137:11
   139:9 141:12,20,22
   149:21 174:19
**computers** 19:25
   20:7 70:10
**concentrate** 50:17
**conceptual** 75:11
**concern** 10:24 28:21
   50:8 174:1 183:16
   183:20
**concerned** 26:13,14
   157:18 168:25
**concerning** 72:10
   164:4 170:22
   171:20

**concluded** 161:9 184:7

**concludes** 86:18 96:19

**concluding** 177:13

**conclusion** 28:1 92:13 97:4 160:24 176:5 177:17 181:5

**conclusions** 26:15 54:9 68:13 81:16 82:9 86:5,6,8 92:9 95:18 96:11 97:8 160:9 177:3 178:19 179:19

**condition** 103:18

**conditions** 32:13

**conduct** 76:11

**conducted** 30:16 58:18,21 115:12

**conference** 30:10,12 30:15,17,20,22,24 30:25 61:24 86:9,11 86:12,16

**conferences** 31:8,12 59:14

**confirming** 29:3

**confuse** 137:14

**confusing** 177:10

**conglomeration** 92:4

**conjunction** 13:7

**connected** 29:13 186:12

**connection** 55:22 62:11 85:2

**connolly** 43:2,3,5

**conscious** 38:25 39:1

**consequence** 160:21 161:6,12,19,20 162:24

**consider** 14:24 105:8,11 129:23

**considered** 14:5,7 15:3 125:24 178:12

**considering** 175:21

**consistent** 57:6

**console** 16:24

**contain** 50:22 54:8

**contained** 29:9 70:11 79:9,9 164:22 181:25

**contend** 133:9

**contested** 171:16

**context** 84:9

**continually** 61:3

**continue** 7:17 35:11 42:19 78:5 80:21 126:10

**continuous** 9:20 12:24

**continuously** 60:16

**control** 45:6

**conversation** 143:12

**conversations** 7:13 167:4

**convert** 22:1

**convinced** 176:25

**copied** 48:25 57:16 57:17 78:18 86:18 86:24 90:15,15,16 90:16 91:17,19,20 100:7,13 134:18 135:11 153:1,8 154:5 161:24 167:1 168:13,22 169:1,5,9 169:11 174:10 178:4,5

**copy** 52:11 66:12 87:4,6,8 91:6 167:9 167:10 168:23

**copying** 48:11 99:16

**copyright** 66:2,7,8 67:5,10 82:15 85:6 85:11 98:11,15 100:3 171:21,22 178:16

**cord** 10:7

**corey** 166:6

**corner** 87:18 88:3

**corporation** 1:4,7 8:2 10:11

**corporations** 10:7

**correct** 11:12 26:16 36:11,12,18,20 53:13,14 68:22 81:24,25 82:3 83:10 85:17 86:21 88:16 99:10,11,20,25 100:4,9,13 104:3 105:21,22 107:7,19 109:3 110:19,23 111:12,16,19,20,25 112:3,10 113:3 116:7 119:16 120:18,20 122:19 123:11 124:8,9 125:21,22 126:1 127:20 131:3,5 132:1 133:5,18,20 134:9 135:7 136:9 136:14,18,22,23 137:5 138:12 144:7 145:3,6,14 146:5 147:4 148:4,23 150:2,4 151:9,11,13 151:15,16 153:2 154:9,16,18 159:17 160:6 161:24 169:22 172:22 176:21 177:3,15,23 179:15,19

**correcting** 109:9

**correctly** 127:18

**corrupt** 14:13

**corrupted** 32:24 57:20 58:16

**counsel** 1:17 3:1 4:3 4:9 6:2 7:25 8:7 71:5 142:11,20,24 143:4 146:8 147:15 147:16 148:16 165:11 170:8 186:11,12

**counsel's** 4:21 71:6 77:4

**counselor** 121:15 123:19

**counted** 47:13

**counterpoint** 42:20

**county** 185:4 186:4 186:14

**couple** 41:19 94:25 134:10

**course** 11:22 19:20 20:24 21:7 33:25 34:6,7,8 37:21 63:12 71:21 77:4,6 78:22,25 86:12 101:5,10 102:7,8,11 102:16,18 103:22 107:12 123:12

**courses** 21:1,6,13 22:4,5,6,7,8,10,23 22:25 23:1 24:6,7 25:4,7,11 33:24 36:2,3 101:4 103:3 103:4,22 122:18,23

**coursework** 35:19 35:24

**court** 1:1 8:4,15 28:9 31:3,4,4 32:4 33:19,20 41:22 43:13,13,14 47:10 53:10 86:7 98:18 146:8 156:7 157:1

**courtesy** 121:19

**cover** 4:6,11,20 7:5 44:8

**covered** 25:12 85:7 144:14

**create** 40:9 83:14 111:2 120:17,18,19

**created** 57:24,25 58:1,3 65:3,10 116:16 120:15 134:16 144:22,23 158:4,22,24 159:6

**creates** 58:2 116:13
**creating** 40:2
**creation** 29:8 32:11
  33:2 144:11 154:12
**credence** 114:15
**crime** 29:5
**criminal** 10:2 42:13
**criteria** 14:12
**critical** 51:8
**cross** 2:19 4:23 5:4
  5:23 6:7 34:22 99:5
**crossing** 123:20
**crr** 1:22 185:6,13
  186:16
**cst** 139:18
**current** 29:17 49:21
**currently** 17:3
  18:10 20:4 31:24,25
  125:17
**curriculum** 3:4
**custody** 32:19 56:10
  56:12 80:12,14,16
  80:18 172:19,23
  173:3,9
**customer** 28:5
**cv** 18:6 36:3,7,10
  46:17
**cyber** 10:5,6,21 13:6
  13:9,9,11 16:14,19
  62:8,9 119:21

**d**

**d** 3:4,5,7,8,9,10,11
  3:12,13,14,15 15:13
  36:5,6,17 46:12
  53:6,7,15 54:11,20
  55:11 59:18,23
  60:10 66:22 70:2,7
  70:16 71:9 72:14
  73:13,19,21,25 74:5
  74:23 87:12 110:11
  151:22 152:7,12,18
  153:6
**d900** 46:8

**dash** 58:9
**data** 9:25 10:25
  11:20,21 12:2,7,10
  12:13,16 13:3,10,13
  13:17,18,18,25 14:1
  14:2,3,10,13,14,17
  14:19,22,25 15:14
  15:17 17:21 19:7
  20:9 22:11,13 23:2
  23:3 25:13,15,15,16
  25:17 26:4,4,9,11
  26:12 27:10,11,12
  27:15,15,16,17,18
  27:20,23 28:2,19,19
  29:4,6,6,19,19,21,22
  31:22 32:3,14,16,17
  32:19,21,22,23,23
  33:10,18,19 35:20
  35:25 37:3,9,19
  38:5,8,13,15 39:12
  40:1 43:16,20 45:13
  45:24,25 46:24 47:4
  47:10,18 49:2,4,5
  49:12,17,19,20,24
  50:1,3,4,9,18,19,20
  50:21 51:15,23
  53:16 56:2,15,16
  57:23,23 62:14,15
  63:12 64:16,17 68:7
  71:14 77:14 79:25
  80:3 81:18 82:10,25
  83:1 84:1,12,23
  95:20,23 96:2,16
  97:10 100:25 101:4
  107:2,11,22 108:5
  108:17,22 109:13
  110:1 111:9 117:24
  128:3,21 129:25,25
  129:25 130:2,3,19
  131:18 132:19,20
  132:21,22,23,25
  133:1,1,11,17,20
  153:8 171:19 172:8
  173:10,13,16

**data's** 49:10,11
**database** 49:17,20
  49:21,23 50:2
**databases** 17:20
  49:10,10,11,11,13
**date** 1:12 7:21 32:11
  32:12,12 58:4 64:25
  64:25 65:12 66:6
  67:7 82:22,25 83:8
  83:12,13,14,14,15
  83:21,22,23 84:8,18
  84:19,25 85:1,6,8
  85:14 90:8,12,20
  91:12,13,15 94:4
  95:6,11 105:2 130:7
  144:10,11,11,12,13
  145:1 149:6,9
  152:23 153:2 154:2
  154:3,4,5,8,9,12,16
  155:7,19 159:5
**dated** 166:5 186:13
**dates** 56:22,23 64:20
  65:7,18,18 80:24,25
  82:20,24 83:3,4,5
  83:16,19,20,25 84:3
  84:4,21 85:24 91:3
  91:22 92:5,7,11,17
  95:9 130:6 144:10
  150:13,21,22
  160:11,12 173:17
**daubert** 4:6,11,20
  5:12,13,15,20 132:7
  138:18 140:13
  142:19,21,23,25
**dave** 72:4
**david** 1:7 8:14
**day** 11:20 49:13
  126:12 150:16
  183:19 185:8
  186:13
**days** 158:20
**de** 130:1
**dealing** 13:17
**dear** 34:3

**deboe** 4:10,10
**december** 1:12 7:21
  65:22 66:1 67:7
  85:11,15,15 185:8
  186:13
**decision** 29:4 50:1
**deep** 74:4
**defend** 121:13
**defendant** 7:25
  41:21
**defendants** 1:8,18
  2:9 4:16 8:13 42:21
**defense** 20:11 59:18
  59:22
**defensive** 121:14
**define** 160:3
**defined** 108:23
**definitely** 51:7
  133:14
**definition** 108:9
**degree** 82:9 103:5,7
  103:10,16,18
  122:11,12,14,16
  123:6,8,13
**degrees** 102:22
**delivered** 140:16
  146:3 148:6,13,16
  149:16
**deman** 46:24 47:4
**demodulate** 132:19
**demodulating** 130:1
**demodulation** 45:9
**demonstrate** 67:2
**demonstration**
  114:1
**denominated**
  165:25 166:1
**denton** 166:6
**department** 101:13
**departments** 101:15
**depending** 23:22
  83:15
**deposed** 8:20
**deposition** 1:10 4:4
  4:6,10 5:16,18,20

7:16,23 39:19 46:8
63:10 72:3,4,4
76:17,18,19 78:3
79:12 104:14,24
108:18,23 121:7
135:6 164:15 168:4
175:2,4 176:2
182:11 183:22,24
184:7 186:7
**depositions**   57:15
72:1,2,6 76:15,16
79:5 163:21 164:3
175:21
**derive**   160:9
**describe**   9:23 22:25
23:16 25:10 26:24
37:7 44:9 55:25
61:14 79:4 106:10
157:24
**described**   11:3,9
17:15 18:5 59:9
62:6 74:4 78:11
79:11 80:8 110:2
147:3 148:18 158:1
**describes**   12:11 74:3
74:18
**describing**   78:12
108:18
**description**   72:20
72:22 106:11
156:16 173:25
**deserves**   126:14
**design**   3:12 72:19
72:19,21 73:1 74:10
74:11 97:20 102:7,7
102:10
**designed**   19:24
44:17,22
**designing**   20:6
**detachment**   24:12
24:14
**detachments**   13:20
**detail**   74:4
**detect**   16:17

**determination**
100:12 133:3
**determine**   14:20,22
26:15 30:23 50:19
56:18 57:23 76:9
80:4 87:7 99:16,19
100:8 130:6 132:7
132:15,22,23
160:12,15,25
162:15 173:2
**determining**   33:17
95:23 96:16 100:6
134:15
**develop**   13:12 58:24
171:2
**developed**   19:21
28:18 32:20 45:6
49:16 60:2 61:6,7
109:13 115:13
117:14 118:18
**developers**   16:4
44:22
**developing**   118:18
169:13 170:11
171:10
**development**   3:13
15:9,21,22,23,23
16:1,13,22 17:17,18
44:13 45:11,17 57:7
73:16 102:9 113:10
113:11 114:2,2
115:2,4,4,11,14
116:4 117:7,8,11,18
117:19 118:12,20
120:11,12
**develops**   15:10
**devens**   23:7 24:23
**devices**   12:1 29:13
40:8,14,14
**diagnose**   33:6
**diaz**   86:19,25
**differences**   100:23
100:25 101:11
**different**   16:1 30:13
32:5,13 37:15 44:14

48:18 57:10 65:17
65:18 66:1 85:9,10
91:21 92:5 100:22
102:3,6 140:9 143:4
147:2 157:19
160:15
**differentiate**   160:2
**differentiation**
159:8
**difficult**   143:11
157:22 159:11
**digital**   9:25 10:25
11:11,14,18,25 12:7
12:13,15,22 13:3,10
13:13,17,18,18,25
13:25 14:1,3,17,20
14:25 18:4 19:7,7
20:3 22:11,13 23:2
24:18,21 27:15,15
27:17 35:20,25 37:3
37:9,19 38:5 43:16
43:20 45:8 47:10,17
50:9 53:16 56:2
58:23 68:7 77:14
79:25 82:10 95:20
96:2 97:10 99:10,12
99:13,15,18,22,24
100:2,16,19,25
101:4,18,20,24
102:11,18,20,22,25
103:6 107:2,10,22
108:5,17,22 110:1
119:7,11,17 128:6
128:21 131:18
132:25 133:1
**direct**   2:18 6:10,11
8:22 37:5 87:14,22
89:17 127:18
133:16 138:17
140:12 147:3
**directed**   115:13
**directly**   19:11 43:25
45:1 152:7
**director**   20:12 41:3
44:13,14 45:11,12

45:14,16
**directories**   93:7,10
152:6,25 153:8,10
**directors**   41:3
**directory**   3:11 51:14
69:15,20,23 70:9,22
70:23,24 77:8 81:2
83:21,23,23 84:5,6
84:7,16 91:19,24
92:2,6 152:21 153:1
153:19,20 154:11
154:24 159:1
162:14,19 173:20
174:23
**disagree**   156:16
**disappointing**   63:9
**discount**   85:23
**discover**   26:9 30:4
**discovery**   1:18
10:25 11:1 15:12
61:21 71:25 111:18
**discuss**   109:13
**discussed**   62:11
114:7 170:21
**discusses**   108:17
110:4
**discussing**   17:21,23
33:3 45:4,5 61:1
143:24
**discussions**   31:13
61:23
**disputed**   175:14
**district**   1:1,1 8:4,4
**divergence**   75:22
**divergent**   14:7,8
100:17,21 102:2,5
**division**   45:24 46:2
**divorce**   10:3
**dna**   28:23
**document**   3:12
36:10,21 44:6 46:11
46:21 52:9,20 59:17
59:25 60:10 66:21
66:22 70:1,12 72:13
72:15,15,19,19,21

72:21,25 73:1,5,19
74:5,11,16,17,20
75:2,5,9 76:4,5,8
77:14,16 82:1 87:25
97:20 142:10
**documentation**
57:25 59:13 74:14
96:4 111:24 145:7
167:25 175:22
**documents** 59:4
68:19 72:8,10 73:3
74:10 75:23 111:22
176:4
**dod** 72:10
**dog** 104:18,22
105:24 106:7
**doing** 7:6 26:10
43:20 59:1 60:3
109:16 129:17
137:18 157:17
161:7 169:18
**dollar** 34:13
**dollars** 19:24
**don** 2:12 50:10
53:19 54:16 55:8
71:3 104:17,19,21
105:24 106:7
150:23 151:19
**don's** 50:24
**door** 35:7
**double** 152:3
**dozen** 15:19 47:12
47:14
**draw** 97:8
**drawing** 27:25
**drew** 181:4
**dril** 15:13,13,20,21
15:24 16:5,7 49:15
49:18 110:22,24
111:5,6 112:14,20
113:2,8,9,14,24,25
114:6,16,21 115:13
115:22 116:2,3,6,6
116:15,17 117:7
119:4,6,11,16,17

**drive** 39:24 40:3
71:17 149:25
**driven** 29:18
**drives** 40:7
**dropped** 92:19
**dufor** 2:13
**duly** 8:19 185:9
**dumped** 91:23 92:1
92:1,5 95:16
**dvd** 138:15,24
139:20 140:1

**e**

**e** 9:2,3,3 17:12 32:25
33:1,5 43:9 52:23
72:1 166:5,16
175:22
**e01** 40:13
**e1** 165:25 166:7
**e3** 166:1,7
**e7** 22:1
**earlier** 48:8,9
100:24
**early** 34:3 60:15,17
85:21,22 150:8,16
**easier** 16:6 89:17
**easily** 25:21,22
93:17 160:8
**eastern** 62:2
**easy** 15:14 125:5
**ed** 4:3
**edde** 30:8 41:5
**ediscovery** 10:5
15:11 31:19 111:11
111:16,18 112:4
**editor** 64:5,7,10,14
**eduardo** 2:2 8:9
**educated** 114:11
**education** 20:15,16
51:4 118:14
**educational** 20:14
21:15,17
**ee** 185:16
**effect** 84:8 90:12
172:12 183:1

**effort** 15:21 115:12
120:11
**eiras** 39:18 52:23
55:20 63:10,21
71:16,18 74:21
76:17,19 77:20
78:20 81:22,23,24
81:25 85:19,25
86:17 95:20 96:1,5
96:12,18 97:10
137:24,25 149:24
150:11 174:9
176:25 179:3,10,17
181:8
**eiras's** 3:6 63:23
85:16 96:13 177:2
177:12 181:2
**either** 35:9,25 80:1
84:15 85:2 109:7
119:18 143:13
148:23 163:18
173:4,23
**electrical** 20:17
122:18,21,25 123:1
123:2,3,17 124:2,5
124:6,7,11,15,17,22
**electronic** 10:4,25
11:1 15:12 45:15
61:20 77:17,18
111:18
**electronically** 11:1
11:22,24 31:20 32:3
32:7 175:1
**element** 86:10
**elements** 62:2
**elevated** 183:15
**eliot** 9:2
**else's** 75:20 76:7
**embedded** 129:24
130:15
**embodied** 116:15
146:8,13
**employ** 120:14,16
**employed** 9:11
131:24

**employee** 186:11,11
**employees** 124:22
**employment** 9:6
44:8,9 61:1
**enable** 160:8
**enabler** 3:12,15
63:13,16 66:17 72:8
72:9,9,19,22,23
73:1,2 74:13,15,15
74:16 75:3,11,12,13
75:24,24,25 76:9,10
76:21 79:7,9 83:2
85:2,2 86:18 90:4
90:17 91:24 136:2
137:10,10 141:10
142:2 148:2 149:10
149:15 154:24
155:4,4,5 164:6,23
166:24 168:2,2
170:12 171:3,10
174:10 180:21
**encase** 37:4,10,25
38:9 40:12 59:5
108:24 109:7,10,11
**encoded** 25:14
**encompassed** 159:2
**encompasses** 62:4,8
110:24
**encryption** 25:23
**ends** 36:15
**endstatements**
47:22
**enforce** 60:20,21
**engineer** 9:16 21:4
122:21,25 123:1,2,4
123:17 124:3,5,6,7
124:12,15,17 125:3
**engineering** 14:19
14:20 20:18,25
103:4 107:14,23
122:18,22
**engineers** 38:20
44:21 60:3,23
124:22,23

enlisted  22:3,19,22
ensure  14:10 16:4
  17:22 27:23 42:2
  62:14
ensuring  15:22
  17:18,20
entail  134:14
entails  32:13
entire  46:4 168:10
entirely  124:9
entirety  82:13
entity  18:24
equipment  20:1,1
  34:15,18 35:14 45:9
  63:3
erroneous  28:1 97:4
  177:13,23
erroneously  174:12
error  177:25 181:9
errors  179:8
escrow  41:23 42:14
  56:14 135:19,20,21
  136:6,8,13
escrowed  136:13
esi  31:19
esquire  2:2,6
essentially  13:21
  16:24 22:5 25:20
  34:9 48:24 56:10
  64:2 91:21 160:22
establish  101:10,14
  105:19
established  42:4,8
  84:18
et  8:3 99:25
ethics  31:3
europe  26:22,23
  27:3 30:15
evaluating  56:14
evaluation  104:20
  127:6 133:9 168:15
  175:19,20
events  25:18
evidence  28:21 31:3
  31:4 40:13 68:17,20

69:7 71:9 173:20
  174:22 175:9
evolving  31:15,16
  31:17
exact  65:25 107:4
exactly  48:22 49:3
  101:7 106:1 107:17
  128:25 143:24
  149:2,12 173:14
examination  2:18
  2:19 4:23 5:4,23
  6:12 8:22 62:17,19
  62:20,23 99:5 132:7
  133:16 138:17
  142:19,23 144:6
  147:3 148:7 149:16
  155:8,20 168:10
examine  6:7 34:22
  64:16 80:2 123:20
examined  8:20
  144:12
examining  172:22
example  16:7 50:20
  57:19 85:6 93:6
  96:24 99:13 103:15
  113:9 114:15 119:4
  132:13 151:22
  173:18 180:8,10
exceed  65:12 84:21
exception  68:18
excerpts  72:14
excuse  40:16 42:7
  53:17 62:22 66:25
  121:11 172:2
executable  48:1
executed  127:16
execution  148:2
exhibit  36:5,17 46:8
  52:10,17 53:6 54:11
  54:17,24 59:18,23
  66:22 70:2,6,19
  72:14 73:13,25
  74:23 77:7 82:5
  87:12 151:22 152:7
  153:6

exhibits  3:1
exist  67:10 103:12
  103:13
existed  32:20 66:6
  66:17 91:18 149:10
  149:15 162:20
  163:3 179:11
existence  158:24
exists  103:8
expand  30:3
expect  4:24 148:21
  155:24 157:18,20
expected  155:23
  156:14
experience  14:15
  49:9 51:5 117:6
experienced  31:25
  32:1
experiences  31:4
expert  5:21 10:1,22
  47:9 50:16 55:23
  63:21 68:19,22,25
  69:6,6,8 81:9 99:9
  105:9,12,16,20
  106:10 112:18,24
  116:10 119:11,18
  120:8 125:16,17
  127:6 137:19,20
  139:6 142:21,25
  175:7
expertise  50:18,24
  50:25 83:11 90:11
  91:16 94:5,13 113:7
  114:22 125:19
  127:17 129:20
  131:20
experts  14:24 41:22
  58:23 86:13 119:7
  147:16
expires  185:15
explain  22:8 28:23
  77:13 116:24 121:6
  121:20 159:19
  172:25 182:20

explained  5:24
  134:13
explaining  153:22
explanation  143:20
  144:18
express  85:19
  139:21
expressed  42:17
expresses  176:23,24
extend  25:1 95:2
extended  33:10
  66:11
extends  29:16 32:15
extensive  26:9
extensively  16:10
  119:4,6
extent  10:9 38:20
  69:7 98:1 104:13
externally  50:1
externals  13:24 24:3
extract  12:2
extremely  159:11
eye  104:18,22
  105:24 106:7

**f**

f  37:4,14,17,18 38:1
  77:22 174:13 180:8
  180:10
facciola  31:9
facilities  68:10
facility  23:7
fact  24:25 33:2 38:6
  39:15 48:9 52:1,5
  59:17 65:16 67:4,4
  67:5,16 69:18 78:14
  78:19,20 79:15
  81:14,18 113:5,11
  116:18 118:4,11
  125:23 131:24
  137:18 153:2,23
  154:6 162:24
  164:16 165:24
  166:1 176:16
  178:16 179:10

182:17

**facts**  55:19 116:11
116:13 132:9
175:14 176:5

**factually**  66:18

**fair**  42:9

**fairchild**  44:12,18
45:13,21,22,23 46:3
123:4

**fairly**  26:6 74:4
75:14

**falcons**  40:6

**false**  124:12

**familiar**  10:20 50:6
50:12 57:6 113:2
114:11 148:5
165:24 166:1

**famous**  33:3

**far**  26:13,13 32:15
38:15 157:18

**farm**  2:7

**fbi**  41:4 62:1,1,3

**fdk**  37:12

**fdle**  38:22

**feature**  174:18

**federal**  1:20 31:6
43:13 47:10 86:12
139:21

**fedex**  135:3,5,5,9
137:5 138:14,24
146:4

**feel**  51:25

**fernandez**  2:14
57:15 72:2 77:5
79:6,12 143:14,15
143:20 144:2,4
157:24 159:25
160:18 182:10

**field**  11:7 13:13 14:4
14:6,25 21:2 22:23
35:21 47:17 50:8,9
59:10 61:12

**fifth**  91:7

**file**  29:8,10,11,14,23
29:25 30:1,3,5 33:7

33:11,11 51:12,12
51:13 56:22 65:6,8
65:9,20,21,23,24,24
65:25,25 66:3 69:21
69:22 84:2,14,15,16
85:8,8,12 89:23
90:9,13,14,16,20
91:13 93:8 111:10
133:10,10 154:19
154:21,22 171:22

**file's**  51:9

**files**  32:9,9,10,12
33:4 39:12 40:13,13
50:21 57:5 63:6
64:3,19,20 65:1,10
65:19 66:5,9,11,14
71:15,22 84:6 90:15
90:19 91:4,4,17,19
91:21,21,22,25 92:4
92:6,10,14,14,21,21
93:8,19 95:16,17
111:1,6,7,8 133:12
141:21 153:19
154:12,13,14 155:2
155:4,9,10 156:20
157:13 160:16
162:15,19 171:20
171:20 174:23

**filing**  149:6

**filter**  25:20

**finally**  77:17

**financial**  48:10,22

**financially**  186:12

**find**  27:21 40:18
57:8 63:10 85:1
93:16 98:10 127:2
162:16 174:24

**findings**  54:9

**fine**  140:23

**finish**  73:8 76:6
97:19 113:15,16,21
135:16 141:15,25
158:7,12 175:25
176:1,13

**firewall**  120:2,3

**firm**  10:1 42:25 43:3
43:3,9,10 57:17
118:25 119:1,1,4
136:11,16 137:1

**firms**  10:15 15:2,18
15:19 16:6 28:5
112:14,16,17

**first**  8:19 21:25 27:8
89:9 102:14 109:10
134:11 137:12
152:19,21 153:5

**fisher**  1:7 8:14 72:4
76:14 163:4

**fit**  131:12 159:12
160:16

**five**  15:4 28:17
40:18 43:18 61:21
121:7 143:2 180:15

**flag**  34:8

**flip**  64:12

**floor**  1:15

**florida**  1:1,3,16,23
2:4 7:24 8:2,4 9:10
36:15 38:21 44:12
44:18 103:15,16
185:3,7,14 186:3,14

**flow**  16:16 17:21
49:20 126:23

**fn**  77:23

**focus**  35:11 36:13
38:19

**focused**  13:11 38:6
38:17,19 64:24 65:2

**folder**  88:18 89:5
90:1,5

**folders**  90:25 93:8

**follow**  31:7 42:11,11
54:13 60:3,25 85:9
96:15 127:24
153:16

**followed**  42:10
58:22 95:23 96:1

**follows**  8:20 115:13

**force**  23:9

**forces**  38:24

**foregoing**  186:8

**forensic**  3:9 10:21
10:23 11:11,14,18
12:16,22 13:13 14:3
14:17,25 18:4 19:7
19:7 28:24 35:21,25
37:5,5,19 38:5,15
38:20 39:8,9,10,23
40:3,7,10 41:17,22
43:16 47:10,18 56:2
56:5,6 57:17,19,24
57:25 58:1,1,3,17
58:22,23 59:6,9
60:3,3,23 61:12
62:5,7,8 65:6 66:12
66:12 68:7 77:14
79:20,25 80:7,22
81:13 82:10 86:13
87:6,6 91:25,25
92:12 95:21,22 96:2
96:15,17 97:10
107:2,11,22 108:22
109:12,16 110:1
111:4 112:7 130:17
133:2,3,13,16,20,25
134:12,14,18,19
137:7 146:3 148:18
148:19,20 163:11
169:23 171:18
172:8,23 173:1,12
173:13 174:7 176:8
176:9,12 179:13
182:15

**forensically**  57:14
57:16,16 81:20 87:4
96:7 130:2 134:8
135:8 147:2 163:12
172:20 176:14
179:10

**forensics**  9:16,25
10:1,25 12:13 13:3
13:10 15:6 37:3,9
38:9,22,23 43:20

50:9,19,25 53:16
59:6 97:23 99:10,12
99:15,18,22 100:2
100:16,19 101:1,5
101:15,18,21,24
102:12,19,20,23,25
102:25 103:6,9,10
103:16 108:1,5,17
110:5,5 119:7,11,17
130:4
**forever** 49:24
**forget** 48:12 68:17
69:17
**forgot** 37:1
**form** 11:15,22 15:1
19:2 23:20 66:19
81:15 82:11 86:20
86:23 87:1 96:22
103:19 104:4
105:14 106:15
112:21 115:24
116:19 118:5
123:18 128:20
132:2 141:6 142:12
143:7 146:15 147:5
147:12 148:25
156:22 163:19
166:2,9 167:13
170:2 177:7
**formal** 20:14,16
56:12
**format** 77:17,18
97:14 111:12,13
**formats** 17:24
111:14
**formatting** 74:18
126:25 127:10,13
**forming** 175:25
176:5
**forms** 157:19
**formulated** 25:14
**formulating** 5:22
132:16
**fort** 23:7 24:23

**forth** 60:9 92:8
163:21 164:3 176:7
**fortran** 21:7,8 104:9
**forward** 6:16
**found** 14:15,15
98:12 162:17 179:7
**foundation** 63:19
**four** 13:16 19:22
43:18 98:20,23
123:6,8
**fourth** 36:19,20
**frame** 11:8 18:16
20:22,23 71:20
84:25 93:1 94:8
132:23 150:6,18
173:16
**frames** 69:25
**framework** 73:2
75:4
**frankly** 6:1
**frequency** 129:2,3,5
**frequently** 26:11
32:8 43:19 129:25
130:15
**front** 30:7 77:8
85:22 87:12 151:25
**frozen** 65:9
**ftk** 37:4,13,25 40:12
**full** 9:1 27:17,17
89:7
**fully** 4:24
**function** 77:23 78:8
96:25 182:4
**functionality** 127:19
**functions** 13:25
26:13 48:23 49:13
**fundamental** 165:18
**funding** 35:15,15
**funds** 34:10
**further** 78:10,17
98:17 186:10

**g**

**g** 2:6 8:12 9:3 43:9

**gallbladder** 132:11
**gather** 160:25
**gathering** 26:6
**general** 60:1 118:14
118:15 120:12
124:11
**generalization**
106:21
**generalized** 118:6
**generally** 47:21 59:9
69:6 100:2 101:25
106:6 108:6
**generated** 49:6
**george** 31:10
**getnumber** 77:23
78:8 96:25 180:8,10
**getstatements** 47:22
**getting** 50:3 55:16
67:21 84:22 95:15
126:12
**give** 30:7,9 53:10
67:22 114:12,14,22
121:21 122:1
140:20 160:16
162:19
**given** 30:24 39:7,9,9
57:25 59:15 83:4
160:17
**gives** 29:24,25 38:24
75:10,10 122:5
**giving** 31:14 121:13
143:6
**glad** 125:6
**glasses** 150:23
**glennon** 2:6 8:12
**go** 4:1 7:4,18 18:8
23:25 26:20,22 27:1
27:16 36:8 47:25
53:2 58:8 69:7 73:3
89:16 91:7 92:6
109:15 121:2
141:17 146:17
152:13 153:25
161:17 162:13
171:15 172:6 178:8

182:6,7 183:6,14
**goes** 46:16 49:19
74:3,14,16 179:14
**going** 4:1 6:6,16,25
7:4 10:9 15:24 17:5
34:20 41:9 50:14
54:21 60:25 67:20
67:23 68:17,20 71:8
76:1 77:25 87:14,22
87:23 88:21 89:21
93:6 98:18,25 105:7
105:11 107:8
109:22 117:13
118:21 126:10
136:24 142:11,13
145:19 154:8
163:21 172:3,6
178:9 182:25 183:9
183:22 184:2,5
**good** 8:24,25 27:8
98:21 99:7,8
**government** 45:4
59:2,3 62:3 115:16
**grade** 21:25
**graduated** 25:2
33:22
**graphical** 48:17
49:1
**greatly** 115:20
**greenberg** 43:11,12
**group** 9:7,8,12,18
9:24,25 10:20,21,22
11:4,6,10,14 12:5
12:12,16,20 13:3
15:9,10 19:9 24:16
37:22 38:7,17,19
41:4,17 60:7 62:1,2
84:25 95:11,12,16
**grouped** 91:23
**groups** 94:4
**grown** 30:6
**guess** 4:22
**gui** 48:18 49:1,2
**guide** 3:13 72:8
73:16

| | | | |
|---|---|---|---|
| **guidelines** 115:14 | **help** 53:21 77:13 | 72:15 73:13,25 75:2 | **included** 180:24 |
| **h** | 88:6 131:1 150:21 | 90:6 101:17 118:9 | 182:18 |
| | 153:22 | 143:15 | **includes** 13:10 |
| **h** 9:2 17:12 58:10 | **helps** 120:5 | **identifying** 96:25 | 152:12,18 178:14 |
| **hackers** 119:23 | **hembree** 166:7 | 130:1 137:25 | **inconsistencies** |
| 120:1 | **hf** 128:12 | **ids** 175:12 | 57:11 |
| **hand** 67:5 87:18 | **high** 28:8 128:21 | **ifstatements** 47:22 | **inconsistent** 92:17 |
| 88:3 153:18 | **higher** 152:24 | **ignore** 27:11 81:17 | 92:18 |
| **handed** 126:10 | **highly** 19:15 20:2 | **image** 39:8,9,23 | **incorporate** 20:7 |
| **handle** 26:4 | 34:17,21 114:11 | 40:3,5,10 56:5,6 | **incorporated** 1:3,6 |
| **handled** 43:15 | **hillary** 1:22 8:16 | 57:19,19,24 58:1,1 | 8:2,11 17:19 |
| **handling** 34:9 49:16 | 185:6,13 186:6,16 | 58:3 59:6 65:6,9 | **incorporating** 16:4 |
| **handwriting** 67:18 | **hillsborough** 185:4 | 66:12 79:20 80:7,8 | **independent** 150:14 |
| 67:19 | 186:4,14 | 80:22,25 87:6 137:7 | 150:15 |
| **handwritten** 87:19 | **hire** 121:5 | 137:8 148:18,19 | **independently** |
| 88:5 94:1,1 95:5 | **history** 44:9 | 163:11 172:21,22 | 150:5 |
| **happened** 29:3,21 | **hold** 18:3,9,10 40:24 | 173:13 174:6,7 | **index** 2:16 |
| 143:23 | 41:1,2 45:16 61:23 | 176:8,9,12 182:15 | **indicate** 57:8,12 |
| **happening** 29:10 | 87:16 88:4,7 124:10 | **imaged** 57:14 | 81:13 85:13 94:12 |
| 127:3 | 124:14 | **images** 99:13,24 | 99:9 103:7 |
| **happenings** 25:18 | **home** 174:17 181:12 | 153:17 | **indicated** 98:12 |
| **happens** 51:12 | 182:1,2,4,6,19 | **imagine** 73:2 139:19 | 107:1 128:15 |
| 127:18 | **hone** 34:9 | **imaging** 40:7 | **indicates** 77:10 |
| **happiness** 42:17 | **horrible** 147:21 | **immediately** 57:1 | 89:14 145:1 153:10 |
| **hard** 40:7,7 157:22 | **hour** 40:17 | **impact** 51:14 80:1 | **indicating** 32:19 |
| **hardware** 40:4,5,6,9 | **hours** 121:7,8 | 85:20 96:10,20 | **indicator** 173:22 |
| 40:15 130:20,25 | **house** 49:16,17 | 172:12 | **indirect** 120:16 |
| 131:3,17 | **huh** 77:10 | **impeachment** | **indistinct** 155:13 |
| **hash** 58:4,4,5,14,15 | **hundred** 34:13 | 106:16 | **individual** 1:7 18:25 |
| 111:2 | **hunt** 1:2 8:5 122:3 | **implement** 35:18 | 90:15 93:8 |
| **he'll** 4:25 5:1 | **hypoglycemic** 172:4 | **implementation** | **individuals** 117:25 |
| **head** 41:6 | **hypothetically** | 45:5 | **industry** 48:11 |
| **health** 5:14 | 179:2 | **importance** 27:9 | 110:15 |
| **healthy** 4:19 | **i** | 31:18 51:10 85:24 | **information** 10:4 |
| **heard** 8:3 12:4 | | **important** 27:14,22 | 11:2,23,24,25 12:3 |
| 22:15 23:4 36:23 | **idea** 66:15 75:11 | 86:10 143:6 176:8,9 | 12:8 14:20,22 15:17 |
| 45:25 176:3,4 | **identification** 46:9 | **importantly** 15:24 | 16:15,16 18:12 |
| **hearing** 5:12,14,15 | 54:18 80:23 151:23 | **impossible** 157:22 | 19:18,19,19 20:10 |
| 5:19 6:10 | 162:5 | 161:15 | 25:1,18,21,22 26:6 |
| **hearsay** 68:19 69:1 | **identified** 143:10 | **improper** 106:15 | 27:12 28:20,21 29:2 |
| 81:6,11 | 149:23 174:12 | **inability** 159:14 | 29:3,9,12,20,24,25 |
| **heart** 126:13 132:10 | **identify** 8:8 26:2 | **include** 25:23 29:9 | 31:20 32:3,8,10 |
| **held** 7:23 30:12,13 | 36:5 46:15 52:20 | 29:12,19,19 61:3,4 | 33:9,9,10 39:24 |
| 30:14,14 44:10,14 | 53:15 54:12 55:6 | 155:8 | 58:13,13,16,19 |
| 86:12 | 59:25 66:22 70:7 | | 68:11 78:2 80:23 |

81:5,13 82:14,15,15
84:20,24 86:11
109:16 111:1,7
117:16,17,23 120:4
120:6 128:6 132:21
132:24 134:18
137:24 154:19,20
159:1 160:9,10
174:1 178:13
**infragard** 41:4 62:1
**infringement** 100:3
**initial** 23:11
**initially** 83:1
**initiated** 83:4
**input** 16:3
**inside** 48:14 83:25
84:6
**insisted** 155:19
**inspect** 142:10
**inspection** 69:14
77:1
**instance** 51:17
**instances** 47:9
**instruct** 122:1,8,9
**instructing** 61:15
121:15
**instruction** 61:16,18
**instructor** 23:14,18
26:17,21
**insulting** 132:4
**integrated** 18:1
**intellectual** 10:2
52:22
**intelligence** 18:23
**intended** 114:5
**intent** 75:14,21 76:7
**intention** 75:12
**intercept** 132:18
**intercepted** 128:17
128:19
**interest** 25:19,22,23
32:10 70:11 77:22
127:2 132:23
**interested** 25:1
29:22 64:23 74:12

169:5 186:12
**interesting** 31:1
**interface** 48:18 49:1
**interfacing** 45:3
169:3
**interfere** 7:16
**interleaving** 130:1
**internally** 28:7 60:2
61:7
**internals** 13:24
23:15 24:8,10,10,11
24:24 25:2 26:23
**international** 10:8
45:14
**interpret** 128:1
**interrupt** 120:25
**interviews** 76:11
**intrusion** 16:17,20
**inventory** 152:11
**investigate** 39:8
131:17
**investigating** 132:20
**investigation** 3:9
30:4 60:4 74:6 75:6
76:12 78:17,22,25
79:18 82:8 86:23
133:13 148:20
**investigative** 38:25
130:17 132:24
**investigator** 36:15
**investigators** 41:1
**involve** 44:24 45:1,2
**involved** 14:16,19
14:21 15:8 16:22
43:25 48:10 107:14
107:22 108:4 118:1
**involvement** 17:16
115:1
**involving** 34:13
**irrelevant** 113:24
126:1,2
**issue** 6:5 96:17
171:15,16 178:16
179:9

**issued** 52:11 54:14
**issues** 13:11 171:20
171:23 172:24
178:15
**issuing** 55:13
**iterations** 85:9

**j**

**j** 9:2,3
**jan** 39:18 52:23
63:10 81:24 174:9
**january** 4:17 63:2
69:17,24 104:24
149:21 150:2,4,9,12
151:4,14,17 152:22
**jasper** 166:8,24
**jersey** 1:7 2:8 7:20
**jgs** 90:2,6
**job** 19:18
**john** 1:10 8:6,18 9:2
185:7 186:7
**joined** 13:14,14,15
20:18
**jointly** 54:15
**jorgensen** 1:10 4:15
4:17,24 5:13 8:6,18
8:24 9:2,4 40:25
41:15 47:17 52:21
53:9,13 55:4,17
59:21 66:23 68:5
69:11 70:3,8 75:19
78:1,5 88:14 93:25
95:7,18 99:7 176:17
176:23 183:14
185:7 186:8
**jorgensen's** 4:7,12
40:17
**judge** 5:15 6:19 7:5
30:21,22 31:9,9,11
69:5 78:5 121:17,17
122:1,3,3,7 140:11
**judge's** 5:19
**judges** 31:7,7,12
32:2 86:12,13

**july** 53:18
**jump** 89:20 178:8
**juror** 114:10
**jury** 153:22 172:14
176:12

**k**

**k** 17:12
**kaplan** 2:2 8:10
**keep** 16:25 142:12
**keeps** 120:1
**kennedy** 55:16,17
81:16,17,22 82:6
**kept** 11:22 174:3
**kevin** 110:9
**key** 50:3 79:13
175:3,5,10,11
**kilobits** 90:7
**kind** 124:8
**knew** 145:15 159:1
159:20,23 167:22
167:22 181:14
**know** 40:20 42:23
42:24 50:10,13
51:21 56:10 58:15
58:20 59:8 70:12,18
79:2 84:19,21 95:25
96:5 97:2 103:14,17
104:12,15 107:4
108:8,10,13,13
109:24 110:12
112:14,19 114:9,9
114:15 116:6,15
123:19 126:9,22
127:12 131:25
138:21 139:7
140:25 142:18,19
142:22,23 143:6
145:12 146:23
147:13,20,22
148:14,14,15 149:2
150:14 151:19
152:5,10,15,16,17
155:21 157:5,9,11
157:17 158:10,13

158:17,21 159:13
159:22 162:1,2
163:22 164:25
165:12 167:21,23
168:16 169:4,12
170:11,25 171:1,9
172:15 173:5,8,13
173:18 178:25,25
179:6 180:18,18,21
180:23 182:3,11
**knowing** 113:7
**knowledge** 46:19
94:13 103:1 113:23
114:21 115:22
116:2,3 118:4,5,15
118:17 119:17
120:7
**known** 25:21,23
45:22
**knows** 119:10
125:25

---

**l**

**l** 9:2,7 15:13 17:12
**lab** 38:22,23
**lacks** 177:23
**lajuana** 2:14 7:19
**landline** 128:10
**language** 21:20
25:12 48:3 104:9
125:10,11,16,18,20
126:1,20,21 127:7
**languages** 17:23
21:8,9,10,14 127:11
**laptop** 39:23 40:3
40:10 64:2,3 71:21
134:25 136:16
137:11 139:9,24
141:12 149:20
**large** 1:23 10:6 17:2
28:5,5 34:10 69:2
108:11
**larger** 72:15
**largest** 30:15

**larry** 166:6
**laser** 128:24
**late** 126:12
**latest** 61:4,5
**law** 10:15 15:2,18
15:19 16:6 28:5
42:25 43:3,3,9,9
61:16 63:1 112:14
112:16,17 118:25
119:1,1 136:11
**lawsuit** 82:23,25
83:4 94:14,20,24
148:3 149:7 162:10
**lawyer** 43:1 112:24
119:10 144:16
170:17
**lawyers** 86:13
111:16 112:3,4,17
113:6 119:7
**layman** 51:22
**layperson** 51:4
**lead** 124:4
**learn** 14:8 120:23
121:3
**learned** 21:14,19,20
**leave** 184:3
**leaves** 28:25
**lecture** 61:11,20
62:8
**lectured** 32:1 61:25
62:3
**lectures** 30:7,9
59:14 61:23
**left** 20:18 44:11 67:5
87:19 90:8 94:1,19
95:5 153:18
**legal** 10:15 30:21,25
81:9 111:24 113:3,3
113:6
**length** 12:20
**lengthy** 161:15,17
**level** 16:24 23:24
25:3 33:18 34:8
**levels** 23:22,23

**license** 36:16 41:1,2
**licenses** 40:24
**lichter** 136:10,11
**limited** 56:3 68:10
**line** 47:25 48:1,2
56:17,17 91:7 105:7
105:23 123:20
127:22 139:8,8,11
139:11
**link** 27:11
**list** 52:18 65:10
**listed** 18:6 36:2
**listen** 122:4
**listing** 69:15,20,23
70:23,23,24 71:13
81:2 84:1,2 162:19
173:21
**listings** 3:11 70:9
**litigation** 10:3 12:3
12:9 112:9
**little** 5:7 6:1 22:9
26:18 92:23
**live** 4:25
**llc** 2:2
**llv** 47:4
**load** 111:6
**local** 4:9 31:7 86:12
**location** 26:22,23
32:18,18
**locations** 30:13
**log** 58:2,2
**logging** 15:22
**logically** 26:7
**logs** 162:14 174:3
**long** 9:17 11:6 12:15
31:15 45:16 63:12
149:3
**longer** 106:12 159:2
**look** 46:18 59:22
66:24 92:23 95:4
130:6 144:11
149:11 150:20
151:2,3 153:9 160:8
165:14,16,17
166:12,13,19 169:4

171:22 179:25
182:7
**looked** 71:16 109:4
109:12 136:8
152:16 158:20
168:24 169:1,2,7,9
179:23
**looking** 27:10 28:2
29:4,22 50:21 51:22
62:15,16 66:4,5,13
66:13 69:20,21
78:10 82:21 83:18
83:19 84:1,4 88:1
92:11,22 93:13 97:6
108:25 127:1
132:20 140:25
141:1,4 143:21
144:6,8,20,24
145:12,13,15
148:14 151:21
153:13,14 157:12
158:4,22,23 159:1,2
159:16,20,23
160:11 161:1,9
166:16 173:2,3,5
174:23 179:21
180:6,11,13 181:24
**looks** 36:7 90:17
91:5
**loop** 16:7 17:10
118:22,23,24,25
119:3
**loral** 45:13,25 46:2
123:4
**lot** 155:16
**lots** 117:22
**ludicrous** 66:17

---

**m**

**m** 17:12 110:11
**machine** 21:10
125:10,13,16,20
126:20
**madam** 156:7

**magistrate** 69:3,5 80:10

**mail** 32:25 166:5,16

**mails** 33:1,5 72:1 175:22

**maintain** 15:22

**maintained** 134:17

**major** 20:24 43:9

**majority** 45:20

**making** 67:15 74:19 77:20 100:17 106:22 137:16 155:11

**malloy** 52:24,24

**management** 34:6,7 34:9 35:13,14,16,22 44:14 45:12,18,19

**manager** 115:15

**managing** 13:7

**mandiant** 110:4,9

**mandiant's** 108:25

**manipulations** 30:1

**manner** 42:12 58:17 58:20 97:14 114:3 147:1,23 148:6,12 148:15

**manual** 59:5,5 97:13 109:18,23

**manuals** 59:6 109:2 109:5

**map** 56:23

**march** 46:25 47:4

**maria** 61:16

**mark** 40:17

**marked** 36:4 46:8 46:11 53:6 59:18,22 66:21 68:18 70:2,6 72:14,14 73:21 74:22 100:23

**masster** 40:5

**matched** 83:6

**material** 55:19 69:11,13 71:12,24 73:12 74:8

**materials** 72:11

**matriculating** 21:4

**matter** 4:4 27:5 34:4 48:25 140:12

**matters** 25:12

**mcclain** 2:12 72:2 76:13

**mcclain's** 76:18

**md** 58:4,9

**md5** 58:9,14

**mean** 31:22 60:21 68:8 81:22,23 100:21 107:7 128:8 129:22 147:22 162:23 167:10 168:9,13,22 172:8 172:20 173:3 179:19

**meaning** 14:14,21 27:17 28:18 152:22

**meaningless** 153:6 163:13,15

**means** 15:14 23:8 32:14 38:15 66:9 84:14 93:5 133:22 155:2 163:2 173:22 176:13

**meant** 144:3

**medal** 24:22

**media** 68:3 145:24

**medical** 183:16,19

**medium** 128:7,8

**meet** 14:11

**memberships** 41:2

**mention** 80:13

**mentioned** 28:12 31:21 119:3 120:13

**merely** 64:11

**meritorious** 20:11

**metadata** 15:16 28:15,16,17,19,19 29:6,16,18 31:1,17 31:18 32:8 33:4,6,7 33:8 39:11 51:11,11 51:17,20 57:21

**64:24** 65:17 69:22 82:14 83:13 85:20 85:23 86:3,10 110:23,25 111:8 130:5,10 133:10 144:20 145:1 153:5 153:10,17 154:8 159:5 171:19

**metadata's** 30:6

**metal** 20:12

**method** 147:2

**methodologies** 27:20 114:12

**methodology** 15:23 28:7 56:1 58:22,25 59:8 60:1,9,12,14 60:16,19 62:10 96:1 114:16 115:5

**methods** 12:8 14:9 14:13 130:18

**michael** 2:12

**microphone** 89:2

**microphones** 7:12 7:15

**microsoft** 44:3

**microwave** 128:11 129:5

**mike's** 146:16

**military** 13:14,22 20:19 21:23,24 22:3 22:6,6

**million** 19:24 34:13

**mind** 65:20 73:23 149:12 170:19

**mine** 69:9 178:11

**minute** 87:20 168:10

**minutes** 40:18 98:23 143:2 180:15

**mis** 126:10

**misappropriation** 112:19

**misrepresentation** 32:7 143:22

**misrepresented** 32:4 106:24

**misrepresenting** 31:4

**misspoke** 122:22

**mitchell** 72:3 79:6 175:8

**mitchell's** 175:4

**modification** 56:22 64:19 91:3,12 92:5 92:7,11 154:1,3,13 154:13

**modifications** 153:11 161:11

**modified** 32:12,23 33:2 64:25 65:18 66:10 83:8,8,12,14 83:19,20,23,25 84:3 84:7,9,15 85:14 90:9,12,20 91:16,22 95:6 153:20

**modifieds** 85:1

**modifies** 174:18

**modify** 29:7

**modifying** 174:20

**modular** 114:4

**modularity** 17:21

**modulation** 20:5 128:22

**modules** 47:22 48:6

**moment** 29:14 50:14 172:2

**monitored** 16:2

**monitoring** 16:22

**monitors** 16:16,19 16:25

**monthly** 93:22

**months** 69:18 77:18 137:21

**moreno** 1:2 5:15 6:19 7:5 8:5 122:3,7 140:11

**mos** 13:23

**moss** 31:11

move  6:16 15:5
    28:13 35:4 63:18
    66:19 68:17,20 71:8
    73:6 75:16 114:18
    118:21 122:6
    123:22 124:20
moved  49:10 83:21
    83:24 84:5,15 154:7
    154:11
movement  51:13,14
    84:7
moving  51:12,15
    75:12 89:1 90:8
multi  75:3
multiple  86:14
    141:19,20
murder  28:24 29:1
music  99:16,24
    100:3,7
myriad  169:2

**n**

n  9:2,3,3,7 110:11
    110:11
name  7:19 8:6 9:1,1
    12:11 17:8 42:23,25
    44:1 45:22 64:6
    88:14,19,19 89:7,16
    90:1,23,25
names  44:4 46:22
    69:22 153:16
national  13:22
    18:17 19:3 21:18
    44:11
native  111:11,13
nature  19:16 23:16
    25:10 26:24
naval  34:1
navy  23:9 35:19
    72:20 74:17 75:12
    79:7
ne  2:3
near  157:22
necessarily  50:24
    107:25 108:1

172:17 173:12
necessary  68:6
necessity  114:4
need  16:1 27:22
    56:15 115:18
    137:12 139:13
    140:22 145:9,17
    152:10,15,15,15
    156:4 170:24
negates  96:18
negative  109:4
neither  119:13
network  16:18 17:2
    102:7
never  39:7 57:25
    73:22 104:16
    105:15 110:20
    122:17 129:17
    136:8 138:3 145:7
    170:19
new  1:7 2:8 7:20
    31:10,10 58:14 61:8
night  93:2,11
nissan  10:7
non  35:2,6,12 57:6
nonresponsive
    117:3
nonsensical  113:1
normal  11:21
normally  14:7 56:4
    63:8
north  1:15 7:23 9:9
northeastern  20:17
    20:18,20 21:16
    122:12,14,16,23
    123:13
notable  31:8
notary  1:22 185:6
    185:14
note  7:11 147:11
    170:18
noted  93:9 97:12
notes  64:11 71:18
    186:9

notice  1:17 142:10
noticed  5:17 57:3,4
    93:18,18 94:7
notifies  16:19
november  54:15
nsa  18:7 19:3,14,22
    20:12 21:22 22:2,5
    22:7,8,10 26:22
    27:5 33:25 36:3
    44:10,17,23 46:3
    125:9,24 126:16
    128:1,4,16 131:22
    131:22
nucor  10:7
number  3:6 15:18
    15:25 31:6 32:4,25
    36:16 51:21 52:10
    52:16 54:17,22,24
    65:25 77:23 82:6
    85:9,9 86:7 88:15
    95:2,15 100:8
    174:13 185:16
numbering  143:25
    144:2
numbers  57:5 111:3
    152:14
numerous  97:13
nurse  40:16,21 77:9
    98:21 140:22 172:2
    183:17,18

**o**

o  9:2,2,3 17:12,12
oath  2:20 8:19
    123:16 185:1
object  7:8 10:9
    34:20 35:4 68:21
    76:1 77:25 98:1
    103:19 105:13
    112:21 115:24
    116:19 117:3 132:2
    141:6 148:25 170:2
    177:7
objecting  73:10

objection  11:15 15:1
    15:5 16:9 18:11
    19:2,10 23:20 25:6
    28:10 36:21 47:15
    51:6 52:2 63:15,18
    66:19 71:10 72:17
    73:4 75:15,17 80:10
    82:11 86:20 87:1
    96:22 104:4 105:13
    106:14,15 110:17
    114:24 117:21
    118:7 119:14
    120:21 123:18
    124:19 131:6,15
    138:16,16 139:1,4
    140:2,7,18 142:4
    143:7 146:15 147:5
    147:11,18 148:9
    155:22 156:22
    157:4 161:25 163:5
    163:19 164:7,24
    165:19 166:2,9
    167:3,13 170:13,18
    171:11 174:21
    175:15 178:6,23
    179:16 181:18
    182:9 183:2
objections  142:12
obvious  75:14 85:24
    95:14 159:4 165:14
obviously  91:25
    174:12
occur  66:4 76:23
    83:17 85:25 86:1
    93:21 131:2
occurred  30:1,2,5
    33:12,13 42:16,20
    93:2 154:2 167:5
occurring  51:17,19
occurs  51:14 86:13
october  40:1 62:23
    64:1 68:8,9 69:13
    69:16,24 76:24,24
    77:2,2 149:22 150:3
    150:6,17 151:10,15

**offer** 11:10 75:20
**offered** 9:24 10:20
  11:6
**offering** 81:8
**office** 64:1 69:12
  70:16 71:6 77:4
  151:4 164:6 166:8
  166:24
**officer** 34:8
**offices** 63:1 183:24
**oh** 34:3,19 35:14
  42:7 52:8 54:21
  67:18 68:16 73:22
  93:15 94:3 114:9
  130:10
**okay** 5:8 6:13 7:2,9
  18:8 27:2,4 34:20
  36:4,9,13 41:7,9
  54:25 55:5,25 64:9
  67:23 70:1,21 71:8
  73:18 82:4 88:7,8
  88:12,25 89:16,23
  90:3 91:9,15 98:16
  98:25 100:16
  103:25 105:19,23
  106:5,12,20,23
  107:10,18 109:9
  111:5,15 112:2,14
  113:13 116:10
  117:17 121:6,9
  124:1,17 125:23
  127:23 128:13
  133:19 136:20
  137:4 138:7,23
  145:19 146:6,20
  148:4 149:20 150:1
  151:7,10 152:5,21
  153:12,21 154:6
  156:4 157:8 159:19
  166:5,15,20,21
  168:11 172:1,3,6,25
  176:11,22 180:16
  180:23 182:14
  183:8 184:2

**old** 9:4
**olstein** 2:7
**once** 68:12 71:14
**ones** 18:6 127:7
  152:10
**ongoing** 10:15
**open** 35:7 64:19
  89:10 126:13
  132:10 176:10
**operate** 11:21
**operated** 24:15
**operating** 29:10,11
  32:13 83:15
**operation** 116:2
**operations** 13:21
  83:16
**operative** 174:4
**opined** 179:21
**opining** 171:16,18
  172:7
**opinion** 4:21,23 5:4
  75:20 85:19 86:24
  96:1 114:13 116:13
  117:13,20 118:3,5
  132:16 143:6
  161:22 162:2
  170:10,16,21 171:8
  171:12,13,15
  172:13 176:11,23
  176:24 177:13,22
  177:25 178:2,4
  179:23 180:6,12
**opinions** 6:18 7:4
  120:9 178:8,9,11,13
  179:13
**opportunity** 6:7
  27:3 66:23
**opposed** 38:9 39:18
**opposing** 69:18
**options** 61:2
**order** 4:14 14:20
  25:17 27:17 35:17
  39:11 58:18 103:6
  121:17 146:9,14,22
  146:24,25 148:22

149:2,2,4,12 152:25
  162:14 175:19
**ordered** 146:13
**origin** 132:22
  172:16 173:8
**original** 71:13 72:9
  153:19 154:12,13
**originally** 28:18
  39:25 60:14 69:24
**output** 20:9 38:12
  49:14,21,25 50:4
**outputs** 17:24,24
  18:1
**outside** 21:16 84:7
**overall** 27:12 72:22
  79:24
**overhead** 34:14
**oversaw** 115:2
**overseeing** 15:21
  16:12 17:18 44:21
**oversees** 18:24
**oversight** 113:10
  120:10
**overwhelm** 49:22,23

**p**

**p** 17:12 81:24 82:5
**p.m.** 1:13,13 7:22
  41:10,13 67:24 68:2
  93:2,11,18 95:11
  99:1,4 145:20,23
  183:9,12 184:6,7
**package** 16:5 135:3
  137:5 138:15
  139:21 146:4
**packages** 48:22
**page** 2:17 3:3 36:17
  36:19,20 47:1,2
  53:20 54:3 55:3,6
  67:5 87:14,24 88:1
  88:11,16 89:5 90:22
  90:23 93:12,13,20
  93:23 94:1,17,18
  95:4,13 105:7,23
  151:2 152:19,21

153:5,15
**pages** 1:25 64:12
  67:7,17 95:1 152:2
  152:4 162:14 186:8
**pandora** 10:8
**panel** 31:13 61:23
**paper** 139:18
**papers** 63:22
**paragraph** 151:3
**paralegals** 112:6
  113:6
**pardon** 52:3 102:17
  123:7
**parentheses** 89:11
**parenthetical** 89:10
**parse** 49:19 50:1
**part** 23:9 29:18
  31:13 34:19,24 38:4
  39:15 50:22 60:24
  61:17 69:3 74:5
  75:5 76:11 77:6
  88:19 93:3 96:24
  113:7 128:3 133:13
  144:22 175:20
  181:9
**partial** 87:6
**partially** 146:12,13
**participants** 86:15
**participate** 55:10
**participated** 32:5
**particular** 13:20
  19:1,18 29:5,5,8,23
  30:5,8 38:13 39:14
  40:4,11 42:21 43:23
  44:5 45:7 48:3,11
  48:15,17 49:13,23
  50:17,25 56:8,21
  61:25 64:6 109:20
  111:9 116:12 118:3
  118:17 152:24
  154:12,21,22
  163:11 180:13
**particularly** 64:23
  74:12

**parties** 7:17 41:20
  41:24 42:17 69:19
  186:11,11
**partly** 148:4
**party** 8:8 148:24
**pass** 53:8 70:3
**patent** 17:5
**patenting** 15:24
**path** 51:9 69:22
  78:11 153:16
**paths** 33:11,11
  133:10
**patricia** 2:13 183:16
  183:17,18
**paul** 4:9
**pay** 124:23
**pcola** 39:9,13 78:23
  78:24 79:2,4,5,11
  79:16,17,20 80:2,4
  80:8,22 81:14,19,20
  82:17,21 86:19,25
  87:5 94:10 172:11
  172:17,21
**peck** 31:10
**peer** 60:24 108:16
  110:13
**pending** 44:2,2 76:2
  134:1
**pennsylvania** 26:20
  26:21,25
**pensacola** 79:6,8
  80:5 90:17,18 91:24
  92:14 163:3,16
  164:11,20,22
  167:16,19 168:3
  173:19,25 174:11
  175:3,12 176:19
  177:1,15,18 178:2
  178:15 179:4,12,25
  181:11 182:15,23
**people** 14:16 24:16
  28:18 33:20 112:5,7
**perceive** 31:25
**percent** 13:4,5,8

**percentage** 13:2
  99:19,23 108:8,11
  108:11
**percentages** 108:10
**perfect** 85:6 183:8
**perform** 11:4,13
  12:2,12 20:1 37:8
  37:19 39:10,20
  49:13 56:4 62:17,20
  62:21 63:4 68:5,6
  111:22 131:1,8
**performed** 12:15,21
  13:24 39:4,21 47:19
  48:22 51:3 62:12,18
  62:22,23 77:15
  79:25 84:10 95:19
  95:21 96:21 150:19
**performing** 12:9
  19:8 21:11 38:5,16
  44:20 56:1 96:2
**performs** 109:11
**period** 46:4 66:11
  84:17 92:18 94:6,7
  94:10 133:11
  144:14 155:3
  157:16 159:3,3
  174:5
**periodic** 93:22
**periods** 159:21
**permitted** 1:19
**perpetrator** 29:2
**person** 114:11 118:6
  118:15 126:7
  131:25 165:21
  176:3,4
**personal** 17:15 54:8
**personally** 10:19
  11:4,5,13 12:12,15
  12:21 20:11 24:6,7
  37:22,25 38:3 41:22
  43:15 47:18 60:19
  62:17,18 67:12
  76:15 106:9 164:4
  185:7

**personnel** 34:10
  35:16
**perspective** 95:20
**phishing** 120:1
**phone** 77:5 143:12
  143:14
**phones** 7:14
**photographs** 99:13
**php** 47:24
**physically** 4:18,24
**pi** 41:1
**pick** 7:12
**picture** 27:12
**piece** 16:21,23 58:12
**pieces** 117:22 160:9
**pile** 156:2
**pinpoint** 118:3
**place** 1:15 7:14 9:6
  60:14
**placed** 135:19,19,21
**places** 86:15
**plaintiff** 1:5 2:5 4:3
  8:11 41:21 52:12
  71:5 168:1
**plaintiff's** 4:21
  52:10,16,18 77:3
**plaintiffs** 42:20
**play** 107:9
**please** 7:11,14 8:7
  8:16 17:11 22:25
  46:6 52:20 53:9,20
  53:22 58:8 59:23
  70:4 72:15 73:14
  74:1 87:25 89:7
  90:1,22 93:12,20
  94:17 99:21 101:23
  108:19 115:20
  120:25 121:19
  123:24 126:13
  141:15 142:17
  147:7 156:6,25
  157:1 158:11
  159:19 169:25
  177:5,9 180:3

**point** 25:4,8 26:19
  35:23 40:18 42:15
  42:19 61:1 65:11
  74:2 96:3 97:11,23
  98:21 108:20
  173:25
**pointed** 110:3
**portion** 4:6 35:6,12
  97:9 98:12 167:2
**portions** 35:3 178:5
**position** 42:14 44:12
  106:10 108:6
  163:10 174:11
**positions** 44:14
**possess** 132:8
**possession** 79:7
  164:1 173:10
**possibly** 145:4,5
**postdating** 171:21
**postgraduate** 33:24
  33:25 34:1 35:20
**postponed** 5:14
**potential** 42:13
**potentially** 26:2
  83:22 174:2
**power** 74:2
**practice** 59:4 155:24
**preach** 123:20
**preceded** 149:6
**preceding** 148:2
**precise** 173:24
**prefer** 56:6 168:16
**prejudice** 7:6
**preliminary** 3:7
  53:12,16 54:14
**preparation** 55:10
  72:11
**prepared** 52:23
  53:18 68:12 70:12
  70:13
**presence** 16:17
**present** 2:11 4:18
  8:7 9:6,21 10:19
  12:25 60:17 64:25
  65:1 66:2 77:1,4,6

81:4,4 82:24 143:13
173:15,16,17
183:19
**presentation** 74:2
**presented** 27:24
32:20 33:18,19 36:6
65:13 68:8 69:12
78:19 79:17,21 82:2
96:7 117:24
**presently** 9:11 61:11
**preserving** 172:21
**president** 9:15,17
10:18,19 41:16
**pressure** 183:15
**pretty** 119:25
157:22
**previous** 67:10
85:12 157:14
**previously** 62:11
72:13 82:2 83:7
105:17 134:13
158:25
**primarily** 37:2 38:7
**primary** 28:20,21
83:23
**printout** 77:8
**prior** 12:20 55:13
66:6 71:19 82:22,23
150:6 156:21
**private** 7:13 36:15
41:1 109:18,23
116:16
**probably** 4:16 13:4
15:19 30:15,18
43:18,24 45:21 48:2
101:25 152:4,25
153:18 168:3 170:6
**problem** 26:8,8
34:16 38:11 43:21
143:11 155:1 181:2
182:22
**problems** 31:5,24
50:5,5
**procedure** 1:20
146:7

**procedures** 42:9,10
95:22 96:15 130:18
**proceed** 23:24
**proceeded** 17:6
42:15
**proceeding** 111:24
**process** 3:9 15:12,12
17:6,7 19:19 24:1
31:19 42:3,16,18,19
49:17,24 50:4 51:19
51:20 60:24 113:12
114:2 117:8,18,19
118:12,18,20
132:25 146:12
150:8,16 157:25
159:25 160:2,19
161:2,4,5
**processed** 15:15
49:11 50:2
**processes** 12:3 14:9
169:12 171:2,9
**processing** 14:11
16:11 19:21,25 20:2
20:9 23:2 24:17
45:7 49:2 50:4
131:1
**processor** 102:9,9
**produce** 70:14
**produced** 38:14
63:22 70:16,25
71:18,24 146:21,23
147:1
**produces** 109:15
**producing** 14:1
72:11
**product** 15:25 114:5
**production** 93:19
133:11 157:18
**productions** 157:19
**products** 99:20
109:19
**professional** 11:10
40:24 41:2 186:6
**professor** 61:17

**proffer** 140:21
**program** 21:14,20
21:21 44:13 45:12
45:17,18,19 49:5,6
49:15,18 103:17
113:9 115:2,15
125:10,25 127:10
154:16,20 155:5
**programmed** 104:1
**programmer** 50:11
72:8,8 74:11 103:25
104:2 120:20
**programmer's**
97:13
**programmers**
120:14,16 121:5
**programming** 102:6
103:1,2,4,21 104:7
104:8,8 120:23
121:4 125:16,18,20
126:5,17,22,25
127:10,13
**programs** 17:1
104:10
**project** 21:19 34:13
34:19 35:14,17
131:21
**projects** 24:14 34:11
46:3
**proper** 15:22,23
17:19 95:22 96:15
142:14 157:21
175:19
**properly** 38:14 42:3
42:4,8 59:7 115:12
143:9
**property** 10:2 52:22
**prosecution** 42:13
**protect** 119:23
120:4,5
**protected** 79:13
**protective** 146:14
146:22,24,25
148:22 149:2,4,11

**prove** 176:17,22
**proven** 33:16
**provide** 10:3,5,6,13
10:22,23 15:13 16:3
26:23 49:14,25
61:16,18 80:23,24
80:25 81:1 115:3
138:8 155:25 156:1
173:24 174:1,2
**provided** 3:6 26:19
39:17,25 56:8 57:9
57:13 61:15 64:22
67:9 82:14,16
135:23,25 136:15
136:21,25 137:1,2,3
137:13,25 138:4,5
138:14,24,25 139:9
139:23,24 140:1,17
141:10,21 144:15
144:17 147:1,15,16
147:17,24 148:23
149:24,24 155:7,13
155:20 156:15,17
157:19 161:15,18
162:2,3,4 180:19,24
180:25 181:25
182:18
**provides** 10:1 39:1,1
57:21 113:25
**providing** 12:8
**proving** 33:4,4
**pruitt** 2:14 7:19
**public** 1:22 124:11
124:14 185:6,14
**publically** 61:8
**publications** 59:13
**published** 60:2,5,6
61:8
**pull** 152:13
**pulse** 183:15
**purchased** 46:3
**purple** 39:24 40:3
71:17 149:25
**purported** 84:23

**purportedly** 70:10
**purpose** 4:5 21:21
  64:9 75:8 76:5
  112:12 132:6
  168:15 173:1
**purposes** 1:18,19
  104:22 105:20
  106:7 124:23,24
  136:7
**pursuant** 1:17 146:7
**purview** 97:22,22
  165:5
**put** 5:3 50:2 56:14
  60:14 87:23 132:12
**putting** 12:19
**putty** 79:13 173:21
  173:22 175:3,5,10
  175:11

**q**

**qualification** 3:5
  46:16
**qualifications** 10:10
**qualified** 47:9
**qualify** 124:4
**question** 31:16
  40:23 57:2 76:2
  84:11 97:5 98:6
  99:21 100:14
  101:23,23 103:20
  104:5 105:8,14,17
  105:24 106:4,15,18
  108:19 112:22,25
  113:15,16 114:16
  114:21 115:10,25
  116:8,14,20 117:5,5
  120:24 121:8,17,19
  123:24 124:7
  131:11,14 132:3,11
  132:17 133:19,24
  134:1,3,5,6,8
  135:17 139:13,15
  140:4,10 141:7
  142:17 143:8 147:7
  147:12,21,21 148:5

148:5 152:17 156:4
156:5,10,23,25
157:2 158:21
163:25 164:12
165:14,18,23
166:10,18 167:14
168:19 169:6,15,17
169:24 170:3,24
171:4 175:10 177:2
177:8 178:22
181:16
**questions** 27:18
  31:22 98:17 117:8
  121:22 122:5
  123:22 176:10
**quick** 40:23
**quite** 154:25 155:1

**r**

**r** 9:3 15:13 17:12
  43:9,9 52:23
**rack** 19:23
**racks** 19:23,23
**radio** 129:1
**ran** 33:15 66:14
**range** 144:12,13
**rasco** 2:2,2,19 4:3,5
  4:15 5:1,3,8,11 6:9
  6:13,15,21,24 7:2,7
  8:9,9,10 10:9 11:15
  15:1,5 16:9 17:8,11
  18:11 19:2,10 23:20
  25:6 28:10,13 34:20
  34:25 35:4,7 36:21
  42:5,7 43:6 46:13
  47:1,15 51:6 52:2
  52:13,14 54:17,21
  54:25 59:19 63:15
  63:18 66:19 68:21
  68:24 69:2 70:14,18
  70:21 71:10 72:17
  73:4,6,10,22 74:24
  74:25 75:15,17 76:1
  77:6,25 80:10,19
  82:11 86:20 87:1,16

87:20,25 88:4,7,9
88:12 89:3,12,19,23
93:12,15,20,23
94:17,20 96:22
97:19 98:1,19,23
99:6 102:15 103:24
104:11 105:18
106:19 110:18
112:23 113:18,20
114:20 116:5,21
117:3,10 118:2,8
119:15 121:1,12
122:7,10 123:23
125:1,8 126:9,15
131:9,13,19 132:5
132:14 134:7
135:14,22 138:20
139:2,12,17 140:3
140:14,24 141:9,16
141:23 142:1,7,11
142:16 143:3,17
145:11 146:1,19
147:8,14,19 148:11
149:8 151:1,5 156:3
156:7,9 157:1,7
158:9,15 162:7
163:6,23 164:9
165:1,6,9,12,15,20
166:4,13,17 167:6
167:17 169:20,24
170:4,9,15,19,23
171:14,24 172:1,5
175:6,16 177:11
178:21,24 179:20
180:5,16,17 181:21
182:13 183:3,6,21
183:25 184:1
**rasco's** 63:1,25
  69:12
**rate** 28:9 128:21
**ray** 128:24
**rbs** 65:20,25 72:10
  74:18,19,20 97:9,15
  97:16,24 98:8,14,15
  171:22

**reach** 30:18 64:14
  82:9 92:9 95:19
  100:11
**reached** 68:14
**reaching** 120:8
**read** 47:19 52:25
  54:5 55:13 85:16
  89:7 90:1,18 104:12
  104:15 105:7 107:8
  107:16 126:21
  147:9,10 156:8,24
  157:2,3 167:25
  169:24 170:1,6
  171:24,25 177:4,6
  180:2,4
**readily** 18:1
**reading** 89:12 96:6
  104:18,22 105:9,12
  105:16,20 106:8
  156:13 171:6
**real** 73:15
**realized** 78:12,15
**really** 14:16 35:22
  50:9 84:23 150:7
  158:8 159:13
  178:22
**realtime** 20:2 186:6
**reason** 38:24 41:25
  42:1 44:16 65:4
**reasonable** 82:9
**reasonableness** 50:3
**reasons** 28:4 169:2
**rebuild** 38:22,23
**rebuttal** 53:4,5,17
  54:14 72:12 96:13
  137:23
**rebutted** 53:4
**recall** 34:5 46:23
  47:8 100:17 104:25
**receive** 20:14 69:17
  103:6 111:21
  132:18 134:20,24
**received** 13:23
  24:22 56:9 65:4,5,8
  65:10 69:15 134:22

[received - results]                                                    Page 23

134:25 135:1,2,2,4
 149:20
**receivers**  19:25
**receiving**  103:18
 145:8 158:14
**recess**  7:10 41:11
 67:25 99:2 145:21
 183:10
**recognition**  124:23
**recognize**  51:16
 54:1 101:11,14,18
 101:20 107:10,13
 129:24
**recognized**  71:15
 101:2,7 108:15,20
 109:17
**recognizes**  108:22
 110:1
**recollection**  46:21
 150:21
**recombine**  162:18
**recommendations**
 97:14
**reconstruct**  26:11
**reconvene**  183:23
**record**  4:2 5:11 7:7
 7:18 9:1 41:10,12
 52:17 53:15 54:12
 67:24 68:1,16 70:7
 72:16 73:14,25 75:2
 82:4 87:11,23 89:8
 95:4 99:1,3 121:24
 122:24 145:20,22
 147:10 156:8 157:3
 170:1 171:25 177:6
 180:4 183:9,11,13
 184:3,5 186:9
**recording**  7:17
 67:15 99:24
**records**  68:25
**recover**  12:7
**recovered**  12:10
**recovering**  13:25
**recovery**  13:18

**rectify**  32:6
**reduce**  27:25
**reference**  108:15
 120:13
**referenced**  3:1
**referred**  53:12
**referring**  18:17
 34:25 88:9 163:7
**reflected**  82:1
**refresh**  46:21
 149:12 150:21
**refreshing**  48:2
**regard**  77:7 79:24
 85:16 97:8 98:11
**regarding**  4:4,22
 46:22 68:13 75:20
 76:7 85:19 86:24
 90:13 95:19 179:13
**regional**  62:2
**registered**  186:6
**relate**  35:20 117:20
 152:6
**related**  77:14
 162:15,17,17
**relates**  152:7,8
**relating**  133:12
**relationships**  10:16
**relative**  26:9 51:10
 186:10,11
**relevant**  111:23
**reliant**  38:12
**relied**  33:5 55:19
**relying**  38:13
**remember**  43:1,2
 44:1 64:8 71:22
 83:9 97:25 98:7,9
 106:2 107:15
 133:17 143:23
 144:13 148:19
 149:12 156:5,12
 164:12,15 169:8
 171:6
**remotely**  37:19
**repeat**  17:8 156:6

**rephrase**  115:19
 140:4
**report**  3:6,7,8 38:10
 38:11,12 39:2 52:11
 52:23 53:3,12,17,18
 54:5,8,13,14,15,19
 55:11,13,16,17
 63:21 68:22 69:8
 77:21 78:20 81:16
 81:17 82:1,6 85:17
 85:21,22,23 86:18
 96:6,9,11 137:23,24
 137:25 150:20
 151:3 156:20
 160:23 171:23
 177:21 178:18,19
 179:4,8 181:2 186:7
**reporter**  8:16 53:10
 156:7 157:1 186:6,6
**reporter's**  2:21
 186:1
**reporting**  12:6
**reports**  14:1 20:10
 53:4,5 68:19 69:6
 72:12 96:12 109:14
 109:15
**represent**  8:8 26:12
 27:16 33:20 84:20
 84:23 149:5 155:4
 162:3
**representative**
 162:12
**represented**  76:20
 148:1 160:11 162:6
**representing**  7:20
 31:3 43:4 92:14
**represents**  33:20
**reprimand**  123:21
**request**  142:10
 144:16
**requested**  69:16,24
 70:22,24 71:4,5,7
 71:16 142:2,6,20,24
 143:4 156:12 186:8

**requesting**  77:19
**require**  103:1
**required**  5:3 10:24
 103:17
**requirement**  59:1,3
**requirements**  45:3,4
 114:3
**research**  26:9 44:13
 45:11
**reserve**  6:4 69:9
**reserves**  35:15
**reserving**  4:22 5:9
**reside**  32:16
**resided**  32:17,18
 56:7 177:14
**residing**  179:4
**resolution**  4:14
**resolve**  27:18 39:11
**resolved**  6:4 176:10
**resolving**  175:14
**resource**  34:6,7
**respect**  126:14
**respectfully**  133:24
**respond**  121:19
**responding**  121:22
**response**  37:4,17,18
 38:1 106:17 180:2
**responses**  5:23
**responsibilities**
 35:15
**responsibility**
 104:19
**responsible**  15:20
 24:17 34:12,15,18
**responsive**  121:16
 121:18
**rest**  90:18
**restate**  177:9
**result**  12:9 14:1 28:9
 48:1 71:19 82:8
 92:10 160:20,21
 161:6 172:14
 176:12
**results**  26:15 27:21
 39:2 60:24 90:17

91:24
**retained** 3:1 55:23
  165:11
**reverse** 14:19,19
  107:14,23
**review** 10:14 15:14
  15:15,17 39:25
  41:23 42:4,5,6,16
  42:19 46:25 52:23
  55:17,19,22 57:22
  60:24 62:11 71:12
  71:19,24 73:12,19
  74:5 75:5 76:4,20
  78:17 82:16 83:2
  97:20 108:16
  110:22 111:6,13,14
  135:24 136:11,12
  139:23 141:2,10
  142:3 146:11
  147:24 149:1 150:3
  150:6,8,15,16,19
  151:5,19 153:3
  156:19 157:8,11,17
  158:3,17,19 159:9
  161:7 162:9 174:25
  180:20,24,25
  181:17 182:18
  186:8
**reviewed** 47:20 48:4
  53:3 56:25 67:1
  69:14,20 71:13,14
  71:17,18,20,23 72:1
  72:2,3,3,4,6,7,9
  74:9,11,19 76:5,8
  80:17 104:10
  110:13 111:8
  121:25 136:2,15,18
  141:11 146:7,10
  149:21,22 150:9,22
  151:18,20 176:18
  176:25 178:17
  179:3 180:22
  182:20
**reviewers** 41:24

**reviewing** 12:6
  43:17 45:2,3 50:19
  50:24 75:8 81:16,18
  82:13 83:6 85:3
  95:24 148:1,21
  156:20 157:6 159:6
  163:9 177:17
**reviews** 151:14,14
**right** 5:2 6:4,8,17,23
  17:20 18:21 35:8
  47:7 65:15,18 66:14
  68:25 69:9 87:18,19
  88:3 89:1,7,22 90:8
  93:13 94:2 95:5
  96:14 98:16 103:7
  103:11 105:19
  112:6,6,15 119:24
  125:12 129:19
  130:3 131:14
  135:15,24 137:14
  140:11 150:13,22
  151:6,17,21 153:4
  154:15 155:2
  161:11 166:13
  173:2,4 176:6
  179:15,18 180:1,7,9
**rights** 4:22 5:9
**road** 2:7 56:23
**rolled** 157:21
**rom** 137:4
**room** 150:24 158:20
**roseland** 2:8
**rosenthal** 2:2,2 8:9
  8:10 151:5,5
**routine** 58:2 77:23
  78:8 174:13
**routines** 12:8
**rpr** 1:22 185:6,13
  186:16
**rsa** 30:10,11,12,15
  30:16,20,21,24,25
  31:7 61:23
**ruled** 69:5 80:11
**rules** 1:20

**run** 70:23 92:24
  93:3,5,11 94:4,5
  95:12,15 100:7
**running** 33:14 43:22
  65:11 79:8 81:3
  164:6

---

**s**

**s** 1:22 9:3,7 17:12
  52:23 58:10 185:6
  185:13 186:6,16
**sadly** 184:1
**sale** 109:25
**sarasota** 1:16 7:24
  9:10
**sat** 47:13 158:20
  176:19
**satellite** 21:21
  128:12
**save** 56:23 64:25
  67:7 83:15
**saw** 65:21 96:8
  137:21 174:22
  176:4 182:21
**saying** 32:17,22
  49:8 59:12 106:2
  118:16 126:8
  133:17 144:25
  150:9,12 163:15
  170:17 176:20
  178:9,10
**says** 57:15 73:2 89:9
  89:9,10 90:17 92:2
  151:3 153:18 166:7
  174:19
**scene** 28:24 29:1
**schedule** 93:5
**scheduling** 35:17
**scheindlin** 31:9
**scheme** 144:2
**schemes** 143:25
**schessel** 46:25 47:5
  47:6
**schlumberger** 45:23

**school** 23:8,8,9,15
  23:17,22 33:22 34:1
  35:20 37:1 61:16
**schooling** 23:12
**schools** 13:17 18:7
  101:21 102:4
**science** 11:7 14:4,6
  14:8,16,18 35:25
  99:22 100:17,20,22
  100:25 101:3,6,13
  101:16,16,17,20,24
  107:1,6,10,21,24,25
**sciences** 102:1,3,6
**scientific** 21:11
  101:8 108:16,21
  109:18,23,24
  112:11 114:12
  153:23
**scientists** 101:18
  107:25 108:2,3,7
  112:2 114:14
**scope** 138:17,18
  139:5 140:12,20
  161:25 170:14
**scoring** 28:25
**screen** 3:10 63:5
  64:4 66:25 67:2,12
  67:15,15 92:10 93:9
**scripts** 49:12
**se** 70:24
**sealed** 136:13
**search** 78:7 90:17
  91:24 111:23
**searches** 77:19
  111:23
**searching** 77:24
**second** 47:2
**secondly** 134:12
**secret** 18:10,23
**secretaries** 113:7
**secrets** 169:12
  170:11 171:2,9
**security** 10:5,6 13:6
  13:9,10,11,15,16,21
  13:22 16:14,20,25

[security - skill]

17:1,1 18:9,18 19:3
21:18 22:16,19
30:12,15 44:11 62:8
62:9 119:21
**sedona** 86:8,11,14
86:15
**see** 6:20 54:21 56:21
56:22 59:24 64:18
64:19,21 65:25 66:2
67:6 73:22 88:14,15
88:18,23 89:3,12,23
90:22,25 91:3,10
93:10,16 95:1,7,10
95:10,11,13,14 96:4
98:10 102:21 114:8
124:4 125:5 127:2
131:12 150:1
153:10,17 154:1
155:1,23 156:14
157:20 166:8
173:20,21,23 175:9
**seeing** 65:6 66:10
84:2,5 104:18,22
105:24 106:7 157:6
**seek** 69:8
**seeking** 68:21
**seen** 47:23 65:23
149:3 157:15
163:20 164:3
**select** 27:1 93:7
**selected** 41:22,25
42:1
**selecting** 34:14,15
34:18
**selection** 35:13
**sell** 15:25 116:7
**sells** 116:17
**semester** 61:19
**senior** 9:15 16:24
23:13,14 24:15,16
**sense** 14:8 49:24
50:16 116:9 144:1
155:16
**sensitive** 7:12 18:12
18:23 120:4,5

**sent** 24:23 136:10,11
**sentence** 176:13
**separate** 101:5,10
101:22 139:23
157:23 161:17
162:12 172:24
**separated** 143:10
159:10 160:18
**separately** 155:25
178:20
**september** 71:20
166:6
**sequence** 94:3,3,7
97:1 144:3
**sequential** 93:10,10
**sergeant** 21:25
**serve** 21:23 26:17
**served** 21:24
**server** 39:10,13
41:18 43:17,23 56:6
65:11 78:23,24 79:2
79:4,5,7,11,12,13,14
79:16,17,20 80:2,5
80:8,9,22,24 81:1,3
81:7,12,14,19,21
82:17,22 86:19,25
87:5 92:14 93:6
94:10 137:7,9 154:7
154:7 163:3,11,16
163:18 164:2,11,19
164:20,22 167:16
167:19 168:3,20
172:11,18,21
173:14,15,17,19,23
173:23,25 174:2,7
174:11,19 175:3,13
176:19 177:1,15,18
178:3,15 179:4,12
181:11 182:15,24
**servers** 70:10
**service** 20:12 23:4,8
23:15,17,21 33:22
73:15,16 79:14
175:12,12

**services** 9:23 10:5,6
10:6,14,20,23,23
11:7,10,13 12:11,21
**set** 28:2,5 42:18
50:23 60:9 85:13
116:10,11,12,14,17
120:8 131:23
149:20 157:16
158:14 160:3
162:20 163:1,2,16
166:7
**sets** 132:16 138:1
161:13
**sha** 58:4,4,5,9,15
**sharp** 47:24 104:10
**sheet** 3:5 46:16
**sheets** 139:18
**shellbag** 61:9
**shemya** 23:12,13
24:14,15,19,25
**shira** 31:9
**shot** 92:10
**shots** 3:10 63:5 64:4
66:25 67:2,12,15,16
93:9
**show** 32:16 33:1
36:4 44:6 48:24
52:9,11 53:6 54:11
59:17 66:21 70:1
72:13 73:13,21
89:19,21 153:12,12
166:5
**showed** 48:20 78:9
**showing** 46:11 70:6
74:22
**shows** 67:5,9 134:18
154:10
**shumaker** 16:7 17:8
17:9,10 118:21,22
118:23,24,25 119:3
**side** 14:17 43:2 67:5
87:19 153:18
169:23
**sided** 152:3

**signal** 22:13 24:20
24:21,22,25 128:1,5
128:19,20,21 129:1
129:19,21,24
130:24 132:18,18
**signals** 24:1,2,3,18
26:14 45:8 130:15
**signature** 54:1,3
55:8,9
**signatures** 55:6
**signed** 54:5
**significance** 90:12
91:15 159:5,8
**similar** 49:15 97:1
97:16 127:10 130:3
133:1
**similarities** 99:20,23
100:8,12
**simple** 29:7 168:18
**simplistic** 100:14
119:25 132:12
**simplistically** 32:11
112:1
**sir** 107:1 123:15,24
125:15 126:16
127:7,25 132:4,6,6
133:8,15,23 136:8
137:22 138:7
139:13 140:15
142:7,17 143:2,18
146:2 152:10
158:16 180:15
181:16
**sit** 47:25 50:14
114:8 183:14
**sitting** 47:8 168:19
**situation** 32:6
143:24
**six** 45:21
**size** 19:23 30:6
89:23,24 90:5
**skill** 116:10,11,12
116:14,17 118:9
120:8 131:20,23
132:15

**skilled**  132:9
**skills**  34:9 126:3
  132:8
**slash**  87:24
**slow**  58:6
**slower**  58:8
**small**  108:11 128:3
**smart**  118:15
  131:25
**smarter**  118:6 126:7
**software**  3:13 12:7
  14:10 15:9,11,23
  16:3,5,12,15,21,23
  17:3,5,21,22,23
  36:23 37:2,4,8,23
  38:3,4,8,10,12,13
  39:3,14,18,19 40:2
  41:24 43:21 44:21
  45:3,4,5 48:5,5,6,13
  48:15 49:5,6 50:13
  58:2 61:4 66:16,16
  67:8,11 73:16 81:1
  81:4,14 82:22 100:8
  109:3,5,6,10,11,14
  109:19,23,25 110:6
  110:7,22,24 111:4
  111:11,15 113:3,3,6
  113:10,11 114:1,2,3
  114:5 115:2,3,4,11
  115:14 116:7,16
  117:6 118:18,19
  119:21 120:11,12
  120:15,17 130:19
  130:20,25 131:4,7
  134:9 154:6 159:15
  161:13,14 168:2,2
**softwares**  17:15,16
  48:19
**sold**  109:19
**solely**  97:10
**solos**  40:5
**somebody**  50:16
  91:20,23 124:5
**somebody's**  81:12

**son**  13:7
**sorry**  42:7 58:7,9
  76:19 81:23 147:6
  150:24 151:2
  163:20
**sort**  28:22,23 157:25
**source**  10:13 41:17
  42:2,4,6 44:24 45:1
  45:2 47:19,20,21,21
  48:4,11 50:10,12,12
  50:13,15,22,23
  53:17 55:22 56:5,7
  56:9,10,11,13,17,19
  56:19,24 57:7,9,13
  63:6 64:2,12,12,19
  64:20,21 65:1,6,8,9
  65:13,24,25 66:5
  67:1,9 68:7 69:16
  69:23 70:11 71:13
  71:15,19,20 76:21
  81:4 82:12,13,16,25
  83:3,5 85:8,13
  96:21,23,24 104:20
  127:6 129:15,17
  134:11,13,14,15,16
  134:16 146:23
  149:17 151:5,14,14
  151:18 152:5,7,8,11
  156:2,15 157:16
  166:24 167:20
  168:15 169:18,21
  172:11,15,16,16,17
  173:8,16,18
**sources**  57:10 129:8
  129:14
**southern**  1:1 8:4
**speak**  6:3 138:19
**speaker**  30:20
**speaking**  47:21
  101:25 106:6 108:6
**special**  13:20,21
  24:12,13,14 38:18
**specializations**  18:4
**specialized**  115:22
  116:2,3 118:5

**specialty**  12:5 14:4,5
**specific**  110:6 142:9
**specifically**  22:11
  24:24 83:8 174:24
**specified**  148:10
**speculate**  142:5
**spell**  17:9,11 43:6
  110:10
**spend**  22:18
**spoke**  4:3,9 76:13,13
  77:5 113:25 183:21
**sql**  49:17
**squire**  1:22 8:16
  185:6,13 186:6,16
**stalker**  16:13,14
  49:18 119:20 120:7
  120:10,13
**stamp**  66:2,7,9 67:6
  67:10 85:11 88:2,3
  95:6 98:15
**stamped**  87:15
**standard**  110:14,16
  110:20
**stands**  22:16 139:19
**start**  36:14 84:1,2
  132:19,21 172:7
**started**  176:7
**starting**  4:16,17
**state**  1:22 9:1 16:25
  43:8,13,14 123:21
  148:1 177:12,18
  185:3,7,14 186:3
**stated**  4:10 39:18
  59:4 63:20 86:10
  100:24 149:3
  156:13 159:4
  160:22 171:13
  177:16 182:10
**statement**  6:5 35:1
  74:13,14,15,17
  100:18 105:21
  107:8,15,16,19
  111:12 114:19
  124:8,9,12,13 131:5
  132:1 133:5,21

**134**:10 136:9,14
  142:14 144:7 150:2
  150:4 151:15
  156:18 158:2,16
  159:17 160:6
  161:24 171:22
**statements**  5:19
  47:23 107:9 122:2
  126:11
**states**  1:1 15:20
  30:14
**stating**  177:24
**status**  22:2
**steel**  10:7
**stenographic**  186:9
**stenographically**
  186:7
**steps**  62:13
**steve**  4:8
**steven**  61:17
**sticker**  46:5
**stipulated**  146:7,12
  146:13
**stipulation**  148:17
**stop**  115:8 122:4
**stopped**  122:4
**storage**  12:1 20:1
  29:13,15 32:21 40:8
  40:14 50:3
**stored**  10:4 11:1,23
  11:24 31:20 32:3,8
  131:18
**strange**  57:8
**stream**  90:15
**stricken**  69:2
**strict**  27:19
**strike**  15:5 28:13
  33:21 35:4 44:6
  59:16 61:10 63:18
  64:15 66:19 68:5
  73:6,12 78:23 79:23
  98:6 114:18 124:20
  125:2 138:9 147:20
  166:11 174:16

**strikingly** 97:16
**string** 130:12
**strong** 75:14
**struck** 65:15,16
**structure** 26:3 33:11
  51:9 76:9 114:4
**structured** 48:5,6,7
  114:4 127:16
**structures** 133:10
**stuck** 65:5,20
**studies** 23:17
**study** 20:24 101:5
  101:10 102:7,8,11
  102:16,18 103:23
  123:13
**sub** 103:22 154:24
  155:7,9,9,10,13
  181:13
**subdirectories**
  51:13 83:20,24 84:2
  153:9,15 154:1
**subdirectory** 78:9
  153:16 154:2
**subject** 4:4 25:12
  27:5 33:16 34:4
  69:4 140:12 162:9
  163:22
**subjects** 30:23,24
  61:25 101:22
**submit** 69:9
**subroutine** 78:11,13
  78:15
**subsequent** 30:2
  158:4,22
**subsequently** 13:19
**success** 28:8
**successes** 28:4
**successful** 28:6
**successive** 65:7,7
**sudden** 43:20 65:23
  66:1,7 85:10
**suggest** 90:12 94:9
  142:11,13
**suggesting** 119:9

**suite** 2:3 9:9 16:12
  16:15 37:2,8 109:11
  109:14,19
**suites** 15:11 17:3,5
  37:4
**summarize** 17:14
**supplemental** 3:8
  54:13,19 178:18
**supplied** 71:14,17
  141:12 160:7
**support** 112:9
**supposed** 50:23
  65:12 82:21 83:5
  84:20,24 149:5
  155:4,11,17 157:17
  163:8
**supposedly** 33:13
  39:13 56:9 57:17
  65:5 66:6 79:8 87:3
  87:8 131:17 135:20
**sure** 36:8 46:18
  103:2,21 108:2,3
  131:22 137:8
  150:13
**surgery** 126:14
  132:10
**surprises** 57:18
**surprisingly** 78:8
**surrounds** 28:20
  32:8
**suzette** 86:19 90:19
  92:3
**swear** 8:16
**switch** 145:18
**swore** 105:2
**sworn** 8:19 185:9
**sylint** 3:7,8 9:7,8,12
  9:18,24,25 10:20,22
  11:4,6,10,14 12:5
  12:12,16,20 13:3
  15:9,10 19:9 28:4
  37:22 38:7,17,19
  41:17 60:7 183:23
**synergy** 16:23,23

**system** 23:10 29:10
  29:13 32:13 49:22
  60:6,7 72:22 74:19
  75:25 83:16 111:7
  166:7 174:4
**systems** 11:25 12:2
  17:2,21,22 18:2
  19:15,22,22,24 20:3
  20:4,5,6,10 26:1,3
  29:15 44:16,22 45:7
  45:14,24 46:1,24
  47:4 61:5

**t**

**t** 9:2,7 37:14 43:9
  110:11
**table** 89:21
**take** 21:1 22:4,22
  24:9 30:3 33:21,24
  33:25 35:24 40:23
  41:7 44:12 49:24
  59:22 62:14 64:11
  67:20 78:6 81:11
  98:23 113:19
  116:11 120:22
  121:3,7,7 136:20
  145:9 151:2 174:25
  183:6,7
**taken** 7:10,25 21:13
  28:17 41:11 57:20
  59:7 67:25 80:7,25
  99:2 104:24 145:21
  183:10
**talk** 31:21 59:6
  109:10 110:5
  119:20 137:12,15
**talked** 67:3 110:22
  110:24 128:13
**talking** 22:9 33:8,9
  34:23,24 35:5 43:23
  48:3 67:6 80:15
  109:7 127:4,22
  130:8 134:11
  135:12,14 148:19
  149:17 182:23

**talks** 31:1,2,2
**tampa** 41:4 62:1
  186:13
**tape** 67:22 145:10
  145:18
**task** 55:23 161:15
  161:16,17
**tasked** 169:14 170:7
**taught** 21:19 22:10
  30:23 61:17 101:4
  101:21 127:25
  128:1,4
**teach** 24:23 61:11
  61:14
**teaches** 24:2
**teaching** 23:25 25:4
  25:7,11 28:7,8
**tech** 165:21
**technical** 17:19
  22:12
**technique** 25:24
**techniques** 14:9
  22:11 25:24,25,25
  28:8 34:14 60:25
  61:6,7,8 115:4
**technologies** 1:6 8:3
  8:14
**technology** 61:9
  128:2,3,5 129:19,21
  130:5,16 131:4
**telephone** 2:13,14
**tell** 28:15 29:20 48:1
  58:2 85:5 87:2,4,5
  87:25 92:25 102:11
  104:14,17,21 105:2
  105:5 118:24
  123:16 124:16
  126:3,20 127:12,13
  129:4,6,19 141:4
  143:14,16 144:2,4
  150:20 151:17
  152:10,11 153:13
  153:21,24 159:14
  160:1,19 167:12,18
  172:13 173:9

**[tell - troublefield]**

176:11 181:7,8

**telling** 7:3 175:9,24
  176:8
**tells** 153:7,8
**ten** 133:15
**tend** 114:14
**tender** 98:18
**tendered** 139:5
**tends** 27:11
**teppler** 61:18
**term** 11:19 22:15
  23:4 31:21,23 36:23
  36:25 45:25 83:7,12
**terminology** 103:7
  126:24
**terms** 20:3 25:11
  58:20 104:23
**test** 26:14
**testified** 83:7 98:3
**testify** 4:25 35:9
  68:12 76:6 80:11
  112:18 174:9
**testifying** 10:11
  40:17 98:2,18
  132:10
**testimonies** 164:15
**testimony** 4:7,13,21
  4:23 5:4 10:1,22
  50:7 51:25 76:18
  78:1 106:13 138:2,5
  163:13 168:4 175:4
  175:5,7,19 176:2
  177:12 182:25
**text** 64:5,6,9,14
**textbook** 108:21
  109:25
**thank** 40:20 46:7
  52:14 88:25 98:16
  109:9 141:18
  146:17 172:1
**thanks** 74:25
**theft** 10:2
**theory** 153:23
**thing** 39:22 65:16
  97:12 161:8,8 173:2

173:4

**things** 27:22 51:8,21
  56:15 61:9 65:14
  99:24 131:2 132:1
  161:9 172:7
**think** 5:6 6:2 26:7
  27:14,25 28:3,3
  36:19 38:24 41:6
  62:4 67:21 68:18
  69:5 71:6 82:5
  85:15 98:8 113:18
  114:6 123:19
  133:22 160:22
  165:4 168:25
  170:19,20,25 171:4
  178:7,17
**thinking** 29:17
  181:3
**third** 16:21 36:17
  89:4
**thought** 6:19 145:13
**thousands** 111:22
**three** 17:14 30:13
  43:18,24 61:22 86:9
**threw** 86:3
**thrown** 156:14
**thumb** 39:24 40:3
  71:17 149:25
**tiff** 111:14
**time** 1:13 8:7 11:8
  12:18,20 18:16
  20:22,22 21:10,12
  22:2,18 26:1 29:12
  34:10,12 35:17
  40:15 44:15 45:20
  46:4 48:4,12 51:16
  65:3,7,9,11 66:10
  66:11 69:24 71:20
  73:15 77:6 84:16,17
  84:25,25 90:14
  92:15,18,22 93:1
  94:4,6,7,8,10 95:11
  95:16 112:8 113:19
  114:7 120:22 121:3
  121:5 125:24 126:6

131:21 132:23
  133:11 134:17
  144:6,14 148:2
  149:3,23 150:6,11
  150:18 151:7,20
  152:25 153:19
  155:3 156:19,19
  157:5,8,10,11,16
  158:3 159:3,3,21
  162:21 163:4
  173:16,25 181:17
  183:9
**time's** 7:22 41:10,13
  67:24 68:2 99:1,4
  145:20,23 183:12
  184:6
**times** 29:7,8,8 47:12
  47:14 61:21,22 66:1
  86:14 92:20,22
  129:10 133:15
**tiring** 126:12
**title** 9:14 42:23
  45:10,16
**titled** 88:18
**today** 4:20 5:5 7:4
  7:21 9:4,24 47:8
  104:3,7 107:3
  108:23 110:2
  131:24 138:2
**today's** 11:20 103:5
**told** 15:2 40:20
  41:25 56:13 102:2
  104:2,6,7 106:24
  123:12 124:2 145:7
  161:4 162:5 175:2
  181:19 182:16
**tonight** 183:22
**tool** 37:16 38:8,9,10
  38:12 39:2 111:11
  111:15 112:2,3,4
**tools** 37:6 39:19,20
  63:3,7,11 139:10
  157:21 159:14
  160:7,17 161:14
  162:20

**top** 15:4 18:10,23
  41:6
**total** 86:3
**tour** 13:16
**track** 16:25 30:21
  30:25
**trade** 169:12 170:11
  171:1,9
**trained** 125:9,23
**training** 20:14 21:15
  21:17 27:4 126:16
**transcript** 186:8,8
**transferred** 154:4
**translated** 128:11
**translates** 127:19
**transmission** 128:6
  130:12
**transmitted** 12:1
  25:14 128:9,10,11
  128:12 129:1,24
**trauberg** 42:24,25
  43:4,6
**traurig** 43:11,12
**traveled** 151:4
**treat** 126:13
**treatise** 108:16,21
  109:24,24
**treaty** 109:18
**tri** 23:4,8,15,17,21
  33:22
**trial** 1:18 4:13,15,18
  4:19 5:1,2,17 6:6,9
  6:12 36:5 52:17
  54:23 68:12
**tried** 174:24
**trier** 52:1,5
**trip** 79:14 173:19,20
  175:11
**troublefield** 2:6,18
  4:1 5:2,6,9,25 6:8
  6:11,14,17,23,25
  7:3,9 8:12,12,23
  10:12,17 11:17 15:7
  17:13 18:14 19:5,12
  24:5 25:9 28:11,14

34:23 35:2,10 36:22
40:19,22 41:7,14
42:22 43:7 46:5,10
46:13,14 47:3,16
51:24 52:4,13,15,19
53:8,11,21,25 54:19
54:23 55:1,2 59:19
59:20 63:24 66:20
67:20 68:4,16,23,25
69:4,10 70:3,5,16
70:20 71:1,8,11
72:24 73:8,11,24
74:24 75:1,18 76:3
77:12 78:4 80:15,20
82:4,7,18 86:22
87:10,17,22 88:2,5
88:8,11,13,21,24
89:6,15,20,25 93:24
94:18,23 95:3 97:7
98:5,16,22 102:13
103:19 104:4
105:13 106:14
110:17 112:21
113:15,19 114:18
114:24 115:6,8,17
115:24 116:19
117:1,4,21 118:7
119:14 120:21,24
121:11,24 122:9
123:18 124:19
125:6 126:9 131:6
131:11,15 132:2,13
134:2 135:13,16
136:10 138:16
139:1,4,14 140:2,7
140:18 141:6,15,18
141:25 142:4,9,13
143:7 145:9,17
146:15 147:5,11,18
148:9,25 155:22
156:22 157:4 158:7
158:11 161:25
163:5,19 164:7,24
165:3,8,11,19 166:2
166:9,15 167:3,13

169:16 170:2,13,18
171:11 174:21
175:15 177:7 178:6
178:23 179:16
181:18 182:9 183:2
183:5,13,18 184:2
**true**  49:18 66:18
101:9 106:5 124:12
125:15 127:25
138:22 153:7
162:11 174:15
182:17 184:1 186:9
**truth**  32:21 33:18
105:2,5 123:16
**truthful**  33:17
**try**  115:19 123:21
132:22,22 150:1
161:17
**trying**  97:25 99:19
132:15 137:18
175:18
**tssi**  18:21,22,25 19:6
**turn**  7:14 20:13
53:20 54:11 55:3
90:22 94:1
**two**  13:17 23:11
26:19 30:23 44:14
48:19,19 61:18 72:6
75:23 99:13,20,23
101:11,22 121:7
131:2 137:25
139:18 151:13,14
172:24
**type**  21:9 26:6 42:5
44:19 47:23 51:4
99:22 101:17
128:24
**types**  21:8 22:13,14
50:5 109:15
**typically**  14:18
19:22 101:5 159:15

| **u** |

**u**  17:12 43:9

**u.s.**  8:3
**uh**  77:10
**unable**  5:13 78:1
131:16 159:16
160:5,12,15,25
161:22 176:17
**unaware**  158:3
**undergone**  84:17
**underlying**  132:20
132:21
**understand**  14:17
25:13,16 26:8,12,12
27:8,9 47:21 48:5
48:13,14 49:4 51:8
51:8,10,18,22 52:7
85:25 101:19 107:2
107:17,21 108:1,4,7
108:12 109:22
112:25 113:11
114:8,13 115:18
121:20 126:23
127:3,21 133:22,23
136:17 137:18
143:11,19 144:5
159:12 161:2,3
165:12 175:18
**understanding**  5:10
5:12,18 6:3,15,18
11:19 13:12 27:15
27:18 28:1,16 31:17
31:18,23 32:9,10,11
33:6 36:25 49:9
50:12 58:24 83:11
114:1 115:3 117:16
117:23 118:10,19
120:11 127:5
147:23,25 149:4
**understandings**
148:16
**understood**  5:19
56:24 127:18 144:8
168:1
**unexpected**  158:6
**unified**  157:15

**unique**  45:8 78:15
**unit**  32:21 68:3
145:24
**united**  1:1 15:20
30:14
**university**  20:17,18
20:21 21:16 26:20
26:21,25 103:16
122:12,15,17,23
123:14
**unnecessarily**
126:11
**unreliable**  92:13
**unsure**  6:1
**updated**  61:3 145:6
145:8
**updates**  57:8
**upper**  87:18 88:3
94:18 95:5
**upset**  61:1
**use**  1:18 14:9,13
15:20 16:6 17:25
32:14 37:2,3 39:6
39:17 40:2,9,12
49:18 63:3,10
104:23 106:9,18
109:13,14 112:6,7,7
112:9,11,14,19
113:2,5,5,7,8
116:14,17 119:11
119:16 125:19
126:4,16 130:19,20
131:3,3 159:15
**user**  48:17 49:1
89:10 91:10 109:19
**users**  89:11,17
**uses**  11:21 119:4
**utilize**  62:10
**utilized**  26:3 170:11
171:1,9
**utilizing**  20:7 64:14

| **v** |

**validate**  27:23 31:22
39:12 56:15 58:18

62:14 80:3 87:8
161:20,23
**validated** 42:3 81:19
81:20 134:9 135:8
147:2 148:18,19
162:25 163:2,12,16
172:20 177:24
179:10
**validating** 27:20
86:11 178:14
**validation** 97:6
133:1,2,3,16,20,25
134:12,14,19 146:3
172:23 173:1
179:13
**validity** 14:12 29:24
33:4,5,7 50:20 57:1
84:11 92:13 95:23
96:16 171:18 172:8
177:23 179:5
**value** 14:22 58:4,4,5
58:12,14,15 86:4
171:19
**valued** 19:23
**values** 111:2
**various** 10:8,14,14
12:7,8 13:17 15:2
15:10 16:4,6,16
17:1,1,25,25 18:7
20:9 23:22 31:11,11
39:19 40:6 45:5
57:5 59:14 62:2,13
63:5,11 65:17 70:9
72:7,10 83:16 84:17
117:25 143:11,15
143:25 144:8 152:8
156:11 157:23
159:21,23 160:9
161:10 167:24
174:3 178:16
**vast** 144:14
**vehemently** 7:7
**vehicles** 21:21
**verification** 57:7

**verify** 58:12,18 96:7
176:14 182:22
**veritext** 7:20
**version** 57:5,7,8
66:8 78:10 142:2
144:22,23 145:5,6
149:14 152:20
153:13 154:24
155:7,9,9,10 159:11
160:16 179:11
181:13
**versioning** 157:25
159:25 160:2,19
161:2,4,5
**versions** 57:12
64:21 65:17 67:8,10
69:22 85:10 141:5,8
141:19,21 143:5,9
143:12,15,25 144:1
144:3,4,5,9,18
145:8 151:18 152:6
152:8,14,16,18,20
154:23 155:13,19
155:25 156:1,12,14
157:14,20,23
159:10,24 160:3,10
160:18 161:1,10,10
161:18 178:17
**versus** 23:17 83:20
100:25
**videographer** 2:14
7:11,20 8:15 41:9
41:12 67:23 68:1
98:20,25 99:3 143:2
145:19,22 146:16
180:15 183:8,11
184:5
**videotaped** 1:10
125:7
**view** 35:23 96:3
97:11,23 119:25
**vitas** 3:4
**vs** 1:5 8:2 39:4,15
42:24 43:5 46:24
47:4 50:7 133:8

**w**

**wait** 87:20
**waldhalm** 2:12
36:11 50:11 53:19
53:21,23 54:16
67:14 71:3 72:5
77:4 98:2 104:17,21
127:1,4,4 134:23
138:3,9,11,13,19
140:5,8,25 143:19
143:23,24 148:8
149:16,21 150:5,19
151:4 155:6 158:20
169:22 170:20,21
171:13 179:7
**waldhalm's** 55:8
97:22 104:19 127:6
127:24
**want** 20:13 28:22
35:8 36:4,13 44:8
53:23 70:1 88:20
93:7 114:17 115:9
116:25 117:4
122:24 137:14,15
139:19 150:1
165:12 178:25,25
**wanted** 6:20 26:2
42:2 76:8 120:22
121:3
**wants** 35:7
**warfare** 45:15
**washington** 1:15
7:24 9:9 31:9
**waste** 121:5
**way** 14:14 28:23
51:11 57:16 58:14
89:4,16 92:19 102:5
110:1 115:9,12,23
117:2 127:15
147:16,17 162:8
177:13 179:1
**ways** 36:23 37:1,2,7
37:8,22 38:7,7,18
38:19,22 39:3,6,10

40:12 59:5 109:1,7
**we've** 6:4 15:14
32:25 43:21 59:14
61:7,7 85:7
**weight** 114:15
**went** 13:16 18:7
20:16 23:7,12 24:14
27:3
**westlaw** 33:3 86:7
**weston** 44:12,18
45:13,21,22,23 46:3
123:4
**whispering** 7:13
**willing** 106:10
**wire** 79:14 173:19
173:20 175:11
**wish** 106:13 122:4
**withdraw** 147:20
**withdrew** 98:4
**withstand** 42:13
**witness** 8:6,17,19,21
10:13 11:16 15:2,6
16:10 17:10,12
18:12 19:3,11 23:21
25:7 35:5 42:6,8
47:2 51:7 52:3
63:16,20 67:22
70:22 72:18 73:5,7
73:8 75:16 77:10
80:13 82:12 86:21
87:2 88:22,23 89:4
89:14,14 93:13,16
93:21 94:22,25
96:23 97:21 98:4,19
102:13 103:21
104:6 105:15,20
106:17 112:24
115:1,11 116:1
117:6,22 120:22,25
122:1 124:21
126:13 131:7,16
132:4 135:18
138:19 139:5,7,16
140:23 141:8,19
142:15 143:9

146:18 147:6,13
148:10 149:1
150:23 155:23
156:24 157:5 158:8
158:11,13 162:1
163:20 164:8,25
165:4 166:3,16
167:4,15 169:18
170:6,20 171:12
172:3 174:22 177:4
177:9 178:7 179:17
180:2 181:19
182:10
**witnesses**  112:18
**won**  48:24
**word**  28:12 81:10
81:12 91:10 154:15
154:20
**words**  106:3,9,11,12
106:18,25 141:1
176:17
**work**  4:14 12:19
13:2,6,7,9 15:3,8
19:8,20 20:11 26:5
37:21 38:4 39:4
44:19,24 48:8,9
59:2 68:11 74:13,14
74:15,17 108:5
130:3 131:22
**worked**  41:15,19
46:2,4
**working**  12:5 19:14
22:18 44:10 45:13
115:15
**works**  75:11
**world**  30:13,16
31:19,20 103:5
**write**  50:15
**writing**  44:24 45:1
50:12 67:16 110:13
**written**  66:16 69:6,8
79:10 104:10 110:6
**wrong**  134:10
143:22 180:11,14
181:4

**wrote**  78:16 107:5
125:13 137:23
156:20

**x**

**x**  1:3,9 36:23 37:1,2
37:7,8,22 38:7,7,18
38:19,22 39:3,6,10
40:12 59:5 109:1,6
109:7 128:24
**xtec**  1:3 8:1,11 39:4
39:15 50:7 52:22
57:17 78:19,20
79:15 88:2 94:9
97:2 117:12,19
118:13,20 133:8
134:21,24 135:11
135:19 136:17,20
137:11,17,20 138:4
138:5,15,25 139:9
139:22,24 140:1,1
140:17 145:7 146:8
146:23 147:15
148:1 149:18
151:18 154:7,24
163:10,17 174:13
174:17,19 180:19
180:24,25 181:4,12
181:14 182:1,18,21
182:21
**xtec's**  74:3 135:14
143:5 146:21
147:23 164:5,22
165:17,24 166:24
167:1,19 169:10,11
170:11,25 171:1,9

**y**

**y**  9:7
**yeah**  54:23 69:4
74:2 129:22 172:3
**year**  7:21 13:16
20:17 26:18 30:18
61:22,22 86:14
123:5,6,8,10 124:10
129:9 152:6

**year's**  30:17
**years**  13:17 18:15
20:20 21:24,25
22:20 23:12 26:17
28:17 30:23 34:2
45:21 60:12 86:9
95:2 129:11,13
157:12
**york**  31:10,10

**z**

**zero**  77:20
**zeros**  127:7

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of



the deposition wholly or partly, on motion under

rule 1.330(d)(4).




DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,

2014. PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.